COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

STERLING TRADING GROUP, INC., Universal FX, Inc., QIX, Inc., STG Global Trading, Inc., Graystone Browne Financial, Inc., Joseph Arsenault, and Andrew Stern, Defendants.

Case No. 04–21346–CIV.

United States District Court, S.D. Florida.

March 20, 2009.

Christine M. Ryall, Eugene Smith, Ghassan Hitti, Peter M. Haas, Commodity Futures Trading Commission, Office of General Counsel, Washington, DC, for Plaintiff.

Christopher John King, Robert Lawrence Bonner, Homer Bonner, P.A., Miami, FL, Jeffrey S. Rosen, Cozen O'Connor, Washington, DC, David J. Stagman, Michael J. Tiffany, Ted S. Helwig, Katten Muchin Rosenman LLP, Chicago, IL, for Defendants.

### ORDER ADOPTING REPORTS OF MAGISTRATE JUDGE (dkt # 270, 271, 273); DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (dkt # 3); GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (dkt # 159); GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (dkt # 202)

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court on the Magistrate Judge's Report and Recommendation on Plaintiff Commodity Futures Trading Commission's ("CFTC") Motion for Preliminary Injunction (dkt # 270) filed on July 23, 2007; Report and Recommendation on Defendants' Motion to Dismiss (dkt # 271) filed on July 24, 2007; and Report and Recommendation on the CFTC's Motion for Summary Judgment (dkt # 273) filed on July 30, 2007. The CFTC filed its Objections to the Magistrate Judge's Reports (dkt # 279) on August 22, 2007 and the Defendants filed their Response to the CFTC's Objections (dkt # 284) on September 25, 2007. The Defendants filed their Objections to the Magistrate Judge's Reports (dkt # 278) on August 22, 2007, the CFTC filed its Response to the Defendants' Objections (dkt # 283) on September 24, 2007, and Defendants filed a Reply (dkt # 285) on October 4, 2007.

UPON CONSIDERATION of Magistrate Judge Simonton's Reports and Recommendations, after a de novo review of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

# I. BACKGROUND

## A. *Factual Background*

In the interests of brevity, the Court adopts by reference the factual background laid out by the Magistrate Judge in her Report on the CFTC's Motion for Preliminary Injunction (dkt # 270 at 1270–90) except as objected to by the Parties as noted herein.

## B. *Procedural Background*

On June 7, 2004, the CFTC filed a four-count Complaint alleging violations of the Commodities Exchange Act ("CEA"), as amended by the Commodities Futures Modernization Act of 2000 ("CFMA"), against Defendants Sterling Trading Group, Inc. ("Sterling"), Universal FX, Inc. ("UFX"), STG Global Trading, Inc. ("STG"), QIX, Inc. ("QIX"), Graystone Browne Financial, Inc. ("Graystone"), Joseph Arsenault and Andrew Stern (collectively, "Defendants"). (dkt # 1.) On the same day, the CFTC filed a Motion for Preliminary Injunction seeking injunctive relief stemming from Defendants alleged violations of the CEA. (dkt # 3.) The Motion for Preliminary Injunction was referred to Magistrate Judge Simonton. (dkt # 14.) The Motion for Preliminary Injunction was fully briefed, an evidentiary hearing was held, and the Magistrate Judge wrote a Report recommending that the Motion be denied. (dkt # 270.)

On April 15, 2005 the CFTC filed a five-count Amended Complaint against Defendants.[1] (dkt # 151.) The Amended

---

1. The Amended Complaint alleges in Count One that Defendants Sterling, UFX, Arsenault, and Stern committed fraud and deceit in the offer and sale of foreign exchange futures contracts, in violation of 7 U.S.C. § 6b(a)(i) and (iii) and 17 C.F.R. § 1.1(b)(1) and (3). (*Id.* at ¶¶ 114–21.) The Amended Complaint alleges that Defendant Arsenault directly or indirectly controlled Sterling, and is therefore liable as a controlling person pursuant to 7 U.S.C. § 13c(b). (*Id.* at ¶¶ 66–69, 117.) The Complaint further alleges that Defendant Sterling is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, since the acts or omissions complained of were committed by Arsenault and other Sterling representatives within the scope of their employment with Sterling. (*Id.* at ¶ 118.) The liability of Defendant Stern is predicated upon the allegation that he is a controlling person with respect to UFX, pursuant to 7 U.S.C. § 13c(b). (*Id.* at ¶¶ 61–65, 119.) The Amended Complaint alleges that UFX is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, for (1) the acts and omissions of its employees; and (2) the acts of Sterling as its agent. (*Id.* at ¶¶ 70–77, 120–21.)

In Count Two, the Amended Complaint alleges that Defendants Graystone, STG, Arsenault and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1, 3) and 32.9(a, c). (*Id.* at ¶¶ 122–27.) Similar to Count One, the Amended Complaint alleges control person liability with respect to Defendant Arsenault for the activities of Defendants Graystone and STG. (*Id.* at ¶¶ 99–101, 125.) The Amended Complaint further alleges that Defendants Graystone and STG are liable as principals, since the acts or omissions complained of were committed by Graystone and STG representatives within the scope of their respective employments. (*Id.* at ¶ 126.) Finally, the Amended Complaint alleges that QIX is liable as a principal for the acts of Graystone and STG as its agent. (*Id.* at ¶¶ 102–08, 127.) Defendant Stern is not charged with liability in Count Two.

In Count Three, the Amended Complaint alleges that Defendants Sterling, UFX, Arsenault and Stern violated 7 U.S.C. § 6(a) through the offer and sale of commodity futures contracts which were not conducted on a board of trade designated as a contract market. (*Id.* at ¶¶ 128–33.) Like Count One, the Amended Complaint alleges principal/agent liability with respect to Defendants Sterling and UFX; and control person liability with respect to Defendants Arsenault and Stern.

In Count Four, the Amended Complaint alleges that Defendants UFX, QIX and Stern violated 7 U.S.C. § 6h by falsely representing that UFX and QIX were members of a registered entity and/or that UFX and QIX were registrants under the CEA. (*Id.* at ¶¶ 134–36.)

Complaint concerns allegedly fraudulent foreign currency ("forex") transactions involving Defendants. The Amended Complaint divides the allegedly fraudulent and illegal activity into two "phases," based on the time period of the forex transactions and the Defendants involved. The CFTC alleges that during Phase I of the operations, which occurred between July of 2002 and August of 2003, Sterling, controlled by Arsenault, used misleading radio advertisements; high-pressure, misleading telemarketing sales tactics; false and misleading account-opening documents; and other deceptive practices to fraudulently solicit retail customers to engage in foreign currency futures transactions with UFX, which was controlled by Stern. The Amended Complaint also alleges that these transactions were illegal since UFX was not a proper counterparty to the transactions. (Amended Complaint ¶¶ 20–77.)

The Amended Complaint also alleges that during Phase II of the operations, which occurred between August of 2003 and June 7, 2004, Graystone and STG, under the control of Arsenault, solicited retail customers to enter into foreign currency options transactions with QIX, which was controlled by Stern. The Amended Complaint alleges that Graystone and STG used false and misleading sales solicitation materials, high-pressure and deceptive sales tactics, and failed to provide access to account information regarding these transactions. The Amended Complaint also alleges that these transactions were illegal since QIX was not a proper counter-

party to the transactions (Amended Complaint ¶¶ 77–108).

Defendants filed a joint Motion to Dismiss the Amended Complaint on May 13, 2005. (dkt # 159.) The Motion to Dismiss was referred to Magistrate Judge Simonton. (dkt # 257.) The Motion to Dismiss was fully briefed, and the Magistrate Judge wrote a Report recommending that the Motion be granted as to Counts I, III, and part of Count IV of the Amended Complaint, and otherwise denied. (dkt # 271.) The CFTC filed a Motion for Summary Judgment on January 3, 2006. (dkt # 202.) The Motion for Summary Judgment was referred to Magistrate Judge Simon. (dkt # 257.) The Motion for Summary Judgment was fully briefed, and the Magistrate Judge wrote a Report recommending that summary judgment be granted as to liability on Count V of the Amended Complaint, and otherwise denied. (dkt # 273.) Prior to writing her Reports, the Magistrate Judge held five days of evidentiary hearings.

## C. The Magistrate Judge's Reports and the Parties' Objections

### 1. Report on the CFTC's Motion for Preliminary Injunction

In her Report on the CFTC's Motion for Preliminary Injunction, the Magistrate Judge began by discussing the CFTC's jurisdiction under the CEA. The Magistrate Judge found that UFX and QIX are not statutorily exempt as counterparties under the CEA. Accordingly, UFX and QIX are subject to the CFTC's jurisdiction

The Amended Complaint alleges control person liability with respect to Defendant Stern. (*Id.* at ¶¶ 98, 136.) Defendants Sterling, Graystone and STG are not charged with liability in Count Four.

In Count Five, the Amended Complaint alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer

and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade. (*Id.* at ¶¶ 137–41.) The Amended Complaint alleges that Defendant Arsenault is liable for these violations as a control person with respect to Graystone and STG; and that Defendant Stern is liable as a control person of QIX.

with respect to all provisions of the CEA. The Magistrate Judge also found that the CFTC has the authority to enforce all regulations existing at the time of the CFMA's enactment, including regulations prohibiting off-exchange transactions and those governing principal/agent and control person liability.

The Magistrate Judge also found that the Seventh Circuit's opinion in *CFTC v. Zelener*, 373 F.3d 861 (7th Cir.2004), provides the proper standard for determining whether the Phase I transactions were futures contracts (over which the CFTC has jurisdiction) or spot transactions (over which the CFTC does not have jurisdiction). The Magistrate Judge found that under *Zelener*, the key consideration in identifying a futures contract is its fungibility. The Magistrate Judge also noted that the *Zelener* Court had expressly rejected the CFTC's argument that its interpretation of the term "futures contract" deserves deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Applying the *Zelener* standard to the Phase I transactions, the Magistrate Judge determined that the Phase I transactions were spot transactions not subject to the CFTC's jurisdiction. Accordingly, the Magistrate Judge held that Counts I and II of the Complaint, as well as that part of Count III which relates to UFX, cannot support injunctive relief.

Next, the Magistrate Judge rejected the CFTC's argument that QIX falsely represented that it was a registrant under the Act, and falsely represented, in connection with the handling of orders for foreign currency options, that the options would be executed by or through a member of a registered entity. The Magistrate Judge found that to the extent that QIX made initial misrepresentations, the misrepresentations were promptly corrected. In addition, QIX has ceased doing business, and there is no likelihood that it will resume business. Therefore, to the extent that the CFTC has not abandoned its argument by failing to present it in its post-hearing brief, the Magistrate Judge found injunctive relief is not necessary with respect to this alleged violation.

Finally, the Magistrate Judge found that, although 17 C.F.R. § 32.11, the regulation that prohibits off-exchange transactions, applies to QIX's transactions, the totality of the circumstances [2] demonstrated that preliminary injunctive relief was not warranted.

### 2. Report on Defendants' Motion to Dismiss

In her Report on Defendants' Motion to Dismiss, the Magistrate Judge began by rejecting the CFTC's argument that the Defendants' jurisdictional challenge directly implicates the merits of their claim, and therefore the Court should apply the summary judgment standard in evaluating its jurisdiction. Next, the Magistrate Judge repeated her finding from the Report on the CFTC's Motion for Preliminary Injunction regarding use of the *Zelener* standard for determining whether the Phase I transactions were futures contracts or spot transactions. As the Magistrate Judge determined that the transactions in Phase I do not fall within the jurisdiction of the CFTC, she recommended that Counts I

---

**2.** The Magistrate Judge found the following circumstances persuasive: the frequency with which Defendant Stern consulted with the National Futures Association ("NFA"), the self-regulatory organization for the U.S. futures industry, and corrected concerns which were brought to his attention; the unsuccessful attempts of the NFA to obtain clarification from the CFTC regarding the "affiliate" exemption from coverage; and the voluntary cessation of business by QIX, Graystone and STG when this lawsuit was filed.

and III of the Complaint, as well as that part of Count IV which relates to UFX, be dismissed. This would result in the dismissal of Defendants Sterling and UFX from this case, but Defendants Arsenault and Stern would remain subject to other counts alleged in the Complaint.

Next, consistent with her finding in the Report on CFTC's Motion for Preliminary Injunction, the Magistrate Judge found that UFX and QIX are not exempt counterparties under 7 U.S.C. § 2(c)(2)(B)(ii) and, as such, Defendants are subject to the provisions of the entire CEA with respect to Phase II transactions. The Magistrate Judge also repeated her finding that the CFTC has the authority to enforce all regulations existing at the time of the CFMA's enactment, including regulations prohibiting off-exchange transactions and those governing principal/agent and control person liability. Since QIX is not an entity exempted in any respect from the jurisdictional reach of the CFTC, and since all existing statutes and regulations apply to the activities of Defendants with respect to the transactions at issue in Phase II, the Magistrate Judge recommended that the Motion to Dismiss Counts Two, Four and Five be denied.

The Magistrate Judge also rejected Defendants' argument that restitution is not an available avenue of relief in this case. The Magistrate concluded that the language, legislative history, and purpose of the CEA as well as the equitable powers of federal courts militate in favor of allowing the CFTC to seek restitution.

Finally, the Magistrate Judge recommended that Defendants' motion to dismiss or for a more definite statement with respect to the control person and principal/agent claims be denied. The Magistrate Judge found that the Amended Complaint contained sufficiently coherent and detailed factual allegations, concise statements of facts, and specific allegations against each Defendant.

### 3. Report on the CFTC's Motion for Summary Judgment

In her Report on CFTC's Motion for Summary Judgment, the Magistrate Judge began her legal findings by repeating her recommendation that QIX was not an exempt counterparty under 7 U.S.C. § 2(c)(2)(B)(ii). The Magistrate Judge also repeated her finding that the CFTC has the authority to enforce all regulations existing at the time of the CFMA's enactment, including regulations prohibiting off-exchange transactions and those governing principal/agent and control person liability.

The Magistrate Judge went on to recommend that summary judgment should be denied as to Count Two. Count Two alleges that Defendants Graystone, STG, Arsenault, and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options. Reviewing Eleventh Circuit cases on the CFTC's burden of establishing fraud as a matter of law, the Magistrate Judge concluded that the record was insufficient to conclude that the scripts and radio advertisements of Defendants were materially misleading as a matter of law.

Next, the Magistrate Judge recommended that summary judgment be granted as to liability on Count Five. Count Five alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade. The Magistrate Judge found that it was undisputed that STG, Graystone and QIX were soliciting, accepting funds for and offering to enter into foreign currency option transactions that were not traded on either a contract market or foreign board of trade. The

Magistrate Judge further concluded that Defendants Arsenault and Stern were liable under the CEA's controlling person statute, 7 U.S.C. § 13(b), as they had the power and the ability to control the activities of their respective companies with respect to the decision to engage in off-exchange trading of foreign currency options.

Finally, the Magistrate Judge recommended that summary judgment be denied as to Count Four with respect to QIX and Stern. Count Four alleges that Defendants QIX and Stern violated 7 U.S.C. § 6h by falsely representing that QIX was a member of a registered entity and/or that QIX was a registrant under the Act. The Magistrate Judge found that there was considerable dispute regarding the inferences to be drawn from the representations in question.

### 4. Objections

Defendants present the following objections to the Magistrate Judge's Reports. First, Defendants argue that the Magistrate Judge erred in finding CFTC jurisdiction over QIX, Stern, and Arsenault. Defendants argue that QIX is exempt from the CFTC's forex jurisdiction as QIX falls within the "affiliated person" exemption of the CFMA. Defendants further argue that even if QIX were subject to the CFTC's forex jurisdiction, the CFTC's jurisdiction does not extend to principal/agent and controlling person claims. Because QIX's only liability in Count II is premised on a principal/agent claim and Stern and Arsenault's liability is limited to controlling person claims in Counts IV and V, Defendants argue that these claims should be dismissed. Second, Defendants argue that the Magistrate Judge erred in finding a per se violation of 17 C.F.R. § 32.11(a) by QIX on the basis of QIX's supposed failure to qualify for the affiliated person exemption. Defendants argue that the CFMA

does not grant the CFTC the authority to use regulations existing prior to the enactment of the CFMA—including § 32.11(a)—as part of its limited forex jurisdiction. Third, Defendants argue that the Magistrate Judge erred in granting summary judgment to the CFTC on its controlling person claims against Stern and Arsenault in Count V because the CFTC was required to show a "lack of good faith" to prove controlling person liability, and the Magistrate Judge acknowledged ample record evidence of Defendants' good faith. Finally, Defendants argue that the Magistrate Judge erred in finding that the CFTC has jurisdiction to recover restitution under 7 U.S.C. § 13a–1. Defendants argue that § 13a–1 does not mention restitution among the specific remedies it provides and the existence of the CEA's comprehensive enforcement scheme precludes the CFTC's authority to seek restitution under § 13a–1.

The CFTC presents a number of its own objections to the Magistrate Judge's Reports. First, the CFTC argues that the Magistrate Judge failed to accord proper *Chevron* deference to the CFTC's interpretation of the meaning of the term "futures contract" in the CEA. Second, the CFTC argues that the Magistrate Judge improperly relied on the Seventh Circuit's decision in *Zelener* in holding that the Phase I transactions were not futures contracts subject to the CFTC's jurisdiction. Third, the CFTC argues that, under either its preferred multi-factor approach or the *Zelener* approach, the Phase I transactions were futures contracts covered by the CEA. Specifically, the CFTC argues that the transactions at issue were fungible and standardized, were not "spot sales for delivery within 48 hours," and provided for customer offset, contrary to the findings of the Magistrate Judge. Fourth, the CFTC urges the Court to adopt its multi-factor approach to defining a futures contract

because it provides for more legal certainty regarding the CFTC's jurisdiction. Fifth, and finally, the CFTC argues that the Magistrate Judge erred in concluding that the jurisdictional question presented in Defendants' Motion to Dismiss is distinct from the Defendants' alleged fraud.

## II. ANALYSIS

### A. *Regulatory Background*

Initially, the only commodities regulated by Congress were certain grain futures transactions under the Grain Futures Act. In 1936, Congress renamed the Grain Futures Act the CEA, and expanded its coverage to include additional agricultural commodities. Until 1974, forex transactions were not covered by the CEA. In 1974, the CEA was greatly expanded to cover, *inter alia,* trading in foreign currency. In addition, Congress created the CFTC, and granted it the power to investigate complaints, hold administrative hearings, order reparations, and seek injunctive relief. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 357–58, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *CFTC v. Next Fin. Serv. Unltd.,* Case No. 04–80562: (dkt # 85 at 11) (S.D. Fla. June 7, 2005). Based upon a concern expressed by the Treasury Department, however, coverage of foreign currency transactions was limited by a provision now known as "the Treasury Amendment." This amendment exempted from CFTC jurisdiction "transactions in foreign currency . . . unless such transactions involve the sale thereof for future delivery conducted on a board of trade." *Next Fin. Serv.,* at 8–9.

The CFTC took the position that the exemption should be narrowly construed and that it was not applicable to options contracts. In *Dunn v. CFTC,* 519 U.S. 465, 469, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997), the United States Supreme Court squarely rejected this position, holding that the phrase "transactions in foreign currency" included transactions in options to buy or sell foreign currency. The Court, however, did not address the meaning of the phrase "conducted on a board of trade," and the lower courts were split on the issue of whether this meant that only interbank transactions were exempt, or whether all off-exchange transactions were exempt. *CFTC v. G7 Advisory Serv., LLC,* 406 F.Supp.2d 1289, 1294 (S.D.Fla. 2005) (Dimitrouleas, J.). The confusion was caused in part by the definition of "board of trade" as "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity." *Id.*

In 2000, Congress enacted the CFMA with the stated purpose of "clarifying the jurisdiction of the [CFTC] over certain retail foreign exchange transactions." Judge Dimitrouleas explained the nature of this "clarified" jurisdiction in *G7 Advisory Serv.*:

> The CFMA, as codified in Title 7, United States Code, § 2(c)(2)(B) grants the CFTC jurisdiction over all off-exchange foreign currency transactions involving noneligible contract participants unless the counterparties to the transactions are an entity enumerated in 7 U.S.C. § 2(c)(2)(B)(ii). The CFMA's listing of specified unregulated entities eliminated the need for judicial interpretation of the term "Board of Trade," which the CFMA redefined as "any organized exchange or other trading facility." 7 U.S.C. § 1a(2).

406 F.Supp.2d at 1295

### B. *Defendants' Objections*

1. Defendants object to the Magistrate Judge's finding that QIX does not qualify for the "affiliated person" exemption.

The CFMA grants the CFTC a limited grant of jurisdiction over foreign currency transactions: "[T]he Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that . . . is a contract of sale of a commodity for future delivery (or an option on such a contract) . . . and is offered to, or entered into with, a person that is not an eligible contract participant. . . ." 7 U.S.C. § 2(c)(2)(B).

There are several exemptions carved out of this limited grant of jurisdiction. The exemption relevant to this action concerns affiliated persons of registered futures commission merchants (FCMs). Under the terms of this exemption, the CFTC lacks jurisdiction over a transaction if "the counterparty, or the person offering to be the counterparty, of the person [offered to or entered into with] is . . . an affiliated person of a futures commission merchant registered under this Act, concerning the financial or securities activities of which the registered person makes and keeps records under . . . section 6f(c)(2)(B) of this Act." 7 U.S.C. § 2(c)(2)(B)(ii)(III).

Section 6f(c)(2)(B) provides:

The records required under subparagraph (A) shall describe, in the aggregate, each of the futures and other financial activities conducted by, and the customary sources of capital and funding of, those of its affiliated persons whose business activities are reasonably likely to have a material impact on the financial or operational condition of the futures commission merchant, including its adjusted net capital, its liquidity, or its ability to conduct or finance its operations.

7 U.S.C. § 6f(c)(2)(B). "Subparagraph (A)" (§ 6f(c)(2)(A)) provides in turn:

Each registered futures commission merchant shall obtain such information and make and keep such records as the Commission, by rule or regulation, prescribes concerning the registered futures commission merchant's policies, procedures, or systems for monitoring and controlling financial and operational risks to it resulting from the activities of any of its affiliated persons, other than a natural person.

7 U.S.C. § 6f(c)(2)(A).

The Defendants argue that the analysis of the exemption ends with the language of § 6f(c)(2)(B). That is, the making and keeping of records by a FCM on "the futures and other financial activities conducted by, and the customary sources of capital and funding of" the affiliated person perfects the exemption under § 2(c)(2)(B)(ii)(III). As QIX Futures kept these financial records on QIX's operations, under Defendants' reading of the exemption, QIX is exempt from CFTC jurisdiction.

The Magistrate Judge interpreted the exemption differently. Under her reading of the exemption, affiliated persons are only exempt if the FCM is required to keep records pursuant to § 6f(c)(2)(B). The Magistrate Judge reasoned that when Congress referenced § 6f(c)(2)(B), it did so for a reason, choosing the specific subpart of the CEA's statutory provision on Risk Assessment for Holding Company Systems that expressly referred to "records required" to be maintained pursuant to the CFTC's regulations. Per the CFTC's regulations, only FCMs possessing sufficient assets are required to keep records. *See* 17 C.F.R. § 1.15(c)(1) ("any futures commission merchant which holds funds or property of or for futures customers of less than $6,250,000 and has less than $5,000,000 in adjusted net capital as of the futures commission merchant's fiscal year-end" is not required to keep records). Because it is undisputed that QIX Futures does not meet the minimum capital requirements, it is not required to keep rec-

ords pursuant to 17 C.F.R. § 1.15(c)(1). Accordingly, under the Magistrate Judge's interpretation, QIX Future's affiliated person, QIX, is not subject to the exemption under § 2(c)(2)(B)(ii)(III). The Magistrate Judge found this interpretation of the exemption to be more in keeping with the spirit of the CFMA: " 'Any registered FCM could skirt CFTC regulation merely by electing to keep records, thereby confounding the CFMA's purpose of making clear which off-exchange foreign currency transactions are subject to CFTC regulation.' " (dkt # 271 at 1295 (*quoting CFTC v. G7 Advisory Serv., LLC*, 406 F.Supp.2d 1289, 1297 (S.D.Fla.2005)).)

The Court agrees with the Magistrate Judge's interpretation of the exemption under § 2(c)(2)(B)(ii)(III), and finds that QIX is not an "affiliated person" as set forth in that provision. The Court finds that Congress gave the CFTC the authority to limit the extent of the "affiliated person" exemption by explicitly tying it to a record-keeping requirement determined by the CFTC's own regulations. Additionally, Defendants' interpretation would allow registered FCMs to avoid CFTC regulation at their discretion, "thereby confounding the CFMA's purpose of making clear which off-exchange foreign currency transactions are subject to CFTC regulation." *G7 Advisory Serv.*, 406 F.Supp.2d at 1297; *accord CFTC v. First Int'l Group, Inc.*, 06–20979–CIV–JORDAN (S.D.Fla. Jan. 5, 2007) (dkt # 34 at 6); *CFTC v. Next Fin. Serv. Unltd.*, 04–80562–CIV–RYSKAMP (S.D. Fla. June 7, 2005) (dkt # 85 at 15–16).

2. Defendants object to the Magistrate Judge's finding that the CFTC has jurisdiction to assert principal/agent claims against QIX and control person claims against Stern and Arsenault and therefore object to the Magistrate's recommendation that Defendants' Motion to Dismiss as to Counts Two, parts of Count Four, and Count Five should be denied.

Section 2(c)(2)(C) of the CFMA provides:

Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions described in subparagraph (B) shall be subject to 7 USCS §§ 6b, 6c(b), 9, 15, and 13b (to the extent that sections 7 USCS §§ 9, 15, and 13b prohibit manipulation of the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any market), 7 USCS §§ 13a–1, 13a–2, 12(a) if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

7 U.S.C. § 2(c)(2)(C). Defendants argue that the CFTC's forex jurisdiction is limited to those sections of the CEA listed in § 2(c)(2)(C). More specifically, Defendants argue that Congress intentionally omitted the provisions the CFTC relies on to assert its principal/agent and control person claims—7 U.S.C. §§ 2(a)(1)(B) and 13c(b)—from the list of provisions of the CEA expressly incorporated by § 2(c)(2)(C). Under Defendants' argument, because the CFMA did not expressly incorporate these sections, the CFTC lacks jurisdiction to pursue principal/agent and control person claims.

The Magistrate Judge rejected Defendants' arguments because "[i]t is manifestly clear that by enacting the CFMA, Congress intended the CFTC to assert the entirety of its jurisdiction, and all of its existing regulations, over foreign currency transactions, with respect to all entities except for those specifically excluded under 7 U.S.C. § 2(c)(2)(B)(ii)." (dkt # 271 at 1258.)

This Court concurs with the Magistrate Judge. As an initial matter, the CFTC is not seeking to impose liability pursuant to § 2(c)(2)(C). Section 2(c)(2)(C) is invoked only if QIX qualifies as a proper counterparty, which it does not. Accordingly, the foreign currency options transactions entered into by QIX are subject to all provisions of the CEA. *Accord CFTC v. Valko,* 06–60001–CIV–DIMITROULEAS (S.D.Fla. Mar. 12, 2007), (dkt # 129 at 8–9). Further, Defendants' interpretation would render provisions of the CEA redundant or meaningless in contradiction of basic principles of statutory interpretation. As expressed by Judge Dimitrouleas:

> if § 2(c)(2)(C) is interpreted as restricting CFTC jurisdiction over off-exchange foreign currency transactions to only those provisions listed in § 2(c)(2)(C), that section would render superfluous § 2(c)(2)(B) which grants the CFTC jurisdiction to enforce the entire CEA in off-exchange foreign currency transactions unless the counterparty fits one of the enumerated exemptions. Thus, if Defendants' reading of the statute—as restricting CFTC jurisdiction to the specific sections listed in § 2(c)(2)(C)—were correct, it would leave § 2(c)(2)(B) meaningless. If, however, § 2(c)(2)(C) is interpreted as reserving CFTC jurisdiction over retail foreign currency transactions between a non-eligible contract participant and an FCM or affiliate of an FCM, both sections can be given their full effect.

*CFTC v. Valko,* at 9 (internal citations omitted). Accordingly, the Court finds that the CFTC has jurisdiction to assert principal/agent and control person claims under 7 U.S.C. §§ 2(a)(1)(B) and 13c(b). Therefore, Defendants' Motion to Dismiss as to Counts Two, Four, and Five is denied.

    3.   Defendants object to the Magistrate Judge's finding that Summary Judgment should be granted as to Count Five.

Section 6c(b) of the CEA provides that "no person shall offer to enter into or confirm the execution of, any transaction involving any commodity regulated under this Act which is of the character of, or is commonly known to the trade as, an 'option,' contrary to any rule, regulation or order of the Commission prohibiting any such transaction." 7 U.S.C. § 6c(b). CFTC Regulation 32.11(a), 17 C.F.R. § 32.11(a), states that it is unlawful for any person to solicit or accept orders for the purchase or sale of any commodity option, except for commodity option transactions conducted or executed on or subject to the rules of a contract market.

Defendants argue that at the time of the enactment of § 32.11 through its most recent amendment in 1988, the regulation never applied to forex transactions. Defendants further argue that nothing in the CFMA gives the CFTC authority to use § 32.11 as part of its new, limited forex jurisdiction. Thus, Defendants contend, there is no basis for the CFTC to enforce § 32.11 against Defendants. Defendants also argue that Congress could have explicitly made old regulations applicable to the CFMA and enforceable under the § 4c(b) as it did in § 2(h). Section 2(h) exempts certain transactions between eligible commercial entities from the CFMA, but makes this exemption "subject to … the regulations of the Commission pursuant to section 6c(b) of this title proscribing fraud in connection with commodity option transactions to the extent the agreement, contract, or transaction would otherwise be subject to such sections and regulations." 7 U.S.C. § 2(h)(4)(B). Finally, Defendants, relying on the testimony of a former National Futures Association employee, argue that § 32.11 has never applied to forex options transactions.

The Magistrate Judge found that § 32.11 applies to off-exchange foreign currency transactions because Congress took no affirmative act to deprive § 32.11 of its effect with respect to forex transactions. The Magistrate Judge reasoned that holding that the CFTC lacks the authority to enforce § 32.11 would be contrary to the CFMA's purpose of clarifying, not revoking, the CFTC's authority to regulate off-exchange foreign currency transactions. "It is manifestly clear that by enacting the CFMA, Congress intended the CFTC to assert the entirety of its jurisdiction, and all of its existing regulations, over foreign currency transactions, with respect to all entities except for those specifically excluded under 7 U.S.C. § 2(c)(2)(B)(ii)." (dkt # 270 at 1323–24.)

The Court concurs with the finding of the Magistrate Judge. The Defendants' argument that § 32.11 never applied to forex transactions prior to the enactment of the CFMA is inaccurate. Defendants overlook the Treasury Amendment's legislative history, as well as judicial interpretations thereof, which indicate that Congress intended to regulate off-exchange foreign currency transactions not involving banks or sophisticated individuals. *See CFTC v. Next Fin. Serv. Unltd.*, 04–80562–CIV–RYSKAMP (S.D. Fla. June 7, 2005) (dkt # 85 at 17).

Defendants' argument regarding §§ 2(h) and 6c(b) is also flawed as it relies on a limited interpretation of § 6c(b) as an enabling statute allowing the CFTC to promulgate new regulations and ignores the language in the provision incorporating existing regulations: "No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter ... contrary to any rule, regulation or order of the Commission prohibiting any such transaction...." 7 U.S.C. § 6c(b). Section 32.11 was in effect prior to the enactment of the CFMA, which left section § 32.11 unaltered. Whereas Congress took no affirmative act to deprive § 32.11 of effect insofar as it relates to off-exchange foreign currency transactions, § 32.11 governs Defendants' conduct. *Accord Next Fin. Servs.* at 18. Therefore, as it is undisputed that STG, Graystone, and QIX were soliciting, accepting funds for and offering to enter into foreign currency option transactions that were not traded on either a contract market or foreign board of trade, this Court finds that STG, Graystone, and QIX violated § 32.11.

■ Defendants further contest, however, that Defendants Arsenault and Stern were not controlling persons with respect to this violation. The control person liability statute of the CEA provides:

> Any person who, directly or indirectly, controls any person who has violated any provision of this Act or any of the rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

7 U.S.C. § 13c(b). A controlling person is liable under 13c(b) if he had " 'actual or constructive knowledge of the core activities that constitute the violations at issue and allowed them to continue.' " *Commodity Futures Trading Comm'n v. Commonwealth Fin. Group*, 874 F.Supp. 1345, 1357 (S.D.Fla.1994) (*quoting In re Matter of Spiegel*, [1987–1990 Transfer Binder] Comm. Fut. L. Rep (CCH) P 24, 103 at 34,767 (CFTC Jan. 12, 1988)).

Defendants argue that the Magistrate Judge improperly granted summary judgment against Stern and Arsenault as to

Count V, because a finding of good faith necessarily destroys a controlling person claim, (dkt # 278 at 20–21.) Defendants' argument rests on a misreading of § 13c(b). The statute is disjunctive and clearly states that the CFTC satisfies its burden of proof by demonstrating either that the controlling person did not act in good faith or that the controlling person knowingly induced the acts constituting the violation. Defendants cite to *Donohoe v. Consolidated Operating & Production Corp.,* 30 F.3d 907, 912 (7th Cir.1994) to support their proposition that "good faith" is a long-recognized defense to controlling person liability. (dkt # 278 at 20). However, *Donohoe* is distinguishable as it concerns the application of the good faith defense to the federal securities laws. Defendants do not cite any authority supporting the use of a good faith defense to the CEA's controlling person provision.

Further, Defendants do not contest the Magistrate Judge's findings that Stern and Arsenault knowingly induced the offer and sale of options in violation of § 4c(b) of the CEA and CFTC Regulation 32.11(a), except to make the conclusory statement that "Andy Stern's good faith, and total lack of knowledge of any purported violation (which Joe Arsenault is a beneficiary of), is a matter of record." This argument is soundly contradicted by the evidence. As stated by the Magistrate Judge:

> it is clear that both Arsenault and Stern had the power and the ability to control the activities of their respective companies with respect to the decision to engage in off-exchange trading of foreign currency options. Neither Arsenault nor Stern appear to challenge their control in this respect. Arsenault has not disputed his extensive involvement and control over the operations of STG and Graystone, challenging only the fact that he was aware of any fraud or misrepresentations, and contending that he took extensive steps to eliminate such abuses.

Stern disputes his control over the day-to-day operations, but does not appear to dispute his ultimate decision-making authority to control the type of business in which QIX engaged, or that he is the person who established QIX for the purpose of engaging in off-exchange foreign currency transactions.

(dkt # 273 at 1355–56.) Therefore, Arsenault and Stern were controlling persons, and violated § 13c(b). Accordingly, CFTC's Motion for Summary Judgment as to liability on Count V is granted.

4. Defendants object to the Magistrate Judge's finding that the CFTC has jurisdiction to seek restitution under 7 U.S.C. § 13a–1.

Title 7, United States Code, Section 13a–1 governs the scope of relief that the CFTC may seek in an action brought in federal court. Section 13a-1 authorizes the CFTC to seek injunctive relief, compliance orders, and civil penalties. Defendants contend that this relief is not available because the statute does not specifically authorize the CFTC to seek restitution. Defendants argue in support of their position by contrasting § 13a–1 with the statute governing available remedies in administrative proceedings convened by the CFTC—7 U.S.C. §§ 9 and 15—which expressly authorizes the CFTC to seek restitution. Defendants further argue that the CEA already gives customers comprehensive rights to recover their losses and specific procedures governing those rights that are not found in § 13a–1. Defendants argue that the lack of a statute of limitations for seeking remedies under § 13a–1, as well as the absence of any regulations prescribing standards of proof and procedures for collecting and distributing restitution to customers, also counsels against reading the ability to seek restitution into § 13a–1.

1260

■ In *CFTC v. E–Metal Merchants, Inc.,* the Court rejected an analogous argument, holding that restitution is an available remedy.

> [D]istrict courts are authorized to order restitution on the basis of the language, legislative history, and purpose of the [CEA] as well as pursuant to the equitable powers of federal courts ... First, the language of the [CEA] does not expressly limit the equitable powers of district courts. *See, e.g.,* 7 U.S.C. § 13a–1. The U.S. Supreme Court has taught that "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And [when] the public interest is involved in a proceeding of [an equitable] nature, those equitable powers assume an even broader and more flexible character." *Porter v. Warner Holding Co.,* 328 U.S. 395, 398 [66 S.Ct. 1086, 90 L.Ed. 1332] (1946).... Next, the [CEA] expressly authorizes the issuance of restraining orders that prohibit the dissipation or disposal of assets, funds, or other property. *See* 7 U.S.C. § 13a–1. The legislative history of the [CEA] explains that it was the intent of Congress that restraining orders would enable the CFTC to seek restitution for customers. *See* H.R. Rep. 97–565, pt. 1, at 93, *reprinted in* 1982 U.S.C.C.A.N. 3871, 3942. Specifically, the House Report explains that Section 13a–1 empowers courts to issue ex parte restraining orders and "such power is provided ... to prohibit movement or disposal of funds, assets, and other property which may be subject to lawful claims of customers." *Id.* (emphasis added). Last, the Court finds that Plaintiff is seeking restitution in equity, that is, it commenced this action in order to restore to [Defendants'] customers particular funds or property in the possession of the Defendants. *See*

*Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213–18 [122 S.Ct. 708, 151 L.Ed.2d 635] (2002). Thus, its equitable powers having been invoked, the Court finds that it may exercise the full range of those powers.... Consequently, the Court concludes that the CEA authorizes the CFTC to seek and this Court to order both disgorgement and restitution.

No. 05–21571–CIV–LENARD (dkt # 60 at 17–18) (S.D.Fla. Jan. 6, 2006)(footnotes omitted). The Court's reasoning in *E–Metal* remains sound. Accordingly, the Court finds that the CFTC has the authority to seek restitution under 7 U.S.C. § 13a-1. However, restitution must be limited to the amount of Defendants' unjust enrichment, and therefore may not be measured by customer losses. *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.,* 531 F.3d 1339, 1345 (11 th Cir.2008).

### C. *Plaintiff's Objections*

1. Plaintiff objects to the Magistrate Judge's finding that the CFTC does not have jurisdiction over the Phase I transactions and that Defendants' Motion to Dismiss as to Counts I, II, and the part of Count IV pertaining to UFX should be granted.

#### a. *Zelener* is the appropriate standard for determining whether a forex transaction is a "futures contract"

■ Under the CEA, the CFTC may exercise its jurisdiction over futures contracts, or "transactions involving contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). There are two competing methodologies for determining whether a forex transaction is a "futures contract" such that the CFTC has jurisdiction over the transaction. On the one hand is the multi-factor, or "totality of the

circumstances," approach set forth in *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 577–81 (9th Cir.1982). This is the approach advocated by the CFTC. A different approach is set forth in *CFTC v. Zelener*, 373 F.3d 861 (7th Cir.2004). Under *Zelener*, a forex transaction is a futures contract if it is a "fungible promise to buy or sell a particular commodity at a fixed date in the future." *Id.* at 864. This is the approach advocated by Defendants.

In *Co Petro*, the Ninth Circuit determined whether contracts for the future purchase of petroleum products offered by Co Petro were futures contracts subject to the CFTC's jurisdiction. The court highlighted three principal features of the contracts in finding that they were not futures contracts: (1) most of Co Petro's customers were "speculators from the general public;" (2) the commodity underlying the transactions had no inherent value to most of Co Petro's customers; and (3) Co Petro's customers "had neither the intention of taking delivery nor the capacity to do so." 680 F.2d at 578. The court in *CFTC v. Midland Rare Coin Exchange, Inc.*, 71 F.Supp.2d 1257, 1262 (S.D.Fla.1999) listed a similar set of factors as useful in distinguishing futures contracts from other contracts (in this case cash forward transactions). These factors include:

> (1) whether the seller of the contracts entered into these contracts only with producers and not with speculators from the general public; (2) whether the buyers and sellers had the ability to take or make delivery on the contracts; (3) whether the seller relied on actual delivery of the commodity to carry out its business; (4) whether the contracts were clearly tools to accomplish the actual delivery of the commodity in exchange for money; (5) whether delivery and payment routinely occurred between the parties in past dealings; and (6) whether the seller received cash payment on the contracts only upon delivery of the actual commodity.

As noted in *CFTC v. Madison Forex Int'l, LLC*, "at their core, these factors ultimately focus on whether 'the parties contemplated physical delivery' of the commodity." 2006 U.S. Dist. LEXIS 96294, *19 (S.D.Fla. July 20, 2006).

In *Zelener*, the Seventh Circuit advanced a different method for determining whether a forex transaction is a futures contract. The transactions at issue in *Zelener* are very similar to the transactions in the instant case:

> Two corporations doing business as "British Capital Group" or BCG solicited customers' orders for foreign currency.... Each customer opened an account with BCG and another with AlaronFX; the documents made it clear that AlaronFX would be the source of all currency bought or sold through BCG in this program, and that AlaronFX would act as a principal. A customer could purchase (go long) or sell (short) any currency; for simplicity we limit our illustrations to long positions. The customer specified the desired quantity, with a minimum order size of $5,000; the contract called for settlement within 48 hours. It is agreed, however, that few of BCG's customers paid in full within that time, and that none took delivery. AlaronFX could have reversed the transactions and charged (or credited) customers with the difference in price across those two days. Instead, however, AlaronFX rolled the transactions forward two days at a time-as the AlaronFX contract permits, and as BCG told the customers would occur. Successive extensions meant that a customer had an open position in foreign currency. If the dollar appreciated relative to that currency, the customer could close the position and reap the profit in one of two ways: take delivery of the currency

(AlaronFX promised to make a wire transfer on demand), or sell an equal amount of currency back to AlaronFX. If, however, the dollar fell relative to the other currency, then the client suffered a loss when the position was closed by selling currency back to AlaronFX.

373 F.3d at 863.

The district court dismissed the action for lack of CFTC subject matter jurisdiction, finding that BCG's customers were speculating in spot contracts by rolling over their positions and entering into offsetting trades. *CFTC v. Zelener*, 2003 WL 22284295 at *4–5, 2003 U.S. Dist. LEXIS 17660 at *14 (N.D.Ill. Oct. 3, 2003). The CFTC appealed, arguing that, under the multi-factor "totality of the circumstances" analysis, the transactions were futures contracts as the currency was sold for speculative purposes to individuals for whom foreign currency had no inherent value and there was no contemplation of physical delivery of the foreign currency.

The Seventh Circuit affirmed the district court's dismissal and, in the process, rejected the "totality of the circumstances" test. The Court held that the determination must be based on an analysis of the contract, rather than the intention of the parties or whether the contracts ultimately led to delivery:

> In organized futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an intermediary, the clearing corporation. Clearing houses eliminate counterparty credit risk. Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract. All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time. Forward and spot contracts, by contrast, call for sale of the commodity; no one deals "in the contract:" it is not possible to close a position by buying a traded offset, because promises are not fungible; delivery is idiosyncratic rather than centralized. *Co Petro*, the case that invented the multi-factor approach, dealt with a fungible contract, *see* 680 F.2d at 579–81, and trading did occur "in the contract." That should have been enough to resolve the case.

> It is essential to know beforehand whether a contract is a futures or a forward. The answer determines who, if anyone, may enter into such a contract, and where trading may occur. Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful. Nothing is worse than an approach that asks what the parties "intended" or that scrutinizes the percentage of contracts that led to delivery ex post. . . . But reading "contract of sale of a commodity for future delivery" with an emphasis on "contract," and "sale of any cash commodity for deferred shipment or delivery" with an emphasis on "sale" nicely separates the domains of futures from other transactions.

*Id.* at 865–66. Thus, the Seventh Circuit concluded that the language of the account opening documents [3]—nearly identical to

---

**3.** The *Zelener* Court described the account opening documents as follows:

> Paragraph 8 provides that if a customer's account contains "two or more open and opposite Contracts providing ... for the purchase and sale of the same Foreign Currency ... on the same Value Date, such

> Contracts shall automatically be canceled and replaced by an obligation to settle only the net difference." So far, so good; offset is a standard feature of trading in the contract on a futures market. But the question we posed in *Nagel* is whether the dealer has promised to sell the offsetting position, and

the language in the documents for the transactions in the *instant case*—did not provide for the automatic right to offset and thus were non-fungible spot sales not subject to the jurisdiction of the CFTC. *Id.* at 869.

The Magistrate Judge, following the reasoning and the holding of *Zelener*, concluded that the Phase I transactions at issue in this case were also non-fungible spot transactions not subject to the jurisdiction of the CFTC. This Court agrees. In its Objections, the CFTC argues that the Magistrate Judge incorrectly applied the *Zelener* approach "by both ignoring or failing to give appropriate weight to contract language, and additionally by relying extensively on the testimony from defendant Andrew Stern to support the Magistrate Court's conclusion that the UFX and Sterling transactions were not futures contracts." (dkt # 279 at 22.) The CFTC argues throughout its objections that

Stern's testimony constitutes impermissible *post hoc* evidence under *Zelener*, as it is outside the terms of the contracts and account statements. The CFTC further objects to the Reports on the grounds that the Magistrate Judge improperly suggests that, under *Zelener*, both fungibility and contractual right to offset are necessary to find that a transaction constitutes a futures contract. The CFTC also objects to the Magistrate Judge's factual findings: specifically, that the contracts were unique in amount of currency and timing, that the transactions were spot sales for delivery within 48 hours, and that the terms and conditions of the UFX's contracts did not provide the right for customer offset.[4]

This Court finds the CFTC's Objections to be without merit. There is no support for the CFTC's argument that the *Zelener* standard forbids an examination of facts outside of the contractual obligations. As

---

thus allow netting on demand. Such an obligation is harder to find in the AlaronFX contract.

Paragraph 9, on which the Commission places its principal reliance, does not contain any promise. What it says instead is that, if the client fails to give timely instructions about the disposition of the positions, then "AlaronFX is authorized, in AlaronFX's sole discretion, to deliver, roll over or offset all or any portion of the Open Position in Customer's Account at Customer's risk." This paragraph does not give the client a right to purchase an offsetting position and thus close a transaction; that option belongs to AlaronFX rather than to the customer. As for ¶ 5: subsection 5.3 says that "AlaronFX will attempt to execute all Orders that it may, in its sole discretion, accept from Customer in accordance with Customer's instructions...." That's not a promise to close any given position by offset. This subsection continues: "AlaronFX or its affiliates may, at a future date, establish a trade matching system.... In that event, AlaronFX ... shall have the right (but not the obligation) ... to act for its own account, and as a counter party or as a broker to AlaronFX customers, in the mak-

ing of markets." The Commission does not contend that such a "trade matching system" was ever established. Customers thus had no assurance that they could close their positions by offset. The only *promise* was that, if AlaronFX did not buy back the currency (and thus create an offset under ¶ 8), it would deliver. This looks more like the business of a wholesaler in commodities such as metals or rare coins than like the system of trading in fungible contracts that characterizes futures exchanges.
373 F.3d at 868.

4. The CFTC filed an attachment to its Objections consisting of nine pages of additional objections in bullet-point form. The objections contained in the attachment purport to relate to the "Magistrate Court's Findings of Fact." The majority of the objections contained in the attachment simply repeat objections the CFTC has already made. The other objections in the attachment contest various findings of fact by the Magistrate Judge as "irrelevant." This is not a valid basis for an objection and the CFTC does not cite any law in support of these objections. Accordingly, this Court need not consider the attachment in ruling on the CFTC's Objections.

the Defendants note in their Reply to the CFTC's Objections, the Seventh Circuit in *Zelener* explicitly relied on post hoc evidence beyond the face of the transaction documents in making its findings. *See Zelener*, 373 F.3d at 864 (finding that few of BCG's customers paid in full during two-day period or took delivery and that AlaronFX rolled the transactions forward two days at a time). Additionally, there is no support for the CFTC's objection that the Magistrate Judge improperly suggested that a finding of fungibility and the contractual right to offset are both required in order for a transaction to be a futures contract. The CFTC does not cite to any portion of the Reports where the Magistrate suggested that both findings were necessary for a transaction to be a futures contract. Additionally, the Magistrate found that the transactions were both non-fungible and did not include a contractual right to offset. Thus, it is unclear on what grounds the CFTC is formulating its objection.

The CFTC's factual objections as to the Phase I transactions are also unpersuasive. The Magistrate Judge found that the Phase I transactions were spot transactions outside the jurisdiction of the CFTC. In support of this finding, the Magistrate Judge relied on the following facts: (1) the account documents, like those in *Zelener*, clearly advised the customers that the transactions were spot transactions and there was no absolute right to offset; (2) like the transactions in *Zelener*, the Phase I transactions were, in form, spot sales for delivery within 48 hours; and (3) the contracts were unique in the amount of currency and in timing.

The factual findings of the Magistrate Judge are well-supported by the Record. A plain reading of the account documents indicates that the right to offset rested with UFX and not the customer. The Phase I transaction account documents state that if the client fails to give timely instructions about the disposition of the positions, then "UFX is authorized, at UFX's sole discretion, to deliver, rollover or offset all or any portion of the Currency positions in the OTCFX account(s) for Trader's Account(s) and at Trader's risk: (*See* dkt # 271 at 1311–12.) In *Zelener*, the Seventh Circuit held that nearly identical contract language did not give the customer an absolute right to offset. See 373 F.3d at 868. Additional language in the Phase I transaction documents reinforces the Magistrate Judge's finding that the customer did not have an absolute right to offset its transactions: "UFX will attempt to execute all orders, which it may, in its sole discretion, choose to accept in accordance with the oral or written, or computer instructions of Trader's. UFX reserves the right to refuse to accept any order." (*Id.*) The CFTC attempts to argue that language in the account documents referencing "round turn lots" implies a promise by UFX to offset transactions. However, the contract language recited above is clear-the right to offset rests with UFX, not the customer. This Court will not read an ambiguity into the contract language that does not exist. Similarly unavailing is the CFTC's argument regarding language in the contract referring to the customer's right to "speculate and/or purchase and/or sell cash or spot foreign currency." The CFTC claims that the only reasonable interpretation of this language is that UFX is promising the customer a right to offset. Again, in light of the clear contract language reserving the right to offset in UFX, the CFTC's attempt to read in an ambiguity is unreasonable.

The evidence also supports the Magistrate Judge's finding that the Phase I transactions were, in form, spot sales for delivery within 48 hours. Defendant Stern testified that UFX used the industry custom of 48 hours as the time between the

opening of the transaction and the settlement date. The CFTC objects to the Magistrate Judge's finding by pointing to evidence that customer positions were often left open for several weeks. However, in *Zelener*, "the contract called for settlement within 48 hours" even though "few of BCG's customers paid in full within that time, and ... none took delivery." 373 F.3d at 863. Moreover, the key consideration in determining whether the transactions were futures contracts is their fungibility. As the Seventh Circuit in *Zelener* held, "Rollover, and the magnification of gain or loss over a longer period, does not turn sales into futures contracts ..." *Id.* at 868.

Finally, this Court concurs with the Magistrate Judge's finding that the Phase I transactions were unique in the amount of currency and in timing. Although UFX's trading platform only permitted foreign currency transactions in hundred thousand dollar increments, if orders were placed by telephone, the orders could be for any amount of currency. Additionally, although Sterling traded for its customers in hundred thousand dollar increments, other introducing brokers chose different amounts. The CFTC argues that the transactions introduced by Sterling were all for $100,000. However, other brokers besides Sterling introduced trades to UFX. Accordingly, the amount of currency traded was not standardized inasmuch as the tradable amount was not fixed, not governed by any binding rule of standardization, and ultimately a matter within UFX's discretion. However, even if trading increments were standardized, this Court would still find that the trades at issue were not futures trades because of the other factors militating in favor of such a finding, primarily the absence of an obligation by UFX to accept an offsetting trade.

Regarding timing, because currency could be purchased 365 days a year and the settlement date was set for 48 hours after purchase, settlement dates varied from transaction to transaction depending on the day and hour of purchase. This differs from futures contracts where "[a]ll contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time." *Id.* at 866. Thus, both the amount of currency and the timing of the Phase I transactions were idiosyncratic—i.e., non-fungible—and therefore consistent with the nature of spot transactions.

All of these findings, individually and collectively, support the conclusion that the Phase I transactions were spot sales, not futures contracts. Accordingly, Counts I and III of the Complaint, as well as that part of Count IV which relates to UFX, are dismissed. This results in the dismissal of Defendants Sterling and UFX from this case.

b. The CFTC's interpretation of "futures contract" is not entitled to *Chevron* deference.

■ The CFTC also objects to the Magistrate Judge's Reports because the Magistrate Judge failed to accord its interpretation of the term "futures contract" proper deference as required by *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the CFTC's interpretation, a "totality of the circumstances" standard—and not the *Zelener* "fungibility" standard—is the proper method for determining whether a transaction is a futures contract.

■ "When an agency interprets a statute that the agency is responsible for administering, courts must give the agency's interpretation due deference if (1) Congress has delegated interpretive authority to the agency, (2) the statute is silent or ambiguous with respect to the

issue at hand, and (3) the agency's interpretation of the statute is reasonable." *Sierra Club, Inc. v. Leavitt,* 488 F.3d 904, 911–12 (11th Cir.2007) (*citing Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). Further, "*Chevron* deference is confined to those instances in which the agency renders its interpretation in the course of a rulemaking proceeding or adjudication." *TVA v. Whitman,* 336 F.3d 1236, 1250 (11th Cir.2003). However, even if an agency's interpretation of its own statute is advanced in the course of litigation rather than through a rulemaking or agency adjudication, courts will still pay some deference to the agency's interpretation. *Id.*

The Magistrate Judge did not expressly hold that the CFTC's interpretation of "futures contract" was not entitled to *Chevron* deference.[5] However, in accepting the Seventh Circuit's approach to defining futures contracts in *CFTC v. Zelener,* 373 F.3d 861 (7th Cir.2004), the Magistrate Judge noted that the *Zelener* court found "that the CFTC's position was not entitled to deference under *Chevron* ... since Congress had not delegated this determination to the CFTC." (dkt # 270 at 1300.)

This Court finds that, consistent with the Magistrate Judge's Reports, the CFTC's interpretation is not entitled to *Chevron* deference. The Court agrees with the Seventh Circuit that Congress has not delegated the CFTC the authority to define "futures contract." *See Zelener,* 373 F.3d at 867; *see also CFTC v. Erskine,* 512 F.3d 309, 314 (6th Cir.2008). Additionally, this Court agrees with the Sixth Circuit in *Erskine* that, because the CFTC has never defined "futures contract" in a

rule-making or adjudication, its interpretation lacks the "administrative formality" entitled to *Chevron* deference. *Id.*

In *Zelener,* Judge Easterbrook found that Congress had not delegated authority to the CFTC to define a "futures contract":

> [T]he central point is that deference depends on delegation. *See United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). When Congress has told an agency to resolve a problem, then courts must accept the answer. When, however, the problem is to be resolved by the courts in litigation—which is how this comes before us—the agency does not receive deference. *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 649–50, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). Courts must heed the agency's reasoning and give it the benefit of the doubt. But the CFTC has avoided rather than addressed the central issue: is trading "in the contract" a defining characteristic? The agency has assumed a negative answer without explanation. In *Nagel [v. ADM Investor Services, Inc.,* 217 F.3d 436 (7th Cir. 2000) ], *Chicago Mercantile Exchange [v. SEC,* 883 F.2d 537 (7th Cir.1989) ], and other decisions, this circuit addressed the subject without extending *Chevron* deference to the Commission; we adhere to that position today.

373 F.3d at 867. This Court agrees with Judge Easterbrook that Congress has not delegated authority to the CFTC to interpret the term "futures contract." The Supreme Court has instructed that delegation requires "specific interpretive authority," which may be express or implied, "to implement a particular provision or fill

---

**5.** The dearth of *Chevron* analysis in the Reports is likely attributable to the failure of the CFTC to raise the argument until its Objections except for a brief footnote in its Motion

for Preliminary Injunction and a Notice of Filing of Supplemental Authority (dkt # 235) filed two years after its first principal brief.

a particular gap." *Mead*, 533 U.S. at 229, 121 S.Ct. 2164. The CFTC points to no "particular provision" under the Modernization Act or any other delegated authority to define "futures contracts" with respect to forex.

Moreover, even if the CFTC has such authority, this Court also finds that the CFTC's interpretation is not entitled to *Chevron* deference. The CFTC has not exercised such authority in the course of a rulemaking proceeding or adjudication in a manner that supports *Chevron* deference as to the use of a multi-factor "totality of the circumstances" test under the circumstances at issue. *Accord Erskine*, 512 F.3d at 314 (the CFTC "has merely asserted its preferred definition during the course of litigation (and in a proposal to Congress for new legislation). This approach does not result in a definition entitled to *Chevron* deference."). The CFTC argues that for twenty-five years, it has exercised its APA rule-making authority to develop its interpretation of futures contracts. The Court disagrees. The "hybrid" and "swap" rules the CFTC purports to rely on predate the CFMA by over a decade and have nothing to do with forex or the CFMA, and establish no formal methodology for defining futures. The ALJ appeals cited by the CFTC are also not entitled to *Chevron* deference. As stated by Defendants in their Reply to the CFTC's Objections, "[t]hese appeals, dating from the 1970's and 1980's, precede by decades the Modernization Act and the *Zelener* Court's analysis. Far from articulating the formal adoption of an approach to determining futures contracts in the context at issue, these ALJ opinions are fact-specific reviews relating, like *Mead*, to 'transactions of the moment.' " (dkt # 284 at 13.) Therefore, this Court finds that the CFTC has not defined "futures contract" in a rule-making or adjudication context sufficiently specific to entitle the CFTC to *Chevron* deference as to the multi-factor "totality of the circumstances" test that the CFTC advocates under the present circumstances.

2. Plaintiff objects to the Magistrate Judge's finding that Defendants' challenge to the CFTC's jurisdiction over the Phase I transactions does not directly implicate the merits of their claim.

In her Report on Defendants' Motion to Dismiss, the Magistrate Judge rejected the CFTC's argument that the jurisdictional challenge directly implicates the merits of their claim, and therefore this Court must apply the summary judgment standard in evaluating its jurisdiction. (dkt # 271 at 1310.) The CFTC argues that the jurisdictional issue in this case and the issue of whether the Defendants engaged in fraud are inextricably intertwined; i.e., "both the Commission's jurisdiction, and the merits of the claims in the Amended Complaint, necessarily involve the question of the proper definitional standard to determine whether the Universal FX transactions are futures contracts." (dkt # 279 at 1.)

This Court agrees with the finding of the Magistrate Judge. As noted by the Magistrate Judge, whether the CFTC has jurisdiction over the Phase I transactions is not at all affected by whether Defendants committed the fraudulent practices alleged in the Amended Complaint. A number of courts in this district have made the same finding. *See CFTC v. Madison Forex Int'l.*, 2006 U.S. Dist. LEXIS 96294, *6 n. 1 (S.D.Fla. July 19, 2006); *CFTC v. Next Fin. Serv., Unltd.*, 04–80562–CIV–RYSKAMP, (dkt # 85 at 9–10) (S.D. Fla. June 7, 2005).

## III. CONCLUSION

Accordingly, it is hereby

ORDERED AND ADJUDGED that Plaintiff's Motion for Preliminary Injunction (dkt # 3) is DENIED. It is further

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss (dkt # 159) is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED with respect to Counts 1, III, and the portion of Count IV involving UFX, and DENIED in all other respects. It is further

ORDERED AND ADJUDGED that Plaintiff's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED as to Count V, and DENIED as to Count II and the portion of Count IV involving QIX and Stern. It is further

ORDERED AND ADJUDGED that the Report and Recommendation on Plaintiff's Motion for Preliminary Injunction (dkt # 270), the Report and Recommendation on Defendants' Motion to Dismiss (dkt # 271), and the Report and Recommendation on Plaintiff's Motion for Summary Judgment (dkt # 273) are ADOPTED consistent with the terms of this Order.

## REPORT AND RECOMMENDATION

ANDREA M. SIMONTON, United States Magistrate Judge.

Presently pending before the Court is Plaintiff's Motion for a Preliminary Injunction (DE # 3). This motion is referred to the undersigned Magistrate Judge to take all necessary and proper action as required by law (DE # 14). The motion is fully briefed, and an evidentiary hearing was held. For the reasons stated below, it is

respectfully recommended that the Motion be denied.

Transcripts of the evidentiary hearing have been filed as follows: September 30, 2004 (DE # 107); October 1, 2004 (DE # 101); November 17, 2004 (DE # 109); November 18, 2004 (DE # 111); December 16, 2004 (DE # 128).

The following documents have been filed by the parties in connection with this motion:

DE # 4: CFTC's Memorandum in Support of its Motion for Preliminary Injunction [1]

DE # 30: CFTC's List of Witnesses, Affidavits, and Exhibits

DE # 48: Response of Defendants Universal, QIX, and Andrew Stern

DE # 49: Defendants' Joint List of Witnesses, Affidavits and Exhibits [2]

DE # 50: Response of Defendants Sterling Trading Group, Inc., STG Global Trading, Inc., Graystone Browne Financial, Inc. and Joseph Arsenault

DE # 59: CFTC's Notice of Filing Supplemental Declaration of Kyong J. Koh

DE # 60: CFTC's Reply to Defendants' Opposition

DE # 61: CFTC's Rebuttal List of Affidavits and Exhibits [3]

DE # 62: CFTC's Notice of Filing Attachments and Exhibits to Plaintiff's Rebuttal List

DE # 65: Defendants' (Stern, Universal FX and QIX) Notice of Filing Supplemental Exhibits

---

1. The Declaration of Robert Chilton, (DE # 4, Ex. 9, and DE # 30) was withdrawn since he was not available for cross-examination at the hearing (DE # 111 at 31–32).

2. The Declarations of Rose Judy, Andre Stepsky, Thomas Keesee, and Michael Mesa were withdrawn since those witnesses were not available for cross-examination; although the

exhibits to these Declarations were admitted in connection with other testimony at the hearing (DE # 128 at 103).

3. Attachment E to DE # 61 was not admitted since it was not properly authenticated, and its contents appear inconsistent with that portion of the Declaration which refers to this exhibit (DE # 111 at 53).

DE # 72: Joint Statement of Stipulated Facts

DE # 74: CFTC's Proposed Findings of Fact and Conclusions of Law

DE # 76: Defendants' (Sterling Trading, STG Global, Graystone Browne, Arsenault) Proposed Findings of Fact and Conclusions of Law

DE # 77: Defendants' (Stern, Universal and QIX) Proposed Findings of Fact and Conclusions of Law

DE # 78: Defendant Stern's Supplemental Memorandum in Opposition to Motion for Preliminary Injunction

DE # 95: CFTC's Notice of Filing Exhibit A to Declaration of Robert Firebaugh

DE # 97: CFTC's Notice of Filing Transcript of Broker Solicitation Tape (included as Exhibit 8 to DE # 30)

DE # 112: Defendants' Notice of Filing List of Exhibits

DE # 132: CFTC's Notice of Filing transcripts of Sterling radio advertisements previously filed in electronic form in DE # 4, Ex. 2, Attachment Z

DE # 134: CFTC Post–Hearing Brief

DE # 136: CFTC's Proposed Findings of Fact and Conclusions of Law

DE # 137: CFTC's Reply to Defendant Stern's Supplemental Memorandum in Opposition to Motion for Preliminary Injunction

DE # 139: Defendants' Notice of Filing Additional Authority (*CFTC v. Next Financial Services, et al.*, 04–80562–CIV–KLR, 2005 WL 3724788 (S.D.Fla. Jan. 27, 2005)).

DE # 144: Defendants' Joint Post–Hearing Brief

DE # 145: Defendants' (Stern, Universal, and QIX) Post Hearing Proposed Findings of Fact and Conclusions of Law

DE # 146: Defendants' (Sterling Trading Group, STG Global Trading, Graystone Browne, and Arsenault) Post–Hearing Proposed Findings of Fact and Conclusions of Law

DE # 147: Defendants' (Sterling Trading Group, STG Global Trading, Graystone Browne, and Arsenault) Notice of Filing Compliance Transcripts

DE # 149: Defendants' (Stern, Universal and QIX) Notice of Filing Declaration of Ronald B. Hobson

DE # 155: CFTC's Reply to Defendants' Joint Post–Hearing Brief and Proposed Findings and Conclusions of Law, and Notice of Errata (DE # 156)

DE # 168: Defendants' Notice of Filing Supplemental Authority in Further Opposition to Plaintiff's Motion for Preliminary Injunction (re: legislative proposals)

DE # 171: CFTC's Notice of Filing Supplemental Authority and of Order Vacating Authority Cited by Defendants (re: *CFTC v. Next Financial Services Unltd.*, Case No. 04–80562 (S.D. Fla. June 7, 2005))

DE # 173: CFTC's Motion to Strike Notice of Filing Supplemental Authority re: legislative proposals (deemed a response to the supplemental authority)

DE # 175: Defendants' Response to Motion to Strike

DE # 176: CFTC's Notice of Filing Supplemental Authority re: asset freeze *CFTC v. United Investors Group*, Case. No. 05–80002–CIV–Hurley, 2005 WL 3747596 (S.D.Fla. June 9, 2005)

DE # 177: CFTC's Reply in Support of Motion to Strike

DE # 179: CFTC's Notice of Filing Supplemental Authority (*CFTC v. National Investment Consultants*, Case No. C05–02641–JSW, 2005 WL 2072105 (N.D.Cal. Aug. 26, 2005))

DE # 198: CFTC's Notice of Filing Supplemental Authority Relating to Plaintiff's Motion for Preliminary In-

junction *CFTC v. G7 Advisory Services, LLC,* 406 F.Supp.2d 1289 (S.D.Fla.2005)

DE # 200: Defendants' Notice of Filing Supplemental Authority in Further Support (*CFTC v. American Derivatives Corp.,* Case. No. 05–2492–STORY, 2005 WL 3149535 (N.D.Ga. Nov. 23, 2005))

DE # 223: Defendants' Notice of Filing Supplemental Authority (article entitled, "The Retail FX Conundrum" by Philip McBride Johnson)

DE # 234: CFTC's Motion to Strike Supplemental Authority contained in DE # 223 (which is deemed a response to the supplemental authority)

DE # 235: Notice of Filing Supplemental Authority re: restitution issue (*CFTC v. Next Financial Services,* Case. No. 04–80562–CIV–Ryskamp (S.D.Fla. Mar. 17, 2006))

DE # 241: Defendants' Response in Opposition to Motion to Strike

DE # 243: CFTC's Reply to Response in Opposition to Motion to Strike

DE # 244: Defendants' Notice of Filing Additional Supplemental Authority *CFTC v. Erskine,* Case No. 04–CV–0016, 2006 WL 1050677 (N.D.Ohio Apr. 19, 2006)

DE # 250: Defendants' Notice of Filing Additional Supplemental Authority *CFTC v. Madison Forex, Int'l,* Case No. 05–61672–CIV–Altonaga (S.D.Fla. July 19, 2006).

DE # 263: Plaintiff's Notice of Filing of Supplemental Authority *CFTC v. First Int'l Group, Inc.,* Case No. 06–20979–CIV–JORDAN (S.D.Fla. Jan. 5, 2007).

## I. BACKGROUND

The Commodity Futures Trading Commission ("CFTC") initially filed a four-count Complaint alleging violations of the Commodities Exchange Act ("the Act"), as amended by the Commodities Futures Modernization Act of 2000 ("the Modernization Act"), against Defendants Sterling Trading Group, Inc. ("Sterling"), Universal FX, Inc. ("UFX"), STG Global Trading, Inc. ("STG"), QIX, Inc., Graystone Browne Financial, Inc. ("Graystone"), Joseph Arsenault and Andrew Stern. In the pending motions, the CFTC seeks a preliminary injunction which (1) prohibits future violations of the Commodity Exchange Act, as amended by the Commodity Futures Modernization Act of 2000; (2) continues the temporary restraining order which prohibited the destruction or alteration of books, records and documents of the Defendants;[4] and (3) which freezes the assets of the Defendants, requires an accounting of such assets, requires repatriation to the United States of foreign-held assets, and requires Defendants to sign consents to the release of financial records and to waive the protections of foreign bank secrecy laws.

More specifically, the Complaint alleges in Count One that Defendants Sterling, Universal, Arsenault, and Stern committed fraud and deceit in the offer and sale of foreign exchange futures contracts, in violation of 7 U.S.C. § 6b(a)(i) and (iii) (Section 4b(a)(2)(i) and (iii) of the Act) and 17 C.F.R. § 1.1(b)(1) and (3).

4. Plaintiff did not seek an asset freeze in connection with the temporary restraining order, and there has been no objection to the continuing duration of the prohibition on the destruction of books, records and documents, or to the retention by the CFTC of the records seized in connection with these proceedings. All of the defendant business entities ceased doing business prior to the commencement of hearings on the preliminary injunction. As stated by counsel for defendants at the outset of the proceedings, they were willing to enter into an agreed order regarding preliminary injunctive relief, other than with respect to the requested asset freeze (DE # 107 at 52–55). Since the CFTC did not agree to this proposal, it was withdrawn.

In Count Two, the Complaint alleges that Defendants Sterling, Universal, Arsenault and Stern violated 7 U.S.C. § 6(a) (Section 4(a) of the Act) through the offer and sale of commodity futures contracts which were not conducted on a board of trade designated as a contract market.

In Count Three, the Complaint alleges that Defendants Universal, QIX and Stern violated 7 U.S.C. § 6h (Section 4h of the Act) by falsely representing that Universal and QIX were a member of a registered entity or that Universal and QIX were registrants under the Act.

In Count Four, the Complaint alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) (Section 4c(b) of the Act) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade.

The Complaint concerns transactions that occurred during two different phases of operations involving overlapping defendants. The CFTC alleges that during Phase I of the operations, which occurred between July 2002 and August 2003, Sterling, acting under the control of Arsenault as an agent and introducing entity for Universal, used misleading radio advertisements and high-pressured, misleading telemarketing sales tactics to fraudulently solicit retail customers to engage in illegal foreign currency futures transactions with Universal, which was controlled by Stern (Complaint ¶¶ 20–76).

The Complaint alleges that during Phase II of the operations, which occurred between August 2003 and June 7, 2004, Graystone and STG, under the control of Arsenault, solicited retail customers to enter into foreign currency options transactions with QIX, which was controlled by Stern. The Complaint alleges that these transactions were illegal since QIX was not a proper counterparty to the transactions (Complaint ¶¶ 77–91).[5]

Defendants argue that the transactions which occurred during Phase I were "spot transactions" rather than futures contracts, and thus the CFTC does not have jurisdiction over those transactions. The parties agree that if the transactions at issue were spot transactions the CFTC does not have jurisdiction. Based upon this argument, Defendants contend that the CFTC lacks jurisdiction over Counts One, Two and that part of Count Three alleging transactions during Phase I. Defendants also contend that, even assuming the transactions could be characterized as futures contracts, the CFTC has failed to establish fraud.

Relying on 7 U.S.C. § 2(c)(2)(B)(ii)(III), the Defendants contend that Defendants Universal and QIX are affiliated persons of a Futures Commission Merchant ("FCM"); that Congress exempted such affiliated persons from the CFTC's jurisdiction; and, thus, the CFTC does not have jurisdiction over any of the claims asserted.

---

**5.** In an Amended Complaint (DE # 151), the CFTC added a fraud claim with respect to the Phase II transactions (between August 2003 and June 7, 2004) in which STG and Graystone acted as agents of and introducing entities for QIX. Specifically the CFTC alleges that Defendants Graystone, STG, Arsenault and QIX engaged in fraudulent and deceptive conduct to induce retail customers to engage in illegal foreign currency option transactions

with QIX. This claim is contained in Count Two of the Amended Complaint, and the original Counts Two, Three and Four have been renumbered, respectively as Counts Three, Four and Five. Although the Amended Complaint is not the basis for the request for preliminary injunctive relief, the undersigned notes that the same jurisdictional arguments apply to both the original Complaint and the Amended Complaint.

In the alternative, Defendants contend that the CFTC's jurisdiction over foreign currency transactions was limited to specified subsections which do not include the claims alleged in Counts Two, Three, and Four; the control person claims alleged in all four counts, or the principal/agent claims alleged in Counts One and Two. More specifically, Defendants Stern and Arsenault assert that they cannot be held liable for the actions of the corporate defendants as controlling persons since the Modernization Act did not make either Section 2(a)(1)(B) or Section 13(b) of the Commodity Exchange Act applicable to off-exchange retail foreign currency transactions, and because they acted in good faith and did not knowingly induce violations by any of the corporate defendants.

With respect to Count Three, Defendants contend that Section 4h of the Act, 7 U.S.C. § 6h, was omitted from the list of sections over which Congress conferred jurisdiction with respect to foreign exchange transactions, and therefore, there is no jurisdiction to enforce this provision; and, even if jurisdiction existed, the CFTC has failed to establish that either Universal or QIX falsely represented its registration status. Defendants also contend that there was no fraud or misrepresentation in the account opening documents. Similarly, Defendants contend that the CFTC does not have jurisdiction over the claim alleged in Count Four since the underlying predicate regulation, § 32.11(a), was not incorporated by the CFMA, and therefore does not apply to foreign currency transactions.

## II. FINDINGS OF FACT

### A. The Parties and Other Relevant Entities

The CFTC filed this action in June 2004 (DE # 72, ¶ 63).[6] The CFTC is an independent federal regulatory agency that is charged with the responsibility for administering and enforcing the provisions of the Commodity Exchange Act (DE # 72, ¶ 64).

Defendant Universal FX, Inc. ("Universal" or "UFX")[7] was incorporated in the State of Florida by Defendant Andrew Stern ("Stern") on or about February 22, 2002 (DE # 72, ¶ 2). At the time of Universal's incorporation, Stern was Universal's President, Director and sole shareholder (DE # 72, ¶ 3). Universal was a trading firm that engaged in transactions in foreign currency (DE # 72, ¶ 4), and was formed with the intention of conducting retail foreign currency business (DE # 111, Stern Test. at 61). Universal used the facilities, personnel, and machinery of Universal Financial Holding Corporation ("UFHC"), and was initially capitalized by UFHC (DE # 111, Stern Test. at 141). Thereafter, in approximately May 2002, Universal funded its own Futures Commission Merchant ("FCM"), which was UTS World (DE # 111, Stern Test. at 142).

Prior to September 2002, Universal, while acting as the counterparty for retail transactions in foreign currency, redirected its customers' orders to FXCM[8] for

---

**6.** Docket Entry # 72 is the parties' Joint Statement of Stipulated Facts.

**7.** In the parties' memoranda and this Report and Recommendation, Universal FX, Inc. is referred to as "Universal." However, in various underlying documents regarding the accounts at issue in the case at bar, Universal FX is referred to as "UFX."

**8.** At all relevant times, FXCM was a company which engaged in foreign currency transactions. The parties have not provided the full name of this entity. However, it appears that FXCM is Forex Capital Markets, LLC, which, according to the opinion of the Court in *CFTC v. Gibraltar Monetary Corp.*, 2006 WL 1789018, No. 04–80132–CIV–WPD (S.D.Fla. 2006), was the world's largest non-bank FCM dealing exclusively in retail foreign exchange.

execution (DE # 72, ¶ 11). In September 2002, Universal opened its own trading desk (DE # 72, ¶ 12). From approximately August 2002 until approximately December 2003, Universal acted as a counterparty to retail off-exchange transactions in foreign currency (DE # 72, ¶¶ 9, 14). In its role as counterparty, Universal executed customer trades, accepted customer money, and took the opposite side of customer trades (DE # 72, ¶ 10). All of Universal's clients came from introducing brokers; except on rare occasions, the individual investors did not directly contact the trading desk (DE # 4, Ex. 2, Att. F) (Michael's Test. at 52–53, 60–61).[9] To minimize its risk, Universal engaged in offset or hedge trading with several European financial institutions, including Dresdner Bank, Swiss Finance and IFX Markets Ltd. (DE # 109 Koh Test. at 69, 106–08; DE # 4, Ex. 2, Att. F (Michael's Test.) at 35–38, 70–77).[10] The accounts at these institutions were initially in the name of Universal Financial Holding Corp. although the money belonged to Universal FX (DE # 4, Ex. 2, Att. F (Michael's Test. at 36–38)).

Universal wholly owns UTS World, Inc., which is also a Florida corporation organized by Stern (DE # 72, ¶ 6). On May 13, 2003, UTS World first became registered as a futures commission merchant ("FCM") (DE # 72, ¶ 7). Stern incorporated UTS World with the intention that it would act as an FCM to Universal such that Universal would be considered an "affiliated person" within the meaning of the Commodities Exchange Act and CFTC regulations (DE # 49, Stern Decl., Ex. A at ¶ 7). At all relevant times, UTS World was financially dependent on Universal (DE # 49, Stern Decl., Ex. A at ¶ 8). UTS World has never held any customer-segregated funds reportable to the National Futures Association on a Form 1–FR (DE # 72, ¶ 8).

Universal Financial Holding Corporation, Inc. ("UFHC") is a Florida corporation organized by Stern in 1994 to conduct business as a registered FCM (DE # 30, Stern Invest. Test., Ex. 1 at 13; DE 65 (NFA Detail Report and 1996 Annual Report)). UFHC deals with commodity futures and options that are traded on recognized exchanges (DE # 111, Stern Test. at 57). During the period for which Universal operated, Universal Financial Holding Corporation never held customer segregated funds of $6,250,000 or more, and had less than $5,000,000 in adjusted net capital at the end of each fiscal year during this period.

Although Universal remains in active status as a Florida corporation, it is not currently doing business (DE # 72, ¶ 5).

Defendant Sterling Trading Group, Inc. ("Sterling") was among several other introducing entities that introduced customers to Universal (DE # 72, ¶¶ 27, 28). Sterling was incorporated as a Florida corporation by Joseph Arsenault on or about May 9, 2002 (DE # 72, ¶ 15). Sterling has

---

**9.** The first Declaration of Investigator Koh sets forth an analysis of the activity of eleven introducing brokers during selected periods of time (DE # 4, Ex. 2 at ¶¶ 9 and 10). During the two-week period from May 1, 2003 through May 14, 2003, Sterling was responsible for $575,101.91, which is approximately 51% of the customer funds deposited at Universal, with the remainder divided among eight additional introducing brokers (*Id.* at ¶ 9). During the month of January 2003, Sterling was responsible for $717,430.00, which is approximately 67% of the customer funds deposited at Universal (*Id.* at ¶ 10).

**10.** The CFTC takes the position that the activities of Universal with respect to what it did with the customers' money after receiving it are irrelevant to the analysis of whether the transactions between the customer and Universal were spot transactions or futures transactions (DE # 107 at 15–16).

never been registered with the CFTC in any capacity (DE # 72, ¶ 16). At the time of Sterling's incorporation, Arsenault was Sterling's chief executive officer and sole shareholder (DE # 72, ¶ 17). At all times since Sterling's incorporation, Arsenault has owned either all shares of Sterling, or a controlling interest of the shares of Sterling (DE # 72, ¶ 19). Arsenault had the authority to hire, and in fact hired, employees at Sterling (DE # 72, ¶¶ 20, 21). Arsenault had authority to fire employees at Sterling (DE # 72, ¶ 22). Arsenault had signatory authority over Sterling's operating bank account, and signed most, if not all, of the checks on behalf of Sterling (DE # 72, ¶¶ 23, 24).

Sterling was active as a business from approximately August 2002 through July 2003, and solicited customers to engage in transactions in foreign currency with Universal as the counterparty (DE # 72, ¶ 25). Sterling solicited certain customers by sponsoring radio ads (DE # 72, ¶ 26). All or almost all of Sterling's Universal accounts were discretionary, meaning that the customer authorized Sterling to trade in the customer's account by executing a limited power of attorney (DE # 72, ¶¶ 13, 32). Arsenault personally placed most of the trades on behalf of the Sterling customers (DE # 72, ¶ 33). Sterling customers who opened an account with Universal did so by completing account opening documents provided by Universal, and transmitting funds to Universal (DE # 72, ¶¶ 29, 30). All customer funds were made payable to Universal. Universal would not accept money from Sterling or any other introducing entity, and would not accept checks made out to any introducing entity (DE # 72, ¶ 31). Universal was a party to some settlement agreements entered into with Sterling customers (DE # 72, ¶ 34).

A review of the account statements submitted as exhibits to the first Declaration of CFTC Investigator Koh reflects transactions in Euros (EUR), Swiss Francs (CHF), Japanese Yen (JPY) and British Pounds Sterling (GBP) (DE # 4, Ex. 2 attachments N through Y). Customer files obtained by the CFTC indicated that Sterling had approximately 298 retail customer accounts at Universal, and that those customers invested approximately $5.6 million from January 2003 through July 2003. During that same time period, Sterling customers had trading losses (including commissions and other fees) of over $4.9 million, and customers received back approximately $734,000 (DE # 4, Ex. 2, Koh Decl. at ¶ 6).

Defendant QIX, Inc. ("QIX") is a Florida corporation that was organized on October 17, 2002 (DE # 72, ¶ 36). At all material times, Defendant Andrew Stern has been President, Director, and sole shareholder of QIX (DE # 72, ¶ 38, DE # 111, Stern Test. at 118). QIX engaged in off-exchange foreign currency options transactions (DE # 72, ¶ 37). QIX has acted as a counterparty for retail foreign currency options transactions from at least August 2003 (DE # 72, ¶ 39). The account opening documents used by QIX were put together by Daniel Perini, but ultimately approved by Stern (DE # 111, Stern Test. at 118).

QIX wholly owns QIX Futures, Inc., an Illinois corporation which has been a registered futures commission merchant ("FCM") since November 20, 2003 (DE # 72, ¶¶ 40, 43). From the time QIX Futures first became registered as an FCM, its approved principals have been Scott Pettersen and QIX, Inc. (DE # 72, ¶ 42). Stern incorporated QIX Futures with the intention that it would act as an FCM to QIX, and that QIX would be an "affiliated person" of QIX Futures within the meaning of the Commodities Exchange Act and the CFTC regulations (DE # 49, Stern Decl., Ex. A at ¶ 17). QIX Futures was

financially dependent on QIX at all relevant times (DE # 49, Stern Decl., Ex. A at ¶ 18). Prior to June 2004, QIX Futures did not conduct any business on recognized commodities exchanges (DE # 111, Stern Test. at 59). QIX Futures has never held any customer-segregated funds reportable to the NFA on a form 1–FR (DE # 72, ¶ 44).

QIX terminated its relationship with its introducing brokers and customers and closed its business when this action was filed, and transferred all of its assets to QIX Futures (DE # 49, Stern Decl. at ¶¶ 21, 52).

Defendant STG Global Trading, Inc. ("STG") was incorporated in California on July 14, 2003 by Defendant Joseph Arsenault, who is the principal and controlling person of STG (DE # 72, ¶ 45). STG introduced customers to QIX (DE # 72, ¶ 47). From at least August 2003 to June 2004, STG solicited retail customers to engage in foreign currency options transactions with QIX as the counterparty (DE # 72, ¶ 46). STG has never been registered with the CFTC in any capacity, but was in the process of applying for registration when this case was filed (DE # 72, ¶ 48). STG ceased doing business when this action was filed (DE # 49, Arsenault Dec. at ¶ 10).

Defendant Graystone Browne Financial, Inc. ("Graystone") was incorporated in Florida by Defendant Arsenault on November 5, 2003 (DE # 72, ¶ 49). Graystone was formerly known as Global Forex Trading, Inc. ("Global" or "GFT").[11] In November 2003, Global changed its name to Graystone Browne Financial when it received a threatening letter from an attorney who represented a company with a similar name (DE # 72, ¶ 50). Graystone's principal place of business at all relevant

times was 18305 Biscayne Boulevard, Suite 303, Miami, Florida (DE # 72, ¶ 51).

From at least November 5, 2003, to June 2004, Graystone solicited retail customers to engage in foreign currency options transactions with QIX as the counterparty (DE # 72, ¶ 52). Graystone has never been registered with the CFTC in any capacity (DE # 72, ¶ 53). Graystone ceased doing business when this action was filed (DE # 49, Arsenault Dec. at ¶ 10).

Graystone and STG both solicited customers by sponsoring radio ads (DE # 72, ¶ 59). QIX provided the account opening documents to Graystone and QIX, which, in turn, provided the documents to the customers (DE # 72, ¶ 60). The account opening documents specified how customers should transfer funds to QIX (DE # 72, ¶ 61). Customers who opened an account at QIX did so by completing the QIX account opening documents and transmitting the funds to QIX (DE # 72, ¶ 58). QIX did not accept any checks or other forms of payment that were not made out to QIX (DE # 72, ¶ 62).

Defendant Joseph S. Arsenault ("Arsenault") organized Sterling, Graystone, and STG (DE # 72, ¶ 15, 17, 19, 49). He was responsible for their overall management and the hiring and firing of employees (DE # 72, ¶¶ 20–24, 54–57). Arsenault was registered with the CFTC as an Associated Person or Principal of five South Florida Commission registrants at various times from 1984 through 1996 (DE # 49 Arsenault Decl. at ¶ 4; DE # 4, Ex. 2, Koh Decl. at ¶ 46). Four of these firms which were the subject of Commission enforcement actions for fraud. (DE # 4, Ex. 2, Koh Decl. at ¶ 46). However, aside from the present case, Joseph Arsenault has never been a defendant or respondent in

---

11. Global had been incorporated in Florida on July 24, 2003.

any other actions brought by the CFTC or the NFA (DE # 72, ¶ 18). He was previously licensed as a securities broker by the Securities and Exchange Commission and the National Association of Securities Dealers (DE # 49, Arsenault Decl. at ¶ 4).

At all relevant times, Defendant Andrew N. Stern resided in North Miami Beach, Florida (DE # 30, Ex. 1, Stern Invest. Test. at 11). He is president and a director of Universal FX; president, a director and sole shareholder of QIX, Inc.; and an officer and director of UTS World, and QIX Futures (DE # 49, Stern Decl., Ex. A at ¶¶ 2, 3). He is a registered Associated Person with the NFA, and an approved NFA associated member and sole owner of UFHC. (DE # 111, Stern Test. at 57; DE # 62, Att. B, Pendleton Decl. at ¶ 4; DE # 4, Ex. 2, Koh Decl. at ¶ 46). Stern has been the respondent in three NFA regulatory and four NFA arbitration actions (DE # 4, Ex. 2, Koh Decl. at ¶ 46).

Shortly before the hearing on the preliminary injunction, Stern entered into a settlement agreement with the National Futures Association in which he agreed that he would terminate his membership with the NFA, and would not supervise any firms that were members, but he was permitted to continue his ownership interest and to have input into financial matters concerning the firms (DE # 111, Stern Test. at 182). The settlement was based upon the vicarious liability of one of his FCMs, Universal Commodity Corporation, for the actions of an introducing broker in making misleading, deceptive and high-pressured sales solicitations, in violation of NFA rules (DE # 111, Stern Test. at 182).

Prior to this lawsuit, Andrew Stern, both directly and through counsel, had numerous conversations with Sharon Pendleton, regarding the rules and regulations applicable to foreign exchange transactions(DE # 49, Stern Decl. ¶ 17; DE # 62, Att. B,

Pendleton Decl. ¶¶ 5–6). Sharon Pendleton has worked at the National Futures Association ("NFA") since 1986, and has been an Associate Director of Compliance since 2002 (DE # 62, Att. B., Pendleton Decl. at ¶ 1; DE # 101, Pendleton Test. at 15). She testified in this case as a witness on behalf of the CFTC. The NFA is a congressionally authorized self-regulatory organization of the U.S. futures industry, and Pendleton's responsibilities there include oversight of staff who conduct audits and investigations; working on enforcement actions; advising Members on compliance issues; developing and monitoring Compliance Department goals; and serving as a primary liaison between NFA and the CFTC in development of rules for Futures Commission Merchants and Introducing Brokers (Id.). She testified that she advised Defendant Stern and his counsel that she did not know whether the requirement of being a material affiliated person applied to the exemption from CFTC regulation (although she believed it did), and that she had been trying unsuccessfully to obtain written guidance from the CFTC for some time (DE # 101 at 26–34, 42–45). She also testified that it was the NFA's position that FCMs and affiliates of FCMs were permitted to offer off-exchange options on foreign currency contracts, and that the NFA had audited members who offered such options, and did not find them to be prohibited by Regulation 32.11 (DE # 101, Pendleton Test. at 81–97). In addition, the NFA has published an interpretive notice and a retail foreign currency transactions regulatory guide which advised its members that they were permitted to conduct transactions regarding options on foreign exchange contracts (DE # 101, Pendleton Test. at 81–83). The standard procedure for issuing such guidance involves a review by the CFTC for approval (DE # 101, Pendleton Test. at 84). The NFA rules

apply only to members, and the NFA rules relating to retail foreign currency transactions ("Forex") became effective on December 1, 2003 (DE # 62, Att. B. Pendleton Decl. ¶ 5). To date, the CFTC has not promulgated rules specifically regarding Forex.

## B. *Phase I Operations*

As stated above, Phase I Operations occurred between the summer of 2002 and July 2003; and involved Forex transactions in which Sterling acted as an introducing broker, and Universal accepted the trades and acted as a counterparty.

Prior to entering the Forex market by establishing Universal, Andrew Stern met with people from two FCMs that were already engaged in this business—FXCM and Alaron (DE # 111, Stern Test. at 134). Initially, Stern entered into an arrangement with FXCM that permitted him to use their Actforex software platform to process the transactions between Universal and its customers (DE # 111, Stern Test. at 135). In addition, FXCM provided Stern with its account opening documents to use in developing Universal's account opening documents. Universal also used parts of Alaron's documents, including their introducing broker agreement and parts of their website (DE # 111, Stern Test. at 136). It was Stern's intention to set up a business identical to what Alaron and FXCM were doing (DE # 111, Stern Test. at 136).

Sterling used customer account documents that were provided by Universal. There were three versions of account opening documents (DE # 4, Ex. 2, Koh Decl. at ¶ 11, and attachments A, B and C). The first version (Ex. A) was used during June, July, and August of 2002. The second version (Ex. B) was used from approximately September 2002 through early July 2003. The third version was used

from on or about July 7, 2003, until Sterling ceased doing business.

Stern testified that the account opening documents for Universal were derived from the account opening documents of two existing foreign exchange firms—AlaronFX and FXCM; and that he made enhancements to them so that they would be as complete as possible (DE # 111, Stern Test. at 64–66).

Universal used the Actforex computerized trading platform, which was the same software trading platform that was used by AlaronFX and FXCM (DE # 111, Stern Test. at 152–53).

Stern testified that Universal FX offered spot cash foreign currency transactions (DE # 111, Stern Test. at 76). The account opening documents state, "trader acknowledges that the purchase or sale of currency always anticipates the accepting or making of delivery," but no retail customers every actually took delivery of a foreign currency (DE # 111, Stern Test. at 76–77). The customers of Universal always provided Universal with U.S. dollars; and the Canadian customers were told to exchange their Canadian dollars into U.S. dollars before doing business with Universal (DE # 111, Stern Test. at 77, 82). Stern testified that Universal had made arrangements to accept foreign currency from several foreign customers who contemplated large accounts, but those accounts never came to fruition (DE # 111, Stern Test. at 78).

Stern testified that customers entered into bilateral agreements with Universal under which the customer agreed to buy a particular currency at a specified price, and Universal agreed to sell the currency to the customer at that price (DE # 111, Stern Test. at 83). The customer was not required to deposit the full value of the contract, but was permitted to deposit a margin amount, which was generally two

percent (DE # 111, Stern Test. at 83). Stern testified that this was a down payment (DE # 111, Stern Test. at 83–84). The customer was required to notify Universal a day in advance if they wanted delivery, and provide sufficient funds (DE # 111, Stern Test. at 85). When a customer placed an order, Universal went to one of Universal's foreign counter parties and obtained the currency needed to make delivery (DE # 111, Stern Test. at 86). Stern testified that the value of most of the transactions was $100,000.00 (DE # 111, Stern Test. at 88). Customers were not required to show that they had liquid assets sufficient to take delivery prior to engaging in transactions with Universal (DE # 111, Stern Test. at 89). Stern further testified that Universal had the right to increase the margin required or to liquidate or close out a customer's position without notice at any time (DE # 111, Stern Test. at 90).

With respect to the length of time between the opening of the transaction and the settlement date, Stern testified that the account opening documents do not set a specific time, but refer to current industry customs (DE # 111, Stern Test. at 92). Stern testified that Universal used the industry custom of 48 hours, but that there was nothing in the account documents that specified this time frame (DE # 111, Stern Test. at 93). Stern testified that customers could have chosen a shorter period of time, but that, based on industry custom, Universal would not have entered into an agreement for a longer period of time (DE # 111, Stern Test. at 95).

Stern's testimony regarding the mechanics of the transactions that actually occurred was somewhat confusing. As stated above, he initially testified that all contracts called for a two-day settlement date (DE # 111, Stern Test. at 93). He testified that the actual rollover transactions were not reflected on account state-ments because of limitations in the software trading platform they were using (DE # 111, Stern Test. at 96). Stern agreed that a "rollover involves offsetting the transaction at the current market price," and testified, "That is, in fact, what happened on the 48–hour period." (DE # 111, Stern Test. at 96). He testified that "[w]hat happened during the rollover was the customer's initial contract was closed out and a new contract was established." (DE # 111, Stern Test. at 96). The price was not reported to the customer on the account statement because of the above-mentioned software limitations (DE # 111, Stern Test. at 96–97). He then testified that the amount of interest charged in the "premium column" of the account statement "was what we approximated that gain or loss to be" (DE # 111, Stern Test. at 98). He then acknowledged that the amount shown in the interest or premium column was a daily charge that was the same for every day (DE # 111, Stern Test. at 98). Stern attempted to explain this by stating, "If we were able to show the detail of the rollover, the amount of difference between the exiting of the one two-day position and the opening of the next two-day position [it] would have been an amount approximately in the nine- or ten-dollar range. Certainly no less than six dollars and certainly no more than 12 dollars. So by picking nine, I think we did our best to approximate what was actually happening with the physical currency." (DE # 111, Stern Test. at 99). Stern then acknowledged, however, that for a typical transaction, the gain or a loss could easily be in the hundreds of dollars (DE # 111, Stern Test. at 99). Stern then explained, "What would happen is whether the position showed the detail of the rollover or was simply mark[ed] to market, the ultimate effect on the liquidation of the account was ultimately the same. What the rollover or the interest, the interest charge was meant to approximate, was the

actual cost of getting out and getting back in. And that was never more than, as I said, you know, maybe 12 or 15 dollars." (DE # 111, Stern Test. at 100). Stern then testified that the interest or premium charge occurred every day that a transaction remained open past 5:00 p.m. because Universal closed out every position every day (DE # 111, Stern Test. at 103–04). He then explained the significance of the two-day period as the maximum that people would go out in the industry, "but on a daily basis positions are rolled, and the value date keeps moving out for two days." (DE # 111, Stern Test. at 105). Stern further testified that the commission was charged, in accordance with the industry customs, at the time the initial position was established, but was not charged every time there was a rollover (DE # 111, Stern Test. at 106). Stern acknowledged that there was nothing on the account statements that would permit a customer to deduce what was actually happening if the introducing broker did not explain what was happening (DE # 111, Stern Test. at 106).

Stern acknowledged that in addition to the commissions, customers were also charged varying amounts of markups that were negotiated between the customer and the introducing broker (DE # 111, Stern Test. at 106–07). The markups were part of the pricing and were reflected in the customer's profit and loss, but were not put on the account statement the same way that a commission or interest fee was (DE # 111, Stern Test. at 108–10). Sterling included markups on both the opening and closing of transactions, generally in the amount of five pips [12], which is the equivalent of $50.00 on a one hundred thousand dollar transaction (DE # 111, Stern Test. at 111). Other introducing brokers charged different markups; some only charged on opening transactions and others only on closing transactions (DE # 111, Stern Test. at 111). The markups were part of the internal pricing, but did not appear on customer statements until July 2003, when the software and account opening documents were revised (DE # 111, Stern Test. at 112).

Customers had the ability to sign onto the trade platform and see the current prices for various currencies; however, these prices did not include markups that would be included within any price for any transaction completed for their account (DE # 111, Stern Test. at 113). If the transaction was completed, the price shown on the account would include the markup charged by Sterling (DE # 111, Stern Test. at 114).

If a Sterling trader placed the trade online, the account statement would reflect the date and time the trade was actually made, but if the trader placed the trade by calling the phone-up desk, there would be a delay from the time called until the person who received the call processed the trade and keypunched it into the system (DE # 111, Stern Test. at 114). The time reflected on the account statement would be the time that the trade was keypunched into the system rather than the time the trade was actually placed (DE # 111, Stern Test. at 115).

Stern testified that the Actforex trading platform that Universal used only permitted foreign currency transactions in increments of a hundred thousand (DE # 111, Stern Test. at 116–17).[13] If trades were

---

12. A "pip" is equal to $10 on a $100,000.00 contract; *i.e.*, 1 pip = .01%.

13. At times during the hearing, and in the exhibits, the one hundred thousand increment appears to refer to dollars, which would yield varying amounts of the commodity purchased per transaction; at other times, such as in this part of the testimony, it appears to refer to the units of foreign currency purchased per transaction. Compare Ticket 82051 for the account of customer Firebaugh (DE # 4, Ex.

placed by telephone rather than online, however, trades could be done for any amount since they were not restricted by the computer software limitations (DE # 111, Stern Test. at 117). Sterling chose to trade its customers with a hundred thousand increment, but other introducing brokers chose different amounts (DE # 111, Stern Test. at 118).

Stern was aware of the CFTC action filed against AlaronFX, which is known as the *Zelener* case (DE # 111, Stern Test. at 153). That action was filed on June 23, 2003. When he first learned of the case, he reviewed the problems that the CFTC had alleged with respect to AlaronFX, and tried to obviate the problems to the extent that they existed in Universal (DE # 111, Stern Test. at 154). As a result of the *Zelener* case, Universal modified its account opening documents to provide details regarding the markups that would occur and how it would affect the customer's ability to make or lose money on a trade (DE # 111, Stern Test. at 167, 169).

At any given time, the difference between the sales price and purchase price of a currency was five points or "pips," *i.e.* .05%. That is, the price for a customer to buy currency was five points higher than the price at which the customer could sell it (DE # 111, Stern Test. at 177). The Actforex software required that all customers receive the same point spread, although the spread could be set to any amount (DE # 111, Stern Test. at 177).

Defendant Joseph Arsenault first met Defendant Andrew Stern in the early 1980's when they both worked in the same brokerage firm (DE # 111, Arsenault Test. at 186–87). Arsenault subsequently moved to California and retired (DE # 111, Arsenault Test. at 188). In approximately 2001 or 2002, when Arsenault was on vacation in Florida, he had dinner with Stern and another individual named Joe Prager. Stern and Prager explained foreign currency trading to Arsenault. Arsenault decided to look into it, and he downloaded a practice trading platform to learn how the business worked (DE # 111, Arsenault Test. at 190–91). Prior to 2002, Arsenault had never traded off-exchange Forex, and never had a personal Forex account (DE # 111, Arsenault Test. at 191). Arsenault founded Sterling in June or July 2002, and discussed with Stern using Sterling to introduce business to Universal (DE # 111, Arsenault Test. at 191–92). The officers of Sterling were Defendant Joseph Arsenault and his father (DE # 111, Arsenault Test. at 192). Arsenault's father did not work at the office, however (DE # 111, Arsenault Test. at 192). At its peak, Sterling had 30 or 40 employees (DE # 111, Arsenault Test. at 192). The brokers contacted the clients, but did not do any trading. Arsenault did all the trading at Sterling (DE # 111, Arsenault Test. at 194–95). Universal conducted all the trades for Sterling (DE # 111, Arsenault Test. at 198). Sterling made its money through commissions and markups (DE # 111, Arsenault Test. at 204–05). Arsenault testified that without the markups the business could not have survived (DE # 111, Arsenault Test. at 205–06).

Arsenault testified that to protect his clients, he put a stop order in at the same time that he placed his initial order for currency (DE # 128, Arsenault Test. at 50). It is not clear from the record how this "stop order" was implemented.

Arsenault was the direct supervisor of all sales representatives for Sterling, and

2 (Koh Decl) at Att. P), where it appears that Swiss francs (CHF) were sold in lots of 100,-000 CHF; with Ticket 63448 for the account of customer Bozzella (DE # 4, Ex. 2 (Koh Decl) at Att. N), where it appears that Swiss francs were sold based upon lots equivalent to $100,000, *i.e.,* 72,014.979 CHF.

approved various radio advertisements that were used to solicit customers (DE # 128, Arsenault Test. at 7). Although Arsenault constantly kept track of how his customers were doing (DE # 128, Arsenault Test. at 57), none of the radio ads mentioned how Sterling customers were actually doing (DE # 128, Arsenault Test. at 60).

Compact disc recordings of certain radio advertisements, as well as transcripts of these advertisements are included in the record (DE # 4, Ex. 2, Koh Decl. at Att. Z(cd's)); DE # 132 (transcripts). For example, on September 25, 2002, a person identified as Guy Davis welcomed Mr. Robert Marshall to a program called, "Business Weekly." (DE # 132, Att. A transcript). Mr. Marshall was identified as a senior account executive with Sterling Trading Group. Mr. Marshall stated that Sterling followed currencies such as the Japanese yen, British pound, Swiss franc and Euro, and that they tried "to target the one currency that could bring us back the greatest gain potential, the greatest profit potential over the shortest period of time while always keeping your risks predetermined." (*Id.* at 10/25/02 Tr. p. 4). Mr. Marshall explained that they recommended a $10,000.00 investment, which would allow the customer to leverage a purchase of approximately 500,000 Euros. If the Euro moved up 7 cents, the customer could see a return of as much as $35,000. (*Id.* Tr. at 7). In responding to a question regarding the risk of becoming involved in the currency market, Mr. Marshall stated that, "We never want to sweep that under the rug. Our traders place stop-loss orders on every trade in order to reduce the inherent risk of trading in the currency market place." (*Id.* at Tr. p. 10). Mr. Marshall then stated that the loss was therefore pre-determined when the trade was placed (*Id.*). Mr. Marshall urged listeners to "stop whatever it is you're doing now, put down your pen, put down your notebook, pull your car over to the side of the road. Call this number." He then provided the toll free number for Sterling (*Id.* at 16). Mr. Marshall also explained that customers could leverage other currencies such as the Japanese yen and purchase 100,000 yen per contract (*Id.* at 18). Mr. Marshall then confirmed that, "if the Euro currency went from 95 [cents] to 100, moved up 5 cents, on five contracts, and [you] caught that whole move, you would make $25,000" (*Id.* at 25). However, if the Euro went down five cents, Mr. Marshall explained that the investor would not lose $25,000 because of the stop-loss orders. As an example, he stated that if you purchased 100,000 Euros at 95, a stop-loss order placed at 94.60 would mean that you would lose only $400.00 per contract, for a total of $2,000.00 on five contracts (*Id.* at 26–27).

Based upon a review of the radio advertisements, the undersigned finds that Sterling was marketing speculative investments in foreign currency in which there was great potential for gains and the ability to pre-determine and limit the potential loss.[14] The earlier advertisements discussed the purchase and sales of contracts by customers; the later advertisements referred to the purchase and sale of "pure" currency (DE # 132, Att. F. (3/31/03 Tr.) at 19), but none of the advertisements

---

14. The undersigned notes that the 11/15/02 ad also discussed stop loss orders (Att. C at 25–26), as did the undated transcript in DE # 132, Att. D at 8–10 and 29–30, but that radio ads on 3/20/03 and 3/31/03, unlike the others, did not mention stop losses. The undated transcript necessarily predated March 20, 2003 since it discusses the potential invasion of Iraq, and President Bush announced the invasion on March 19, 2003 (*Id.* at 24). The undated radio ad necessarily occurred after February 2, 2003, since it refers to the price of the Euro on that date (DE # 132, Att. D at 29).

contemplated that the customer would take delivery of the currency, particularly within 48 hours. For example, one radio ad discussed the increase in the value of the Euro over a one month period, claiming that the Euro had increased from 102 to 109 during the preceding 30 days, and that if the investor had opened an account with $12,000.00 and purchased 6 contracts 30 days ago, he could have made $42,000.00 in one month (DE # 132, Att. D at 22–23). That same advertisement explains that an investor who puts $2,000.00 in the market controls $100,000.00 in leverage, but that the customer doesn't "physically own that" (DE # 132, Att. D at 27). Similarly, the radio ad on March 20, 2003, discussed the concept of leverage and controlling a $100,000.00 contract with a "margin or a good-faith deposit of $2,000.00," and stated that the investor didn't "actually own that $100,000" but was "just using it" (DE # 132, Att. E (3/20/03 Tr.) at 3). In discussing risk, the ad states that they would "risk somewhere in the neighborhood of one third to 40 percent of that on any given trade" (DE # 132, Att. E (3/20/03 Tr.) at 4–5). The ad then explained that the investor bought a contract that was not an option, and not a put or a call, and that there was no time value or expiration; rather, "This is the cash or the spot currency market. This is not futures. It's not options." (DE # 132, Att. E (3/20/03 Tr.) at 5–6). The ad also explained that Sterling charged a "$150 round turn commission" which means you only pay one way, and that Sterling didn't take any of the profit from the trades (DE # 132, Att. E (3/20/03 tr.) at 8). This ad also disclosed an "interest" charge of about $5 per night if there is a trade over 24 hours (DE # 132, Att. E (3/20/03 Tr.) at 9).

The ads claimed that the traders, customers and clients were very happy, but did not disclose the significant losses that customers were suffering (See DE # 132, Att. F (3/31/03 Tr.) at 32, "Not only am I very happy with the success of Sterling Trading Group and our traders, but our investors and our clients are very happy with the return on their investments."). Later advertisements included the $150 commission that would be charged, and stated that it would be "per contract," "to buy and to sell," and that there was "nothing else" charged (DE # 132, Att. F at 28). Like the earlier ads, the March 31, 2003 ad emphasized that a $12,000.00 investment would buy six contracts, and that if there was a two penny move in the market, the investor would double his money, less the $150 per contract commission for each of the six contracts (DE # 132, Att. F (3/31/03 Tr.) at 38–39).

Each of the ads repeatedly advised the listener to call the toll-free number to speak to a Sterling representative and obtain an information package.

Arsenault's control over operations at Sterling included providing sales scripts for his salespersons to use, and using a "barge" system which allowed him to monitor the conversations between his salespersons and customers (DE # 128 at 9).

Sterling customers Phillip Matthews, Robert Firebaugh, Gregg McNelley, and Anthony Chentnik, as well as NFA employees Bridget Freas and Shamika Wade, provided sworn Declarations and testified regarding the information on foreign exchange currency trading that they received from representatives of Sterling. The undersigned credits their testimony, and finds that Sterling representatives routinely touted the profitability of investments, while failing to disclose the losses being suffered by customers or the mark-ups that would be included in their transactions; that none of the customers intended to take delivery of the currency; and that all of the customers invested for the purpose of speculation.

Arsenault testified that Universal was the counterparty to the transactions of his customers; but also testified that Universal would not take the opposite side of Sterling's transactions unless Universal could hedge the trades overseas (DE # 111, Arsenault Test. at 199–200). Therefore, "if Universal sold a contract, then a Sterling customer would purchase that contract" (DE # 111, Arsenault Test. at 200). Arsenault testified that if his clients stayed in a position after 5:00 p.m., they would be charged interest, and that contracts were rolled over every 48 hours unless they were closed out (DE # 128, Arsenault Test. at 22). Arsenault was the person who made the decision whether to close out transactions (DE # 128, Arsenault Test. at 22).

Arsenault claimed that he could have placed trades through other affiliates of FCMs, such as Alaron or FXCM, but he chose to use Universal because Stern was the one who had brought this business to his attention (DE # 111, Arsenault Test. at 198).

With respect to the decision to disclose markups, Arsenault testified that, after the *Zelener* case was brought, it was his decision to change the account documents to more fully disclose the markups (DE # 111, Arsenault Test. at 206–07).

Arsenault testified that he decided to close Sterling because "after a year I realized there's no way anybody could make any money ... in the spot[15] market" and so he sent the clients a letter stating that the market was too volatile, their money was being returned, and he was shutting down the business (DE # 111, Arsenault Test. at 207–08).[16]

### The Account Opening Documents

Since the three versions of the account opening documents are, in large part, identical; and, since at least the majority of Sterling's customers signed the second version, except as otherwise specified, all references in this discussion are to the second version (DE # 4, Ex. 2, Koh Decl. at Att. B). Each package contained a Risk Disclosure Statement that was taken verbatim from 17 C.F.R. § 1.55(c), Appendix A, which is a generic risk disclosure statement, which begins with the statement, "This brief statement does not disclose all of the risks and other significant aspects of trading in futures and options. In light of the risks, you should undertake such transactions only if you understand the nature of the contracts (and contractual relationships) into which you are entering and the extent of your exposure to risk. Trading in futures and options is not suitable for many members of the public." It then contains specific sections under the headings, "Futures," "Options," and "Additional risks common to futures and options." (*Id.*, at pp. 101 00058–59)

Following the Risk Disclosure Statement is a Customer Information form which seeks certain biographical, trading experience and financial information concerning the customer (*Id.* at p. 101 00060).

The next document in the package is entitled, "Notice to Traders." The first line of this Notice is centered, and states, "This Agreement Is a Legal Contract, Please Read It Carefully" (*Id.* at pp. 101 00061–62). The contract is between Universal FX (referred to in the contract as "UFX") and the customer. In pertinent part, this contract has the following provisions:

---

**15.** The parties agreed that there was a typographical error in the transcript on page 208, and that although the transcript reflects the word "stock," Mr. Arsenault actually said "spot." (DE # 128 at 30–32).

**16.** A copy of this letter is contained in (DE # 49, Ex. A).

In connection with opening an account to speculate and/or purchase and/or sell cash or spot foreign currency (hereinafter referred to as "Currency") through the OTC foreign exchange markets (hereinafter referred to as "OTCFX") with UFX, Customer (hereinafter referred to as Trader) acknowledges that Trader has been advised and understands the following factors concerning trading in leveraged OTCFX, in addition to those contained in the Risk Disclosure Statement which has been provided to Trader.

1. OTCFX is not traded on a regulated exchange. There are no guarantees to the credit worthiness of the counter party of your Currency position. Every attempt has been made to deal with reputable credit worthy banks/clearing houses. Also, there may be certain cases in which trading liquidity decreases causing trading in a certain Currency to cease, thereby preventing the liquidation of an adverse position that may result in a substantial financial loss.

2. Trading in OTCFX is suitable only for those sophisticated institutions or sophisticated participants financially able to withstand losses that may substantially exceed the value of margins or deposits . . . .

3. Trader acknowledges that the purchase or sale of a Currency always anticipates the accepting or making of delivery.

4. UFX's margin policies and/or the policies of those banks/clearing houses through which trades are executed may require that additional funds be provided to properly margin Trader's account and that Trader is obligated to immediately meet such margin requirements. Failure to meet margin calls may result in the liquidation of any open positions with a resultant loss. UFX also reserves the right to refuse to accept any order.

5. OTCFX business is not traded on a regulated market . . . .

6. . . . .

b) Market risks and on-line trading

Trading currencies involves substantial risk that is not suitable for everyone. See Trader Agreement for more detailed description of risks . . . .

7. In OTCFX, firms are not restricted to effect off-exchange transactions. The firm with which you deal may be acting as your counter party to the transaction. If may be difficult or impossible to liquidate an existing position, to assess the value, to determine a fair price or to assess the exposure to risk. . . . . Off-exchange transactions may be less regulated or subject to a separate regulatory regime . . . .

8. In the event that Trader grants trading authority or control over Trader's account to a third party (Trading Agent), whether on a discretionary or non-discretionary basis, UFX shall in no way be responsible for reviewing Trader's choice of such Trading Agent or for may any recommendations with respect thereto. . . . .

The next document in the package is entitled, "Trader Agreement" (*Id.* at pp. 101 00063–68). It provides, in pertinent part:

In consideration of UFX agreeing to carry one or more accounts of the undersigned ("Trader") and providing services to Trader in connection with the purchase and sale of cash currencies (including financial instruments) and any similar instruments (collectively referred to as "OTCFX"), which may be purchased or sold by or through UFX for Trader's accounts(s)[*sic* ], Trader agrees as follows:

1. AUTHORIZATION TO TRADE. UFX is authorized to purchase and sell OTCFX for Trader's account(s) with a

counter party bank or sophisticated institutions or participants in accordance with Trader's oral or written or computer instructions. Unless instructed by Trader to the contrary in writing, UFX is authorized to execute all orders with such banking institutions, counter party, bank, or sophisticated institutional participants as UFX deems appropriate.

. . . .

3. MARGINS AND DEPOSIT REQUIREMENTS. Trader shall provide to and maintain with UFX margin in such amounts and in such forms as UFX, in its sole discretion, may require. Such margin requirements may be greater or less than margins required by a counter party bank. UFX may change margin requirements at any time. Trader agrees to deposit by immediate wire transfer such additional margin when and as required by UFX. . . . UFX may at any time proceed to liquidate Trader's account in accordance with paragraph 7 below and any failure by UFX to enforce its rights hereunder shall not be deemed a waiver by UFX to enforce its rights thereafter. . . . UFX retains the right to limit the amount and/or total number of open positions that Trader may acquire or maintain at UFX. UFX will attempt to execute all orders, which it may, in its sole discretion, choose to accept in accordance with the oral or written, or computer instructions of Trader's. UFX reserves the right to refuse to accept any order. . . .

. . . .

5. SETTLEMENT DATE AND ROLLOVERS. With respect to purchases or sales of Currencies through an OTCFX account, Trader agrees to instruct UFX as to the offset or rollover of a Currency position. Except as provided herein, during the term of the Currency position, Trader shall give UFX instructions for rolling the Currency position no later than two hours prior to the settlement of trading in the Currency contract on the day Trader intends to rollover a Currency position. In addition, Trader, by noon of the business day before the settlement date of the contract of the Currency contract, shall instruct UFX whether to deliver, offset or rollover the Currency position. In the absence of timely instructions from Trader, UFX is authorized, at UFX's absolute discretion, to deliver, rollover or offset all or any portion of the Currency position in the OTCFX account(s) for Trader's Account(s) and at Trader's risk. Trader's account(s) shall be charged commissions, at broker's rates, upon the rollover or offset of a Currency position.

6. COLLATERAL AND LENDING AGREEMENT. All funds, securities, currencies, and other property of Trader which UFX or its affiliates may at any time be carrying for Trader . . . are to be held by UFX as security and subject to a general lien and right to set-off for liabilities of Trader to UFX . . . . UFX shall at no time be required to deliver to Trader the identical property delivered to or purchased by UFX for any account of Trader. The rights of UFX are subject to the applicable requirements for the segregation of Trader funds and property under the Commodity Exchange Act, as amended (the "Act"). The purpose of the Lending Agreement is to allow UFX to use depository receipts (representing delivery) as collateral. Should Trader take delivery of Currencies through settlement of trades, UFX is obliged to make full payment for the delivery on 24 hours notice. If the balance in the Trader's account is not adequate to pay for the delivery, the depository receipts become property carried on margin in the Trader's account, since they are not fully paid for by Trader. The Lending Agreement al-

lows UFX to use the depository receipt as collateral for a bank loan, the proceeds of which are used to pay for the depository receipts until rollover of the Currency and/or payment in full by Trader. Should Trader intend to take delivery of the Currency covered by any other obligation, UFX requires the Trader to sign the Lending Agreement so it may use the Currencies, property, depository receipts or evidence of ownership thereof, as collateral for a bank loan, the proceeds of which may be used to pay for the Currencies or evidence of ownership thereof, until payment in full, including interest, by the Trader. . . .

7. LIQUIDATION OF ACCOUNTS AND PAYMENT OF DEFICIT BALANCES. In the event of (a) the death or judicial declaration of incompetence of Trader; (b) the filing of a petition in bankruptcy . . .; (c) the filing of an attachment against any of Trader's accounts . . ., (d) insufficient margin, or UFX's determination that any collateral deposited to protect one or more accounts of Trader is inadequate . . . or (f) any other circumstances or developments that UFX deems appropriate for its protection, and in UFX's sole discretion, it may take one or more, or any portion of, the following actions: . . . (2) sell any or purchase any or all Currency contracts, securities held or carried for Trader; and (3) cancel any or all outstanding orders or contracts, or any other commitments made on behalf of Trader. Any of the above actions may be taken without demand for margin or additional margin, without prior notice of sale or purchase or other notice to Trader, Trader's personal representatives, . . . . In liquidation of Trader's long or short positions, UFX may, in its sole discretion, offset in the same settlement or it may initiate new long or short positions in order to establish a spread or straddle which in UFX's sole judg-

ment may be advisable to protect or reduce existing positions in Trader's account. Any sales or purchases hereunder may be made according to UFX's judgment and at its discretion with any interbank or other exchange market where such business is then usually transacted. . . . Trader shall at all times be liable for the payment of any deficit balance of Trader upon demand by UFX and in all cases, Trader shall be liable for any deficiency remaining in Trader's account(s) . . . .

8. SETTLEMENT DATE OFFSET INSTRUCTIONS. Offset instructions on Currency positions open prior to settlement arriving at settlement date must be given to UFX at least one (1) business day prior to the settlement or value day. Alternatively, sufficient funds to take delivery or the necessary delivery documents must be in the possession of UFX within the same period described above. If neither instructions, funds nor documents are received, UFX may without notice, either offset Trader's position or roll Trader's positions into the next settlement time period or make or receive delivery on behalf of Trader upon such terms and by such methods deemed reasonable by UFX in its sole discretion.

9. CHARGES. Trader shall pay such brokerage, commission and special service and all other charges (including, without limitation, markups and markdowns, statement charges, idle account charges, order cancellation charges, account transfer charges or other charges), fees. . . . UFX may change its commission, charges and/or fees without notice. . . . UFX confirms all prices quoted Trader are not inclusive of markups and markdowns.

. . . .

13. CURRENCY FLUCTUATION RISK. If Trader directs UFX to enter into any currency transaction: (a) any profit or loss arising as a result of a fluctuation in the exchange rate affecting such currency will be entirely for Trader's account and risk; (b) all initial and subsequent deposits for margin purposes shall be made in U.S. dollars, in such amounts as UFX may in its sole discretion required; and (c) UFX is authorized to convert funds in Trader's account for margin into and from such foreign currency at a rate of exchange determined by UFX in its sole discretion on the basis of the then prevailing money market rates.

14. RISK ACKNOWLEDGMENT. Trader acknowledges that investments in leveraged and non-leveraged transactions are speculative, involves a high degree of risk, and is appropriate only for persons who can assume risk of loss in excess of their margin deposit. Trader understands that because of the low margin normally required in OTCFX trading, price changes in OTCFX may result in significant losses that may substantially exceed Trader's investment and margin deposit.... Trader recognizes that guarantees of profit or freedom from loss are impossible of performance in OTCFX trading. Trader acknowledges that Trader has received no such guarantees from UFX or from any of its representatives or any introducing agent or other entity with whom Trader is conducting his/her UFX account.

The account opening documents also include an Arbitration Agreement which provides, "Any controversy between Trader and UFX, arising out of or relating to Trader's account shall be, except as provided below, resolved by arbitration in accordance with Part 180 of the Commodity Exchange Act as amended." (*Id.* at 101 0069).

The account opening documents include a document labeled "EXHIBIT A Disclosure Statement and Commission Acknowledgment" which contains, *inter alia,* the following language:

_____("INTRODUCER") AND UFX HAVE ENTERED INTO AN AGREEMENT PURSUANT TO WHICH INTRODUCER WILL SOLICIT AND INTRODUCE PROSPECTIVE COUNTER PARTIES SUCH AS YOURSELF TO UFX FOR THE PURPOSE OF ENTERING INTO OVER–THE–COUNTER FORWARD AND SPOT FOREIGN CURRENCY AND FOREIGN CURRENCY OPTIONS CONTRACTS ("FOREIGN EXCHANGE") WITH UFX.

. . . .

PURSUANT TO THE AGREEMENT, UFX WILL COLLECT AND REMIT TO INTRODUCER THE TRANSACTION–BASED COMMISSIONS CHARGED TO THE INTRODUCED COUNTER PARTY BY INTRODUCER. SUCH TRANSACTION–BASED COMMISSIONS SHALL EQUAL THE AMOUNT INDICATED BELOW PER TRANSACTION. UFX WILL NOT SHARE IN ANY TRANSACTION–BASED COMMISSIONS CHARGED BY INTRODUCER.

UFX IS AN AFFILIATE OF A FUTURES COMMISSION MERCHANT WITH THE COMMODITY FUTURES TRADING COMMISSION ("CFTC") AND IS A MEMBER OF THE NATIONAL FUTURES ASSOCIATION ("NFA") PURSUANT TO THE PROVISIONS OF THE COMMODITY EXCHANGE ACT (THE "ACT"). HOWEVER, FOREIGN EXCHANGE CONTRACTS ENTERED INTO BETWEEN UFX AND YOU AS COUNTER PARTY ARE NOT TRADED ON OR SUBJECT TO THE

RULES OF AN EXCHANGE REGULATED BY THE CFTC, NOR ARE SUCH FOREIGN EXCHANGE CONTRACTS CLEARED OR GUARANTEED BY ANY CLEARING ORGANIZATION, BUT RATHER SUCH CONTRACTS ARE BILATERAL AGREEMENTS BETWEEN UFX AND YOU.

INTRODUCER IS NOT REGISTERED IN ANY CAPACITY WITH THE CFTC OR NFA.[17]

UFX DOES NOT SUPERVISE THE ACTIVITIES OF INTRODUCER AND ASSUMES NO LIABILITY FOR ANY REPRESENTATIONS MADE BY INTRODUCER. UFX AND INTRODUCER ARE WHOLLY SEPARATE AND INDEPENDENT FROM ONE ANOTHER. THE AGREEMENT BETWEEN UFX AND INTRODUCER DOES NOT ESTABLISH A JOINT VENTURE OR PARTNERSHIP AND INTRODUCER IS NOT AN AGENT OR EMPLOYEE OF UFX.

The page following the above disclosure statement sets forth the commissions which will be charged. This paragraph varied between the three versions. The first version contained two forms of accounts which could be established—a six-month unlimited trading account which charged a fee of $1,500; and a UFX Account, which charged a $150 fee (DE # 4, Ex. 2, Koh Decl., Att. A at 101–00020). The second version eliminated the six-month unlimited trading account (DE # 4, Ex. 2, Koh Decl., Att. B at 101 00075). There is no evidence that any of the Sterling customers had a six-month unlimited trading account. The second version provides, in pertinent part:

> UFX is hereby authorized to deduct from my account and pay

**Commissions Per Round Turn Lot**
$ _____

Lots Size equivalent

100k FXTS trading platform = 100,-000 position

**Commission Payable to**

**INTRODUCER**

_____

Because the risk factor is high in the foreign exchange market trading, only genuine "risk" funds should be used in such trading. If Trader does not have the extra capital the Trader can afford to lose, Trader should not trade in the foreign exchange market. No "safe" trading system has ever been devised, and no one can guarantee profits or freedom from loss. In fact no one can even guarantee to limit the extent of losses.

The third version of the account opening documents changed this page to include a caption in larger, bold print, "COMMISSIONS AND MARK–UP DISCLOSURE," and to include the following disclosures regarding mark-ups:

> **Spread per currency pair ____ wide.**
>
> **Mark-up's per currency pair ____ pips on the Open, and ____ pips on the Close**
>
> **Total Mark-up's kept by introducer ____ total Mark-up's credited to counterparty**
>
> **Commissions Per Round Turn Lot**
> $ _____

For example, if you trade the EUR/USD and your IB charges $150 in commissions with a 2 pip mark-up on the open, and a 2 pip mark-up on the close, you need a $190 move to overcome all commissions and fees before any profit is realized. In the EUR–USD market,

---

**17.** This line was not included in the first version of the account opening documents, which is at DE # 4, Exhibit 2, Koh Decl. Attachment A at 101 00019.

that would equate to a 19 pip move in your favor.

(DE # 4, Ex. 2, Koh Decl., Att. C at 101 00031).

The account opening documents also included a Limited Power–of–Attorney which authorized Sterling to act as Trading Agent for the Customer "to purchase and sell currencies on the OTCFX market and/or options on OTCFX market contracts on margin...." (DE # 4, Ex. 2, Koh Decl., Att. B at 101 00077).

## C. Phase II Operations

After Sterling closed, Arsenault opened two other firms, STG and Graystone Browne f/k/a Global Forex Trading (DE # 128, Arsenault Test. at 13). STG was located in California, and Graystone Browne was located in Florida. From approximately August 2003 through June 2004, these firms solicited customers to engage in foreign currency options transactions with QIX. Arsenault was responsible for operations at those firms, but the clients were responsible for making their own trading decisions (DE # 128, Arsenault Test. at 15). STG and Graystone executed Introducing Agreements with QIX, under which STG and Graystone agreed to serve exclusively as introducing brokers who referred customers to QIX (DE # 61, Ex. A, Koh Decl. ¶ 3c, Att. A and B); and, pursuant to these agreements, the customers of STG and Graystone Browne were introduced to QIX (DE # 128, Arsenault Test. at 16).

QIX prepared the account opening documents which were used by STG and Graystone, and they are substantially similar to the account opening documents which were used during Phase I of the operations.[18] With respect to the present motion, the CFTC specifically notes that they include a Regulation 1.55 Risk Disclosure, refer to arbitration and CFTC reparations proceedings in the same manner as Universal's documents, and that they falsely claim that QIX is a member of the NFA, and, thus, that the options would be executed by or through a member of a registered entity (DE # 74 at 28–29). With respect to the assertion that QIX has falsely claimed membership in the NFA, the undersigned notes that the original account opening documents used by QIX contained the same language as the Universal documents in that it stated, "QIX, Inc. is an affiliate of a Futures Commission Merchant with the Commodity Futures Trading Commission ("CFTC"), and is a member of the NFA pursuant to the provisions of the Commodity Exchange Act" (DE # 62, Att. B. Pendleton Decl. ¶ 8). On February 9, 2004, the NFA wrote a letter to QIX Futures, Inc. advising that the language in the account opening documents was "potentially misleading" and requesting that the language be clarified "to prevent any confusion." The NFA suggested that the language be modified to state, "QIX, Inc. is an affiliate of a Futures Commission Merchant *which* is registered with the Commodity Futures Trading Commission and is a member of the NFA." (emphasis added to highlight the changed language) (*Id.* at Att. 2). On March 11, 2004, Andrew Stern sent an e-mail to the NFA advising that the suggested modification had been made on the website and to the hard copies of the account documents. The modified language states:

QIX, INC. IS AN AFFILIATE OF A FUTURES COMMISSION MERCHANT WHICH IS REGISTERED WITH THE COMMODITY FUTURES TRADING COMMISSION ("CFTC") AND IS A MEMBER OF THE NA-

---

18. A copy of the these account opening documents is attached to the Declaration of Andrew Stern (DE # 49, Ex. A: Ex. C). Hereafter, references to these documents will be made by citing to "QIX Account Doc." followed by the page number.

TIONAL FUTURES ASSOCIATION ("NFA") PURSUANT TO THE PROVISIONS OF THE COMMODITY EXCHANGE ACT (THE "ACT").

(QIX Account Doc. at 17).

The Declaration of CFTC Investigator Koh provides a summary of the business conducted by STG and Graystone (DE # 61, Ex. A at ¶ 11). According to internal financial reports obtained from QIX and examined by CFTC Investigator Koh, between December 2003 and June 2004, 35 STG customers lost money, while 1 customer made a profit. Approximately 975 of STG customers, whose records were complete, lost a total of $546,929.50. During the same time period, 77 Graystone customers lost money, and no customers made a profit. The Graystone customers, whose records were complete, lost a total of $1,287,599.30.

When the present lawsuit was initiated, QIX terminated its relationship with all its customers (DE # 49, Stern Decl. at ¶ 20). Its customers were sent a letter which offered them the choice of liquidating their positions, moving to QIX Futures, which had served as QIX's FCM, or moving their open positions to any other FCM of their choice (DE # 49, Stern Decl. ¶ 21 and Ex. E). Customers were advised that if they did not make another choice, open positions would be transferred to QIX Futures. Thus, all of QIX's Forex business was assigned to QIX Futures in July 2004 (*Id.*).

Since there is no dispute that the CFTC has jurisdiction over transactions involving foreign currency options, and since there is no claim in the present motion which seeks relief based on fraud as to the operations of STG, Graystone and QIX, a detailed recitation of the account opening documents and business operations of Phase II is not necessary.[19]

### III. *LEGAL ANALYSIS*

#### A. *The Standard for Granting a Preliminary Injunction*

■ Title 7, United States Code, Section 13a–1 authorizes the CFTC to bring an action to enjoin or restrain violations of the Commodities Exchange Act. Section (b) of that statute provides, "Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond." Although there is no standard set forth in the statute, the Courts have held that the traditional standards applicable to private parties seeking injunctive relief do not apply. In order to obtain a statutory preliminary injunction, the CFTC must demonstrate a prima facie case that a violation has occurred and that there is a reasonable likelihood of a future violation. *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979). Unlike the traditional standards for a preliminary injunction applicable to private parties, to obtain a statutory injunction, the CFTC need not prove irreparable harm or the inadequacy of other remedies. *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir.1978). Moreover, the Eleventh Circuit has held, "When a preliminary injunction is challenged on the basis of jurisdiction, a plaintiff need only establish 'a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits.'". *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir.1999) (citations omitted).[20]

---

19. To establish the likelihood of continuing fraud to support its request for injunctive relief as to The CFTC presented Declarations and testimony from investors Brad Campbell, who entered into transactions with Graystone/QIX; Vivian Barnhart, who entered into transactions with STG/QIX; and, Gary Hicks, who entered into transactions with Graystone (then known as Global Forex Trading, or "GFT")/QIX.

20. Since the injunctive provisions of the Commodities Exchange Act are in all material

■ The test for determining whether "a proper showing" has been made to support injunctive relief has been described as follows:

Although the mere fact of a past violation does not ipso facto establish the SEC's right to injunctive relief, and thus is not alone tantamount to the "proper showing" of present or future violations, the Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a "reasonable likelihood" of future transgressions....

Relevant considerations in the "reasonable likelihood" analysis resolve into essentially three areas of inquiry: the nature of the past violation, the defendant's present attitude, and objective constraints on (or opportunities for) future violations.... Such factors include the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

SEC v. Zale Corp., 650 F.2d 718, 720 (5th Cir.1981) (citations omitted); SEC v. The Globus Group, Inc., 117 F.Supp.2d 1345 (S.D.Fla.2000).

Where the relief sought is more than to preserve the status quo, for example where an asset freeze or other mandatory relief is sought, a more substantial showing may be required to support the relief sought. See SEC v. Unifund SAL, 910 F.2d 1028, 1039 (2d Cir.1990) ("Like any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks."). Accord SEC v. Healthsouth Corp., 261 F.Supp.2d 1298, 1317–19 (N.D.Ala.2003).

B.  *The Law Governing the Transactions At Issue*

As stated in the introductory portion of this Report, Defendants have mounted several challenges to the jurisdiction of the CFTC over their activities. The first section addresses the scope of regulatory jurisdiction under the CEA. The next section addresses whether the CFTC has proven that the transactions at issue in Phase I are futures transactions within the scope of any regulation, as opposed to excluded spot transactions.

1.  *The CFTC's Jurisdiction Over the Regulatory Violations Alleged in the Complaint*

It is useful to set forth the background of the regulation of commodities in order to put in perspective the issues presented in the case at bar. An excellent and detailed history is set forth in the opinions of Judge Ryskamp In *CFTC v. Next Fin. Serv. Unltd.*, Case No. 04–80562: DE # 85 (S.D. Fla. June 7, 2005) (DE # 171), and Judge Dimitrouleas in *CFTC v. G7 Advisory Serv., LLC,* 406 F.Supp.2d 1289 (S.D.Fla.2005) (DE # 198); therefore, only an abbreviated summary is presented here.

Initially, the only commodities regulated by Congress were certain grain futures transactions pursuant to the Grain Futures

---

respects similar to the injunctive provisions of the Securities Exchange Act of 1934, 15 U.S.C. s 78u(e), and the Securities Act of 1933, 15 U.S.C. s 77t(b), the case law developed under those sections of the securities laws is pertinent to cases under section 13a–1

of the Commodities Exchange Act. *CFTC v. British American Commodity Options,* 560 F.2d 135, 141 fn. 11 (2d Cir.1977); *CFTC v. J.S. Love & Assoc. Options, Ltd.,* 422 F.Supp. 652, 661 (S.D.N.Y.1976).

Act. In 1936, Congress renamed the Act to be the Commodity Exchange Act ("CEA"), and expanded its coverage to include additional agricultural commodities.

Until 1974, foreign currency transactions were not included in the CEA. In 1974, the CEA was greatly expanded to include, *inter alia,* trading in foreign currency. In addition, Congress created the CFTC, and granted it the power, *inter alia,* to investigate complaints, hold administrative hearings, order reparations, and seek injunctive relief. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 357–58, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Next Fin. Serv.* at 11. Based upon a concern expressed by the Treasury Department, however, coverage of foreign currency transactions was limited by a provision now known as "the Treasury Amendment." This amendment exempted from CFTC jurisdiction "transactions in foreign currency ... unless such transactions involve the sale thereof for future delivery conducted on a board of trade." *Next Fin. Serv.* at 12–13.

The CFTC took the position that the exemption should be narrowly construed and that it was not applicable to options contracts. In *Dunn v. CFTC,* 519 U.S. 465, 469, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997), the United States Supreme Court squarely rejected this position, holding that the phrase "transactions in foreign currency" included transactions in options to buy or sell foreign currency. The Court, however, did not address the meaning of the phrase "conducted on a board of trade," and the lower courts were split on the issue of whether this meant that only interbank transactions were exempt, or whether all off-exchange transactions were exempt. *G7 Advisory Serv.,* 406 F.Supp.2d at 1294. The confusion was caused in part by the definition of "board of trade" as "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity." *Id.*

In 2000, Congress enacted the Commodities Futures Modernization Act of 2000 ("CFMA") with the stated purpose of "clarifying the jurisdiction of the [CFTC] over certain retail foreign exchange transactions." As explained by the Court in *G7 Advisory Serv.,* "The CFMA, as codified in Title 7, United States Code, § 2(c)(2)(B) [21]

---

21. Title 7, United States Code, § 2(c)(2)(B) provides:

**(B) Agreements, contracts, and transactions in retail foreign currency**
This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that—
  **(i)** is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option ...; and
  **(ii)** is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, of the person is—
  **(I)** a financial institution;
  **(II)** a broker or dealer registered under ... the Securities Exchange Act ... or a futures commission merchant registered under this chapter;

**(III)** an associated person of a broker or dealer registered under ... the Securities Exchange Act ... or an affiliated person of a futures commission merchant registered under this chapter, concerning the financial or securities activities of which the registered person makes and keeps records under ... the Securities Exchange Act ... or section 6f(c)(2)(B) of this title;
**(IV)** an insurance company described in section 1a(12)(A)(ii) of this title, or a regulated subsidiary or affiliate of such an insurance company;
**(V)** a financial holding company (as defined in section 1841) of Title 12; or
**(VI)** an investment bank holding company....
**(C)** Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions described in subparagraph (B) shall be subject to sections

grants the CFTC jurisdiction over all off-exchange foreign currency transactions involving non-eligible contract participants unless the counterparties to the transactions are an entity enumerated in 7 U.S.C. § 2(c)(2)(B)(ii). The CFMA's listing of specified unregulated entities eliminated the need for judicial interpretation of the term "Board of Trade," which the CFMA redefined as 'any organized exchange or other trading facility.' 7 U.S.C. § 1a(2)." 406 F.Supp.2d at 1295 (footnote added).

Thus, the first issue in the case at bar is whether the transactions alleged are exempt from regulation pursuant to section 2(c)(2)(B)(ii). It is undisputed that most, if not all, of the persons who engaged in transactions with Defendants were not eligible contract participants.[22] Thus, to determine whether the transactions at issue are exempt from regulation pursuant to this provision, and therefore outside the jurisdiction of the CFTC, it is only necessary to examine whether Universal and

QIX, as counterparties, were one of the entities enumerated in subparagraph (B)(ii).[23] Subparagraph (B)(ii)(II)[24] provides exemption for a futures commission merchant registered under the Act, and subsection (B)(ii)(III)[25] provides for exemption for "an affiliated person of a futures commission merchant registered under this Act, concerning the financial or securities activities of which the registered person makes and keeps records under . . . section 6f(c)(2)(B)[26] of this Act."

■ Defendants Universal and QIX claim exemption as "affiliated persons" under this provision. An affiliated person is "any person directly or indirectly controlling, controlled by, or under common control with a futures commission merchant." 7 U.S.C. § 6f(c)(1)(I). During the relevant periods of time, it appears, and the undersigned assumes for the purpose of this discussion, that Defendant Universal was affiliated with UTS World or UFHC[27] and

6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b of this title prohibit manipulation of the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any market), 13a–1, 13a–2 and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

22. An "eligible contract participant" is defined as an individual who has total assets in excess of $10,000,000.00; or, has assets in excess of $5,000,000.00, and enters into the contract in order to manage the risk associated with an asset owned or a liability incurred by that person. 7 U.S.C. § 1a(12)(A)(xi). Based upon CFTC Investigator Koh's examination of the records, as well as the testimony of the individual investors at the evidentiary hearing, none of the customers met this definition (DE # 4, Ex. 2: Koh Decl. ¶ 19).

23. 7 U.S.C. § 2(c)(2)(B)(ii). Hereafter, for ease of reference, in the body of this discussion, the provisions of subsection 2(c)(2) will

be referred to only by the letter designation and numbers which are within this subsection, and the full citation will be footnoted to avoid potential confusion. *I.e.*, 7 U.S.C. § 2(c)(2)(B) will be referred to as subparagraph (B); 7 U.S.C. § 2(c)(2)(B)(ii) will be referred to as subparagraph (B)(ii); 7 U.S.C. § 2(c)(2)(B)(ii)(III) will be referred to as subparagraph (B)(ii)(III); 7 U.S.C. § 2(c)(2)(C) will be referred to as subparagraph (C); etc.

24. 7 U.S.C. § 2(c)(2)(B)(ii)(II).

25. 7 U.S.C. § 2(c)(2)(B)(ii)(III).

26. 7 U.S.C. § 6f(c)(2)(B) (footnote added).

27. The CFTC points out that Universal began acting as a counterparty on or about June 2002, but that UTS was not registered as an FCM until May 2003 (DE # 136 at ¶ 118). However, Universal was also affiliated with UFHC, which was registered as an FCM during the relevant time (DE # 111, Stern Test. at 121–22; DE # 65: NFA Detail Report and Annual Report on UFHC).

Defendant QIX was affiliated with QIX Futures.

The critical issue in this case is whether all affiliated persons are exempt as long as the registered FCM keeps records, or whether the exemption applies only where the registered FCM is required to keep records pursuant to § 6f(c)(2)(B). The CFTC contends that because the registered FCMs in the case at bar were not required to keep records, the exemption does not apply, and the fact that the registered FCMs, in fact, decided to keep records is irrelevant. Defendants, on the other hand, contend that since the registered FCMs elected to keep records, they qualify as exempt affiliates.

Section 6f(c)(2)(A)-(B) (emphasis added) provides, in pertinent part:

(A) Each registered futures commission merchant shall obtain such information and make and keep such records as the Commission, by rule or regulation, prescribes concerning the registered futures commission merchant's policies, procedures, or systems for monitoring and controlling financial and operational risks to it resulting from the activities of any of its affiliated persons, other than a natural person.

(B) The records *required* under subparagraph (A) shall describe, in the aggregate, each of the futures and other financial activities conducted by, and the customary sources of capital and funding of, those of its affiliated persons whose business activities are reasonably likely to have a material impact on the financial or operational condition of the fu-

tures commission merchant, including its adjusted net capital, its liquidity, or its ability to conduct or finance its operations.

Pursuant to this authority, the CFTC has promulgated 17 C.F.R. §§ 1.14(d) and 1.15(c)(1). Those regulations require FCMs to keep financial records regarding certain affiliated persons which are determined to be "Material Affiliated Persons."[28] However, those record keeping requirements do not apply to certain smaller FCMs, and specifically exempt "any futures commission merchant which holds funds or property of or for futures customers of less than $6,250,000 and has less than $5,000,000 in adjusted net capital as of the futures commission merchant's fiscal year-end." It is undisputed that, under these provisions, the relevant FCMs in the case at bar—UFHC, UTS World, and QIX Futures—are not required to keep records.[29]

The CFTC argues that Congress sought to limit the exemption for affiliates set forth in subparagraph (B)(ii)(III)[30] by including the proviso "concerning the financial ... activities of which the registered person makes and keeps records *under section 4f(c)(2)(B)*[31] *of the Act.*" (Emphasis added). When Congress referenced this subparagraph in the text of the CFMA, it chose the specific subpart of the CEA's statutory provision on Risk Assessment for Holding Company Systems that expressly referred to "records required" to be maintained pursuant to the CFTC's regulations. At the time the CFMA was enacted, there was a regulatory scheme in place that

---

**28.** Section 1.14(a)(2) sets forth a five-factor test to be used to determine whether an affiliated person is a Material Affiliated Person, which "involves consideration of all aspects of the activities of, and the relationship between, both entities." 17 C.F.R. § 1.14(a)(2).

**29.** Moreover, the CFTC points out that UFHC did not, in fact, "make and keep" any records

for Universal (DE # 4, Ex. 2, Koh Decl. at ¶ 48; DE # 30, Stern Invest. Test. at 115–16).

**30.** 7 U.S.C. § 2(c)(2)(B)(ii)(III).

**31.** Section 4f(c)(2)(B) of the CEA is codified at 7 U.S.C. § 6f(c)(2)(B).

specified which FCMs were required to keep records for such affiliates; these affiliate were referred to as "material affiliates" in that scheme. Based upon this specific reference, the CFTC argues that the CFMA exemption applies *only* to those affiliates who are subject to the recordkeeping requirements of § 6f(c)(2)(B)— *i.e.*, affiliates that are classified as "Material Affiliated Persons" or "MAPs" of certain FCMs that meet the specified capital requirements. Since neither Universal nor QIX fits into this category, the CFTC contends that the limited exemption specified in subparagraph (B)(ii)(III) does not apply to their activities.

Numerous cases in this District have considered this issue and adopted the position of the CFTC, and the undersigned Magistrate Judge concurs with this result.

Those courts have rejected "the Defendant's interpretation, as it would allow registered FCMs to avoid CFTC regulation based on personal preference. Any registered FCM could skirt CFTC regulation merely by electing to keep records, thereby confounding the CFMA's purpose of making clear which off-exchange foreign currency transactions are subject to CFTC regulation." *CFTC v. G7 Advisory Serv., LLC,* 406 F.Supp.2d at 1296–97. *Accord CFTC v. Next Fin. Serv. Unltd.,* 04–80562–CIV–RYSKAMP (S.D.Fla. Jun. 7, 2005) (DE # 85) [32]; *CFTC v. E–Metals Merchants, Inc.,* 05–21571–CIV–LENARD (S.D.Fla. Jul. 26, 2005) (DE # 29 (R & R, adopted on other grounds in DE # 60),); *CFTC v. First Int'l Group,* 06–20972–CIV–JORDAN (S.D.Fla. Jan. 7, 2007) (DE # 34, relying on *G7 Advisory Serv.*).[33]

**32.** The undersigned notes that in *Next Fin. Serv.,* the Court specifically found that QIX was not a proper counterparty to the foreign currency transactions at issue in that case. Although QIX was not a party to that action, which was brought only against certain introducing brokers who were similarly situated to Defendants STG and Graystone in the case at bar, the rationale supporting this determination is persuasive.

**33.** The CFTC contends, in the alternative, that even if Defendants were exempt affiliates, the statute contains an exclusion from this exemption which makes the transactions alleged in the case at bar subject to the jurisdiction of the CFTC with respect to the anti-fraud provisions of the CEA. Subparagraph (2)(C) provides:

> Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions ... shall be subject to sections 6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b prohibit manipulations of the market price of any commodity ...), 13a–1, 13a–2, and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

7 U.S.C. § 2(c)(2)(C). The CFTC contends that this provision reserves the CFTC's anti-fraud jurisdiction with regard to retail foreign currency transactions where one party is a retail customer and the counterparty is a registered FCM or an affiliate of an FCM. The position of Defendants is that they fall within the exclusion from the anti-fraud provisions of subparagraph (2)(C) since they are "an entity described in subparagraph (B)(ii)." Other courts in this District have adopted the argument of the CFTC in this regard, holding that the final provision of subparagraph (2)(C) operates to provide an exemption from the CFTC's anti-fraud jurisdiction for only those registered FCMs or qualified affiliates that are also another type of entity described in subparagraph (2)(B)(ii), such as financial institutions, insurances companies, financial holding companies, investment bank holding companies, or fully registered broker-dealers. *See CFTC v. Madison Forex Int'l,* 05–61672–ALTONAGA (S.D.Fla. July 19, 2006) (DE # 80 at 6–7); *CFTC v. Gibraltar Monetary Corp.,* 2006 WL 1789018 (S.D.Fla. May 30, 2006); *First Int'l Group* at 6–7. This reading of the exemption makes sense because those entities are regulated by other agencies. However, it is not necessary for the Court to reach that issue in the case at bar since the undersigned concludes that Defendants do not qualify as exempt affiliates.

Therefore, the undersigned concludes that Defendants Universal and QIX were not proper counterparties within the meaning of Section 2(c)(2)(B)(ii)(III), and therefore they do not qualify for the exemption from jurisdiction set forth in that provision. Therefore, they are subject to the provisions of the entire Commodities Exchange Act as specified in Section 2(c)(2)(B)(i)-(ii).

■ Finally, Defendants contend that the only regulations applicable to foreign currency transactions are those which were expressly incorporated by the CFMA. Thus, Defendants contend that the following regulations, which were promulgated prior to the CFMA and have not specifically been made applicable to foreign currency transactions, cannot be enforced by the CFTC in the case at bar: Section 4h of the CEA, 7 U.S.C. § 6h (which makes it unlawful to falsely represent registration status) (DE # 145 at 46); Section 32.11 of the Regulations (regarding the prohibition on off-exchange transactions) (DE # 145 at 51–54); Section 4(a) of the CEA, 7 U.S.C. § 6(a) (which makes it unlawful to trade off-exchange futures contracts) (DE # 145 at 50–51); CFTC Regulation 1.2, 17 C.F.R. § 1.2 and Sections 2(a)(1)(B) and 13(b) of the CEA, 7 U.S.C. §§ 2(a)(1)(B) and 13c(b) (respectively, principal/agent and control person liability) (DE # 145 at 51, 54). Defendants contend that the CFTC did not have jurisdiction to regulate off-exchange foreign currency transactions until the enactment of the CFMA. Therefore, none of the pre-existing regulations were applicable to the transactions at issue in the case at bar. Defendants further argue that since 7 U.S.C. § 6c(b), specifically states that regulations "may be made only after notice and opportunity for hearing," and since there was no regulation promulgated which specifically adopts the above regulations to the transactions, there has not

been the required hearing and the regulations do not apply.

To support their argument, Defendants rely on *Krause v. Forex Exch. Mkt., Inc.,* 356 F.Supp.2d 332 (S.D.N.Y.2005). In *Krause,* investors filed suit against a registered FCM (FXCM) and various other defendants. The liability of FXCM was based upon control person liability pursuant to section 13(b) and principal/agent liability pursuant to section 2(a)(1). The Court held that since registered FCMs are exempt from the CFMA's grant of jurisdiction, except with respect to certain sections specifically enumerated in § 2(c)(2)(C), and since neither section 13(b) nor section 2(a)(1) were among those enumerated provisions, the CEA claims against FXCM must be dismissed.

The CFTC agrees that the regulations at issue were in existence at the time the CFMA was enacted. However, the CFTC contends that when Congress enacted the CFMA to clarify its jurisdiction over certain retail foreign exchange transactions, Congress subjected the Defendants' conduct to the CEA in its entirety. The CFTC emphasizes that Congress is presumed to know the existing law when it enacts legislation, and that a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction (DE # 134 at 24).

At the outset, the undersigned notes that Defendants' reliance on *Krause* is unavailing since Defendants in the case at bar, unlike FXCM in *Krause,* are not proper counterparties, and therefore the construction of the exemption granted to registered FCMs (and certain of their affiliates) does not apply. At least three other cases in this District have adopted the arguments advanced by the CFTC. *See CFTC v. G7 Advisory Serv., LLC,* 406 F.Supp.2d 1289, 1297–98 (S.D.Fla.2005) (holding that 17 C.F.R. § 32.9 applies to

off-exchange currency transactions, since Congress took no affirmative act to deprive § 32.9 of effect with respect to Forex transactions, and to hold otherwise would by contrary to the CFMA's purpose of clarifying, not revoking the CFTC's authority to regulate off-exchange foreign currency transactions); *CFTC v. Next Fin. Serv. Unltd.,* 04–80562–CIV–KLR (S.D. Fla. June 7, 2005), DE # 85 at 20–23 (DE # 171) (same); *CFTC v. First Int'l Group,* 06–20972–CIV–AJ (S.D. Fla. DE # 34 Jan. 7, 2007), DE # 34 at 2n.3 (DE # 263) ("When Congress passed the CFMA it was simply *clarifying* the CFTC's jurisdiction. Given the presumption that Congress had knowledge of the law enacting the CFMA ... Regulation 32.9 applies to the transactions here."); *CFTC v. Valko,* 06–60001–CIV–WPD (S.D.Fla. Mar. 12, 2007), DE 129 at 7–12 (holding that both CFTC Regulations 32.9 and 32.11, which bar fraud in connection with commodity option transactions and suspend commodity option transactions not otherwise permitted under the regulations, are applicable to foreign currency transactions conducted by Defendants who are not proper counterparties, as are the sections of the CEA regarding control person liability, 7 U.S.C. §§ 13c(a) and 13c(b)).

The undersigned concurs with the opinions of the District Judges in the above cases. It is manifestly clear that by enacting the CFMA, Congress intended the CFTC to assert the entirety of its jurisdiction, and all of its existing regulations, over foreign currency transactions, with respect to all entities except for those specifically excluded under 7 U.S.C. § 2(c)(2)(B)(ii). Since, as previously discussed, neither of the two counterparties in the case at bar—Universal and QIX—

qualify for this exclusion, the full regulatory scheme applies in the case at bar.

2. *The Determination of Whether Transactions Involve Futures Contracts or Spot Transactions*

With respect to Phase I of the operations, the threshold issue is whether Sterling and Universal were engaged in spot transactions or futures transactions. The parties agree that the Commodity Exchange Act regulates only options contracts and futures contracts, but does not regulate spot transactions. Thus, if, as Defendants contend, the transactions at issue were spot transactions, the CFTC does not have jurisdiction to regulate those transactions. On the other hand, if the transactions are futures transactions, the CFTC possesses regulatory jurisdiction and may pursue the present enforcement action.

Under the Commodities Exchange Act, the CFTC may exercise jurisdiction over "transactions involving contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). The scope of the term "future delivery" is clarified in 7 U.S.C. § 1a(19), which provides: "The term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery." The Eleventh Circuit has not addressed the appropriate methodology for determining jurisdiction under this statute, and the Courts of Appeals are divided. The competing methodologies are illustrated by comparing the opinion in *CFTC v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 577–81 (9th Cir.1982)[34], with the opinions in *CFTC v. Zelener,* 373 F.3d 861 (7th Cir.2004); and *CFTC v. Madison Forex Int'l, LLC.,* Case No. 05–

---

**34.** *Accord CFTC v. Noble Wealth Data Info. Serv.,* 90 F.Supp.2d 676, 688–89 (D.Md.2000), which was adopted in *CFTC v. Baragosh,* 278 F.3d 319, 329 n. 3 (4th Cir.2002); *CFTC v.*

*Nat'l Inv. Consultants, Inc.,* 2005 WL 2072105 (N.D.Cal. Aug. 26, 2005); *CFTC v. Calvary Currencies LLC,* 437 F.Supp.2d 453, 460–64 (D.Md.2006).

61672–CIV–Altonaga (DE # 80, filed 7/19/06).[35].

In *Co Petro*, the Ninth Circuit examined contracts offered by Co Petro for the future purchase of petroleum products to determine whether the CFTC had regulatory jurisdiction over these sales. The Court described these contracts, which were titled "Agency Agreement for Purchase and Sale of Motor Vehicle Fuel" as follows:

> Under the Agency Agreement, the customer (1) appointed Co Petro as his agent to purchase a specified quantity and type of fuel at a fixed price for delivery at an agreed future date, and (2) paid a deposit based upon a fixed percentage of the purchase price. Co Petro, however, did not require its customer to take delivery of the fuel. Instead, at a later specified date the customer could appoint Co Petro to sell the fuel on his behalf. If the cash price had risen in the interim Co Petro was to (1) remit the difference between the original purchase price and the subsequent sale price, and (2) refund any remaining deposit. If the cash price had decreased, Co Petro was to (1) deduct from the deposit the difference between the purchase price and the subsequent sale price, and (2) remit the balance of the deposit to the customer. A liquidated damages clause provided that in no event would the customer lose more than 95% of his initial deposit.

680 F.2d at 576. The Court also examined the context in which the transactions occurred, noting that although the contracts were not as rigidly standardized as futures contracts traded on licensed markets, they were not individualized since there was uniformity in the units of volume offered for sale, the dates were uniform regarding notification of intent to resell a contract or take delivery, there was a right to offset the transaction, and the delivery date was set at ten months from the purchase date.

In determining that these transactions were futures contracts, the Court used a totality of the circumstances test:

> In determining whether a particular contract is a contract of sale of a commodity for future delivery over which the Commission has regulatory jurisdiction by virtue of 7 U.S.C. § 2 (1976), no bright-line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose. The contracts here represent speculative ventures in commodity futures which were marketed to those for whom delivery was not an expectation. Addressing these circumstances in the light of the legislative history of the Act, we conclude that Co Petro's contracts are "contracts of sale of a commodity for future delivery."

680 F.2d at 581.

The Seventh Circuit took a different approach in *Zelener*. There, the Seventh Circuit examined transactions which were very similar to the transactions at issue in the case at bar, and concluded that they were spot transactions over which the CFTC lacked enforcement jurisdiction. The similarity to the transactions in the case at bar is not coincidental; as discussed in more detail below, the business which was the subject of the *Zelener* opinion was the model for the business operations in Phase I of the Complaint in the case at bar. The focus of the Court in *Zelener* was whether the transactions at issue involved trading in "contracts" for the sale of a commodity, in which case they were futures transactions, or whether the

---

**35.** *Accord CFTC v. Erskine,* Case No. 04–CV–0016, 2006 WL 1050677 (N.D. Ohio April 19, 2006), *appeal docketed,* No. 06–3896 (6th Cir. Jun. 21, 2006).

transactions were for the purchase and sale of the underlying commodity, in which case they were not subject to the CFTC's jurisdiction. The Court expressly held that the motive and intent of the purchaser, *i.e.* to ultimately take delivery or to engage in speculation and enter into an offsetting transaction, was not a relevant factor in the analysis. In addition, the Court emphasized that the jurisdictional determination did not relieve the defendants of liability for fraud—it merely changed the avenue for pursuing such claims away from the CFTC to other avenues for relief.[36]

The transactions in *Zelener* were described by the Court as follows:

> AlaronFX deals in foreign currency. Two corporations doing business as "British Capital Group" or BCG solicited customers' orders for foreign currency.... Each customer opened an account with BCG and another with AlaronFX; the documents made it clear that AlaronFX would be the source of all currency bought or sold through BCG in this program, and that AlaronFX would act as a principal. A customer could purchase (go long) or sell (short) any currency; for simplicity we limit our illustrations to long positions. The customer specified the desired quantity, with a minimum order size of $5,000; the contract called for settlement within 48 hours. It is agreed, however, that few of BCG's customers paid in full within that time, and that none took delivery. AlaronFX could have reversed the transactions and charged (or credited) customers with the difference

in price across those two days. Instead, however, AlaronFX rolled the transactions forward two days at a time—as the AlaronFX contract permits, and as BCG told the customers would occur. Successive extensions meant that a customer had an open position in foreign currency. If the dollar appreciated relative to that currency, the customer could close the position and reap the profit in one of two ways: take delivery of the currency (AlaronFX promised to make a wire transfer on demand), or sell an equal amount of currency back to Alaron FX. If, however, the dollar fell relative to the other currency, then the client suffered a loss when the position was closed by selling currency back to AlaronFX.

373 F.3d at 863.

In *Zelener*, the CFTC focused on three principal factors to support its argument that the above transactions were futures contracts: "first, the positions were held open indefinitely, so that the customers' gains and losses depended on price movements in the future; second, the customers were amateurs who did not need foreign currency for business endeavors; third, none of the customers took delivery of any currency." 373 F.3d at 863. The Court rejected this "totality of the circumstances" approach, holding that the determination must be based on an analysis of the contract, rather than the intention of the parties or whether the contracts ultimately led to delivery:

> In organized futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an intermediary,

---

**36.** The Court emphasized that the challenged conduct "could form the basis of a mail-fraud or wire-fraud prosecution, a civil or criminal action under RICO, or fraud litigation in state court. Consumers or state attorneys general could invoke consumer-protection laws as well. It is unnecessary to classify the transactions as futures contracts in order to provide remedies for deceit. Why stretch the Commodity Futures Act—with resulting uncertainty, litigation costs, and potentially unhappy consequences for other economic arrangements that may be swept into a regulatory system not designed for them—when other remedies are ready to hand?" 373 F.3d at 867.

the clearing corporation. Clearing houses eliminate counterparty credit risk. Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract. All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time. Forward and spot contracts, by contrast, call for sale of the commodity; no one deals "in the contract:" it is not possible to close a position by buying a traded offset, because promises are not fungible; delivery is idiosyncratic rather than centralized. *Co Petro,* the case that invented the multi-factor approach, dealt with a fungible contract, see 680 F.2d at 579–81, and trading did occur "in the contract." That should have been enough to resolve the case.

It is essential to know beforehand whether a contract is a futures or a forward. The answer determines who, if anyone, may enter into such a contract, and where trading may occur. Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful. Nothing is worse than an approach that asks what the parties "intended" or that scrutinizes the percentage of contracts that led to delivery *ex post* .... But reading "contract of sale of a commodity for future delivery" with an emphasis on "contract," and "sale of any cash commodity for deferred shipment or delivery" with an emphasis on "sale" nicely separates the

domains of futures from other transactions.

373 F.3d at 866.

The Court expressly rejected the CFTC's contention that the rollovers turned these contracts into futures contracts, holding that the CFTC's position was not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), since Congress had not delegated this determination to the CFTC. 373 F.3d at 867. Thus, rather than turn to the totality of circumstances, the Court examined the contract to determine whether trading occurred in fungible contracts. Since customers of AlaronFX did not purchase identical contracts since each was unique in the amount of currency and in timing, and did not have defined expiration or delivery dates, the Court concluded that the contracts were not fungible *unless* there was a promise to create an offset. The Court recognized that "A promise to create offsets makes a given setup work *as if* fungible: although the customer can't go into a market to buy an equal and opposite position, the dealer's promise to match the idiosyncratic terms in order to close the position without delivery means that the customer can disregard the absence of a formal exchange." 373 F.3d at 868.

Examining the account opening documents, the Court concluded that the following language, which is nearly identical to the language in the case at bar, did not give the customer an automatic right to offset, and that therefore the contracts were not fungible.[37] In sum, the Court

---

**37.** The Court stated: "Paragraph 8 provides that if a customer's account contains "two or more open and opposite Contracts providing ... for the purchase and sale of the same Foreign Currency ... on the same Value Date, such Contracts shall automatically be canceled and replaced by an obligation to settle only the net difference" .... Paragraph 9, on which the Commission places its principal reliance, does not contain any promise. What it says instead is that, if the client fails to give timely instructions about the disposition of the positions, then 'AlaronFX is authorized, in AlaronFX's sole discretion, to deliver, roll over or offset all or any portion of the Open Position in Customer's Account at

concluded: "These transactions were, in form, spot sales for delivery within 48 hours. Rollover, and the magnification of gain or loss over a longer period, does not turn sales into futures contracts. . . ." 373 F.3d at 869.

In *CFTC v. Madison Forex Int'l, LLC.,* *supra.,* this Court followed the *Zelener* approach, and determined that transactions which occurred on the same on-line foreign exchange platform that was used in *Zelener* and this case were not futures contracts, but were spot transactions not subject to the regulatory jurisdiction of the CFTC.

The undersigned concludes that the approach taken by the Seventh Circuit in *Zelener* should be followed in the case at bar. This approach leads to consistency in the application of the CFTC's regulatory jurisdiction, based upon the provisions of the contracts into which the parties enter, rather than the uncertainty created by a post-hoc determination, based upon the totality of the circumstances. As recognized by the Seventh Circuit, there is a need for certainty regarding the legal duties of persons offering commodities for sale that is undermined by the examination of facts outside the contractual obligations.

An examination of the account documents in the case at bar reflects that, as in *Zelener* and *Madison Forex,* the customers were clearly advised that these were spot transactions and there was no absolute right to offset. The undersigned recognizes that there are some differences upon which the CFTC has relied to distinguish this case. However, those differences are not material.[38] In fact, the problem with a post hoc determination of coverage is exemplified, in part, by the position of the CFTC in the case at bar. On the one hand, the CFTC contends that it has jurisdiction over these transactions; on the other hand, it asserts that Defendants misled its customers into believing that the transactions were covered by the CFTC by including the risk disclosure statement mandated by 17 C.F.R. § 1.55(c), Appendix A, and an arbitration agreement that states any disputes shall be resolved by arbitration in accordance with Part 180 of the CEA. The testimony of Andrew Stern that he included these provisions in an abundance of caution due to the lack of guidance from the CFTC regarding Forex transactions following the enactment of the CFMA, and the uncer-

---

Customer's risk.' This paragraph does not give the client a right to purchase an offsetting position and thus close a transaction; that option belongs to AlaronFX rather than to the customer. As for ¶ 5: subsection 5.3 says that 'AlaronFX will attempt to execute all Orders that it may, in its sole discretion, accept from Customer in accordance with Customer's instructions. . . .' That's not a promise to close any given position by offset. This subsection continues: 'AlaronFX or its affiliates may, at a future date, establish a trade matching system. . . . In that event, AlaronFX . . . shall have the right (but not the obligation) . . . to act for its own account, and as a counter party or as a broker to AlaronFX customers, in the making of markets.' The Commission does not contend that such a 'trade matching system' was ever established. Customers thus had no assurance that they could close their positions by offset. The only *promise* was that, if AlaronFX did not buy back the currency (and thus create an offset under ¶ 8), it would deliver. This looks more like the business of a wholesaler in commodities such as metals or rare coins than like a system of trading in fungible contracts that characterizes futures exchanges." 373 F.3d at 868.

38. Perhaps the most significant difference is the disclosure of the commission rate in this case as "per round turn lot." However, there is scant evidence in the record regarding what this meant; and, the fact that the commission would be charged only on the first transaction, and not for any subsequent disposition, is not sufficient to create a right on the part of the customer to offset the transaction.

tainty of the CFTC's jurisdiction is credible.

The transactions at issue in Phase I were, in form, spot sales for delivery within 48 hours, as were the transactions in *Zelener*. The Customer Agreement expressly states that "trader acknowledges that the purchase or sale of a Currency always anticipates the accepting or making of delivery." The Agreement also provides that a customer could take actual delivery on the settlement date, and the evidence supports that fact that Universal had the ability to make delivery.

In addition, the account documents do not give the customer an absolute right to offset their transactions; although, at the discretion of Universal, offset was certainly contemplated:

> UFX also reserves the right to refuse to accept any order. (Agreement at Bates No. 101 00035)

> UFX retains the right to limit the amount and/or total number of open positions that Trader may acquire or maintain at UFX. UFX will attempt to execute all orders, which it may, *in its sole discretion,* choose to accept in accordance with the oral or written, or computer instructions of the Trader's. UFX reserves the right to refuse to accept any order. (Agreement at Bates No. 101 00037) (emphasis added).

In addition, as in *Zelener*, the contracts were unique in amount of currency and in timing; there were no defined expiration or delivery dates as is common with futures contracts.

The CFTC argues that the rollovers were, in fact, sham transactions that did not really occur. If this is the case, it does not mean that the contract was a "futures" contract within the jurisdiction of the CFTC, rather than a contract for the purchase and/or sale of a commodity.[39] What it means is that Defendants engaged in fraudulent conduct, and are subject to the traditional civil and/or criminal remedies for fraud. The same remedies apply with respect to the radio advertisements used by Sterling to market these transactions. Some of these ads appear to be marketing futures transactions, particularly the ad that states customers who invested $2,000.00 would control $100,000.00 of the currency, but wouldn't "physically own that" (DE # 132, Att. D at 27). On the other hand, other ads referred to the purchase and sale of "pure" currency (DE # 132, Att. F at 19). The marketing pitch of introducing brokers such as Sterling, however, cannot logically control the jurisdiction of the CFTC to regulate the actual transactions conducted by Universal (or any other counterparty, for that matter). If this were the case, Universal would be subject to the jurisdiction of the CFTC, and its panoply of regulations, with respect to transactions with customers of some introducing brokers, but not subject to those regulations with respect to identical transactions entered into with customers of other introducing brokers. This result is not tenable, and illustrates the wisdom of the Court's approach in *Zelener*, which focuses on the account opening documents.

---

**39.** The undersigned finds, however, that the CFTC did not prove at the hearing that the transactions were, in fact, sham transactions. Based upon the evidence adduced at the hearing, including testimony that Universal purchased currency overseas to cover its domestic transactions with Sterling, the undersigned finds that the transactions were for the sale of currency with settlement dates that did not exceed 48 hours, and rollovers occurred in the manner described by Stern. Although additional or more persuasive evidence of sham transactions may exist, the Court must rule on the record as it presently stands.

It bears repeating, however, that this decision does not excuse or relieve sellers of these commodities from the consequences of fraud; on the contrary, they remain subject to the traditional remedies for fraudulent transactions.

Since the undersigned has determined that the transactions in Phase I do not fall within the jurisdiction of the CFTC, Counts I and II of the Complaint, as well as that part of Count III which relates to Universal, cannot support injunctive relief.[40]

3. *Violations of 7 U.S.C. § 6h (Section of 4h of the CEA) False Representations Regarding Status as a Member of a Registered Entity or as Registrants Under the Act (Count 3)*

The CFTC contends that through its account opening documents, QIX falsely represented that it was a registrant under the Act, and falsely represented, in connection with handling of orders for foreign currency options, that the options would be executed by or through a member of a registered entity (DE # 136 at 36). Title 7, United States Code, Section 6h provides that it is unlawful for any person to falsely represent themselves to be a member of a registered entity.

Assuming that the initial documents of QIX, which stated, "QIX, Inc. is an affiliate of a Futures Commission Merchant with the Commodity Futures trading Commission ("CFTC"), and is a member of the NFA pursuant to the provisions of the Commodity Exchange Act" were misleading, the undersigned notes that, long before this lawsuit was initiated, and as soon as the misleading nature of this statement was brought to the attention of Defendant

Stern, he caused it to be corrected in accordance with language suggested by the NFA. In March 2004, the language was changed to provide: "QIX, Inc. is an affiliate of a futures commission merchant which is registered with the Commodity Futures Trading Commission ("CFTC") and is a member of the National Futures Association ("NFA") pursuant to the provisions of the Commodity Exchange Act" (QIX Account Doc. at 17).

In its initial Proposed Findings of Fact (DE # 74 at 28–29), as well as post-hearing brief (DE # 136 at 35–36), the CFTC includes statements that QIX falsely represented that it was a registrant; however, the CFTC does not even address this alleged violation by QIX in its supporting memoranda of law (DE ## 134, 155).

The undersigned finds that, to the extent that QIX made initial misrepresentations, they were promptly corrected. In addition, QIX has ceased doing business, and there is no likelihood that it will resume business. Therefore, to the extent that the CFTC has not abandoned its argument by failing to present it in its post-hearing brief, injunctive relief is not necessary with respect to this alleged violation.

4. *Violations of 7 U.S.C. § 6c(b) (Section 4c(b) of the CEA) and 17 C.F.R. § 32.11(a) Through the Offer and Sale of Off–Exchange Commodity Options*

■ In Count 4 of the Complaint, the CFTC alleges that all of the transactions conducted by QIX were illegal under 17 C.F.R. § 32.11, which prohibits the purchase or sale of any commodity option (with certain exceptions not relevant to

**40.** The undersigned notes that if Congress disagrees with the *Zelener's* interpretation of the CFTC's jurisdiction, or determines that the CFTC should have a more expansive jurisdiction over foreign currency transactions, it can

enact the legislation proposed by the CFTC on May 20, 2005, which "revises the Commission's existing jurisdiction over retail foreign exchange transactions to address ... the recent *Zelener* decision" (DE # 168).

this case) except transactions "conducted on or subject to the rules of a contract market or a foreign board of trade in accordance with the provisions of section 4c of the Act."

As stated above, the undersigned concludes as a matter of law that this provision applies to the transactions of QIX, and therefore all of the foreign currency options transactions conducted in Phase II were illegal. However, as demonstrated by the uncontradicted testimony of Defendant Stern, as soon as he was made aware of the Commission's position in this regard, QIX terminated its relationship with its introducing brokers and their customers. QIX offered customers the choice of liquidating positions, moving positions to QIX Futures, or moving positions to another FCM. All of QIX's capital was transferred to QIX Futures, and QIX has ceased conducting business. The CFTC is kept apprised of the financial activities of QIX Futures, and made no showing of dissipation or hiding of assets. The undersigned notes that fraud has not been alleged in the Complaint upon which the request for injunctive relief was predicated with respect to the transactions of QIX.

Based upon the totality of the circumstances, as set forth in *SEC v. Zale*, and *SEC v. The Globus Group, Inc.*, and especially considering the frequency with which Defendant Stern consulted with the NFA, and corrected concerns which were brought to his attention, and considering the unsuccessful attempts of the NFA to obtain clarity from the CFTC regarding the "affiliate" exemption from coverage, and the voluntary cessation of business by QIX, Graystone and STG when this lawsuit was filed, the undersigned finds that *preliminary* injunctive relief is not warranted. In addition, the CFTC has not provided sufficient evidence to support the need for an asset freeze.

## IV. CONCLUSION

Based upon the foregoing analysis the undersigned concludes that:

1. The CFTC does not have jurisdiction over the transactions alleged between Defendants Universal and Sterling.

2. Defendant QIX is subject to the full panoply of regulations promulgated by the CFTC with respect to trading in foreign currency options.

3. Regulation 32.11(a), 17 C.F.R. § 32.11(a), prohibits Defendant QIX from engaging in off-exchange foreign currency option transactions.

4. Preliminary injunctive relief is not necessary to enforce compliance with the CEA.

Therefore, it is hereby

**RECOMMENDED** That Plaintiff's Motion For Preliminary Injunction be **Denied.**

**DONE AND SUBMITTED** in Miami, Florida, this 23rd day of July, 2007.

The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned. Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.), *cert. denied*, 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993).

## REPORT AND RECOMMENDATION

Presently pending before the Court is Defendants' Joint Motion to Dismiss Amended Complaint (DE # 159). This motion is referred to the undersigned Magistrate Judge to take all necessary and proper action as required by law (DE

# 257).  The motion is fully briefed (DE ## 160, 165, 172).  For the reasons stated below, it is respectfully recommended that the Motion be Granted as to Counts I, III, and part of Count IV, and otherwise denied.

## I. BACKGROUND

The Commodity Futures Trading Commission ("CFTC") has filed a five-count Amended Complaint alleging violations of the Commodities Exchange Act ("the Act"), as amended by the Commodities Futures Modernization Act of 2000 ("the Modernization Act" or "CFMA"), against Defendants Sterling Trading Group, Inc. ("Sterling"), Universal FX, Inc. ("UFX"), STG Global Trading, Inc. ("STG"), QIX, Inc. ("QIX"), Graystone Browne Financial, Inc. ("Graystone"), Joseph Arsenault and Andrew Stern (DE # 151).

More specifically, the Amended Complaint alleges in Count One that Defendants Sterling, Universal, Arsenault, and Stern committed fraud and deceit in the offer and sale of foreign exchange futures contracts, in violation of 7 U.S.C. § 6b(a)(i) and (iii) [1] and 17 C.F.R. § 1.1(b)(1) and (3) (Amended Complaint ¶¶ 114–21).  The Amended Complaint alleges that Defendant Arsenault directly or indirectly controlled Sterling, and is therefore liable as a controlling person pursuant to 7 U.S.C. § 13c(b) (Amended Complaint ¶¶ 66–69, 117).  The Complaint further alleges that Defendant Sterling liable as a principal, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, since the acts or omissions complained of were committed by Arsenault and other Sterling representatives within the scope of their employment with Sterling (Amended Complaint ¶ 118).  The liability of Defendant Stern is predicated upon the allegation that he is a controlling person with respect to Universal, pursuant to 7 U.S.C. § 13c(b) (Amended Complaint ¶¶ 61–65, 119).  The Amended Complaint alleges that Universal is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, for (1) the acts and omissions of its employees; and (2) the acts of Sterling as its agent (Amended Complaint ¶¶ 70–77, 120–21).

In Count Two, the Amended Complaint alleges that Defendants Graystone, STG, Arsenault and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1, 3) and 32.9(a, c) (Amended Complaint ¶¶ 122–27).  Similar to Count One, the Amended Complaint alleges control person liability with respect to Defendant Arsenault for the activities of Defendants Graystone and STG (Amended Complaint ¶¶ 99–101, 125).  The Amended Complaint further alleges that Defendants Graystone and STG are liable as principals, since the acts or omissions complained of were committed by Graystone and STG representatives within the scope of their respective employments (Amended Complaint ¶ 126).  Finally, the Amended Complaint alleges that QIX is liable as a principal for the acts of Graystone and STG as its agent (Amended Complaint ¶¶ 102–08, 127).  Defendant Stern is not charged with liability in Count Two.

In Count Three, the Amended Complaint alleges that Defendants Sterling, Universal, Arsenault and Stern violated 7 U.S.C. § 6(a) through the offer and sale of commodity futures contracts which were not conducted on a board of trade designated as a contract market (Amended Complaint ¶¶ 128–33).  Like Count One, the Amended Complaint alleges princi-

---

1.  Section 6 of Title 7 codifies Section 4 of the Commodity Exchange Act. Although the Amended Complaint and the memoranda of the parties cite to both, this Report and Recommendation uses only the citation to the appropriate section of Title 7.

pal/agent liability with respect to Defendants Sterling and Universal; and control person liability with respect to Defendants Arsenault and Stern.

In Count Four, the Amended Complaint alleges that Defendants Universal, QIX and Stern violated 7 U.S.C. § 6h by falsely representing that Universal and QIX were members of a registered entity and/or that Universal and QIX were registrants under the Act (Amended Complaint ¶¶ 134–36). The Amended Complaint alleges control person liability with respect to Defendant Stern (Amended Complaint ¶¶ 98, 136). Defendants Sterling, Graystone and STG are not charged with liability in Count Four.

In Count Five, the Amended Complaint alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade (Amended Complaint ¶¶ 137–41). The Amended Complaint alleges that Defendant Arsenault is liable for these violations as a control person with respect to Graystone and STG; and that Defendant Stern is liable as a control person of QIX.

As relief, the Amended Complaint seeks the following (DE # 151 at 40–41):

a. a permanent injunction prohibiting the defendants and any other person or entity associated with them, or any successor thereof, from engaging in conduct violative of the provisions of the Act as alleged in this Complaint, and from engaging in any activity relating to commodity interest trading, including but not limited to, soliciting, accepting or receiving funds, revenue or other property from any person, giving advice for compensation, or soliciting prospective customers, related to the purchase and sale of any commodity futures or options on commodity futures contracts;

b. an order directing the defendants and any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constituted violations of the Act, as described herein, and interest thereon from the date of such violations;

c. an order directing the defendants to make full restitution to every customer whose funds were received by them as a result of acts and practices which constituted violations of the Act, as described herein, and interest thereon from the date of such violations;

d. an order directing the defendants to pay a civil monetary penalty in the amount of not more than the higher of $120,000 or triple the monetary gain to each defendant for each violation of the Act or Regulations; and

e. such other and further remedial ancillary relief as the Court may deem appropriate.

The Amended Complaint concerns transactions that occurred during two different phases of operations involving overlapping defendants, and contains detailed allegations regarding the nature of the operations and the allegedly fraudulent activities which occurred. The CFTC alleges that during Phase I of the operations, which occurred between July 2002 and August 2003, Sterling, controlled by Arsenault, used misleading radio advertisements; high-pressured, misleading telemarketing sales tactics; false and misleading account-opening documents; and other deceptive practices to fraudulently solicit retail customers to engage in for-

eign currency futures transactions with Universal, which was controlled by Stern. The Amended Complaint also alleges that these transactions were illegal since Universal was not a proper counterparty to the transactions. (Amended Complaint ¶¶ 20–77).

The Amended Complaint alleges that during Phase II of the operations, which occurred between August 2003 and June 7, 2004, Graystone and STG, under the control of Arsenault, solicited retail customers to enter into foreign currency options transactions with QIX, which was controlled by Stern. The Amended Complaint alleges that Graystone and STG used false and misleading sales solicitation materials, high-pressure and deceptive sales tactics, and failed to provide access to account information regarding these transactions. The Amended Complaint also alleges that these transactions were illegal since QIX was not a proper counterparty to the transactions (Amended Complaint ¶¶ 77–108).[2]

The Amended Complaint contains a detailed recitation of the specifically alleged fraudulent activities with respect to both phases.

## II. THE POSITIONS OF THE PARTIES

At the outset, the undersigned notes that, to the extent that the Motion to Dismiss is a factual challenge on the jurisdiction of the Court, both parties rely on the evidence adduced at the evidentiary hearing held in connection with the CFTC's request for a preliminary injunc-

tion, and the voluminous documents filed in connection with those proceedings.

Defendants argue that the transactions which occurred during Phase I were "spot transactions" rather than futures contracts, and thus the CFTC does not have jurisdiction over those transactions. The parties agree that if the transactions at issue were spot transactions the CFTC does not have jurisdiction. Based upon this argument, Defendants contend that the CFTC lacks jurisdiction over Counts One, Three and that part of Count Four alleging transactions during Phase I.

In addition, relying on the CFMA, 7 U.S.C. § 2(c)(2)(B)(ii)(III), Defendants contend that Defendants Universal and QIX are affiliated persons of a Futures Commission Merchant ("FCM"); that Congress completely exempted such affiliated persons from the CFTC's jurisdiction; and, thus, the CFTC does not have jurisdiction over any of the claims asserted.

In the alternative, Defendants contend that the CFTC's jurisdiction over foreign currency transactions is limited to specified subsections listed in 7 U.S.C. § 2(c)(2)(B)(ii)(III), which do not include the principal/agent claims made pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2; the control person claims made pursuant to 7 U.S.C. § 13c(b); the alleged violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1, 3) and 32.9(a, c), regarding fraud and deceit in the sale of off-exchange foreign currency options, contained in Count Two; the alleged violation of 7 U.S.C. § 6(a), regarding the sale of off-exchange futures contracts, contained in

---

**2.** The Amended Complaint (DE # 151) differs from the initial Complaint filed in this case in that the CFTC added a fraud claim with respect to the Phase II transactions (between August 2003 and June 7, 2004) in which STG and Graystone acted as agents of and introducing entities for QIX. This claim is contained in Count Two of the Amended Complaint, and the original Counts Two, Three and Four have been renumbered, respectively as Counts Three, Four and Five. Although the Amended Complaint is not the basis for the request for preliminary injunctive relief, the undersigned notes that the same jurisdictional arguments apply to both the original Complaint and the Amended Complaint.

Count Three; the alleged violation of 7 U.S.C. § 6h, regarding the false representation of registration status, contained in Count Four; or the alleged violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11, regarding the sale of off-exchange options contracts, contained in Count Five.

Finally, they claim that CFTC Regulations 32.9 (alleged in Count Two) and 32.11(a) (alleged in Count Five) should be dismissed as a matter of law because those regulations were not applicable to foreign currency transactions prior to the enactment of the CFMA, and Congress gave the CFTC no authority to use previously existing regulations "as part of its new, but limited, jurisdiction over foreign currency transactions" (DE # 160 at 14). Defendants contend that to apply those regulations to the transactions in the case at bar would violate 7 U.S.C. § Section 6c(b), which requires notice and a hearing prior to the promulgation of regulations.

With respect to the prayer for relief, Defendants contend that the Court should dismiss or strike the claim for restitution because the CEA provides no authority for the CFTC to seek restitution to a third party in a federal court proceeding.

Finally, Defendants contend that the Complaint contains commingled claims in violation of Fed.R.Civ.P. 10(b), and that the individual claims fail to allege "key elements" needed to support the alleged control person and principal/agent claims.

In response (DE # 165, which incorporates by reference DE # 43), the CFTC first claims that, pursuant to the rationale of *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir.1990), this Court should not resolve disputed material issues of fact regarding the jurisdictional challenge to Phase I of the operations, since that challenge directly implicates the merits of the case. The CFTC claims next that the overwhelming evidence adduced at the evidentiary hearing supports their claim that the transactions in Phase I of the operations are futures transactions within the jurisdiction of the CFTC.

The CFTC also asserts that neither Universal nor QIX are proper counterparties exempt from regulation under the provisions of 7 U.S.C. § 2(c)(2)(B)(ii)(III), and therefore they are subject to the jurisdictional grant to the CFTC over all covered commodity transactions. In addition, the CFTC contends that the reservation of jurisdiction in 7 U.S.C. § 2(c)(2)(C) that exists with respect to certain regulations, applies to all registered FCMs and affiliates, and that it has jurisdiction under this provision to enforce its regulations under section 2(a)(1)(B) with respect to principal/agent liability, and under 13(b) with respect to control person liability.

The CFTC disagrees with Defendants' claim that only regulations which were expressly incorporated by the CFMA, or promulgated thereafter can be applied to foreign currency transactions. The CFTC asserts the action of Congress in enacting the Commodity Futures Modernization Act to "clarify" the jurisdiction of the CFTC with respect to foreign currency transactions, made all then-existing regulations applicable to the transactions which fall within the clarified scope of the CFTC's jurisdiction.

With respect to the challenge to the sufficiency of the Complaint under Fed. R.Civ.P. 10(b), the CFTC asserts that it has not improperly commingled claims, and that setting forth separate counts for controlling person liability and principal/agent liability would not facilitate a clearer presentation of its claims. In addition, a more definite statement should not be required under Fed.R.Civ.P. 12(e) since the Complaint provides detailed notice of the CFTC's claims against Defendants.

Finally, the CFTC argues that pursuant to 7 U.S.C. § 13a–1, this Court has the

authority to grant complete equitable relief, including the authority to order restitution as part of its ancillary relief.[3]

## III. *STANDARDS OF REVIEW*

Defendants seek dismissal of the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(1) on the grounds that the Court lacks subject matter jurisdiction, and pursuant to Fed.R.Civ.P. 12(b)(6), on the grounds that the Complaint fails to state a claim upon which relief can be granted.

██ Under Fed.R.Civ.P. 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction. *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994). Attacks on subject matter jurisdiction come in two forms—a facial attack based upon the allegations of the Complaint, and a factual attack which goes beyond the four corners of the Complaint. Where, as here, the attack is factual, the trial court may proceed as it never could under 12(b)(6). Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *See Goodman v. Sipos*, 259 F.3d 1327, 1331 n. 6 (11th Cir. 2001) ("district court properly went beyond the pleadings in order to determine whether it lacked subject matter jurisdiction"); *McMaster v. United States*, 177 F.3d 936, 940 (11th Cir.1999); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir.1990). In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of subject matter jurisdiction claims.

██ There is an exception to this general rule, however, where the factual attack on jurisdiction involves facts that are also intertwined with a determination on the merits of the case. In that case, the Court must apply a Rule 56 summary judgment standard. *Lawrence v. Dunbar*, 919 F.2d at 1530.

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that dismissal of a claim is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir.1994) (*quoting Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). On a motion to dismiss, the Court must accept as true all facts alleged and draw all inferences therefrom in the light most favorable to the non-moving party. *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir.1994). A very low sufficiency threshold is necessary for a complaint, or counterclaim, to survive a motion to dismiss. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir.1985) (citation omitted). Moreover, a complaint should not be dismissed for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *M/V Sea Lion V v. Reyes*, 23 F.3d 345, 347 (11th Cir.1994) (citation omitted).

Finally, under Fed.R.Civ.P. 12(e), a motion for more definite statement should be granted only where the pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." *See Betancourt v. Marine Cargo Mgmt., Inc.* 930 F.Supp. 606, 608

---

**3.** The CFTC's claim that the Motion to Dismiss should be denied as untimely was resolved by the prior Order which granted Defendants' motion for extension of time to respond to the Amended Complaint (DE # 213).

(S.D.Fla.1996); *Moore v. Fidelity Financial Services, Inc.*, 869 F.Supp. 557, 559–60 (N.D.Ill.1994). Motions under this rule are most commonly granted where a Complaint is defective under the provisions of Fed.R.Civ.P. 10(b), which requires that, "[e]ach claim founded upon a separate transaction or occurrence . . . shall be stated in a separate count . . . whenever a separation facilitates the clear presentation of the matters set forth."

## IV. THE JURISDICTION OF THE CFTC OVER THE PHASE I TRANSACTIONS

### A. Introduction

The parties have incorporated by reference the various memoranda filed in connection with the evidentiary hearing on this issue that was held in connection with the CFTC's Motion for Preliminary Injunction. However, the CFTC makes the additional argument that the jurisdictional challenge directly implicates the merits of their claim, and therefore this Court must apply the summary judgment standard in evaluating its jurisdiction. This argument was squarely rejected by the Court in *CFTC v. Madison Forex Int'l.*, 05–61672–CIV–ALTONAGA, DE #80 at 4 n.1 (S.D.Fla. July 19, 2006) (DE #250) ("The CFTC does not explain how the Defendants' jurisdictional challenge to the reach of the CEA implicates the merits of the CFTC's fraud allegations."); and, in *CFTC v. Next Fin. Serv., Unltd.*, 04–80562–CIV–RYSKAMP, DE #85 at 9–10 (S.D. Fla. June 7, 2005) (DE #171) ("CFTC fails to explain, and the Court cannot discern, how this action involves intermingling of jurisdictional and actual facts: at issue is whether the CEA allows regulation of Defendants, not whether Defendants engaged in fraud.")

In the case at bar, the parties do not dispute that the issue of whether the transactions alleged in Phase I of the Complaint are futures contracts is a matter of law to be determined by the Court. As discussed in the Report and Recommendation regarding the Motion for Preliminary Injunction, the determination of this legal issue is not affected by whether or not Defendants committed the fraudulent practices alleged in the Complaint.

### B. Facts Regarding Phase I Operations

Detailed findings of fact entered with respect to the Motion for Preliminary Injunction (DE #270) are adopted and incorporated by reference into this Report and Recommendation. Therefore, the undersigned sets forth below the facts in abbreviated form.

The CFTC is an independent federal regulatory agency that is charged with the responsibility for administering and enforcing the provisions of the Commodity Exchange Act (DE #72, ¶64).

Defendant Universal FX, Inc. ("Universal" or "UFX")[4] was a trading firm that engaged in transactions in foreign currency (DE #72, ¶4), and was formed with the intention of conducting retail foreign currency business (DE #111, Stern Test. at 61). From approximately August 2002 until approximately December 2003, Universal acted as a counterparty to retail off-exchange transactions in foreign currency (DE #72, ¶¶9, 14). In its role as counterparty, Universal executed customer trades, accepted customer money, and took the opposite side of customer trades (DE #72, ¶10). All of Universal's clients came from introducing brokers; except on rare occasions, the individual investors did not di-

---

**4.** In the parties' memoranda and this Report and Recommendation, Universal FX, Inc. is referred to as "Universal." However, in various underlying documents regarding the accounts at issue in the case at bar, Universal FX is referred to as "UFX."

rectly contact the trading desk (DE # 4, Ex. 2, Att. F (Michael's Test. at 52–53, 60–61)).[5]

Defendant Sterling Trading Group, Inc. ("Sterling") was among several other introducing entities that introduced customers to Universal (DE # 72, ¶¶ 27, 28). Sterling was incorporated as a Florida corporation by Joseph Arsenault on or about May 9, 2002 (DE # 72, ¶ 15). Sterling has never been registered with the CFTC in any capacity (DE # 72, ¶ 16). At the time of Sterling's incorporation, Arsenault was Sterling's chief executive officer and sole shareholder (DE # 72, ¶ 17). At all times since Sterling's incorporation, Arsenault has owned either all shares of Sterling, or a controlling interest of the shares of Sterling (DE # 72, ¶ 19).

Sterling was active as a business from approximately August 2002 through July 2003, and solicited customers to engage in transactions in foreign currency with Universal as the counterparty (DE # 72, ¶ 25). Sterling customers who opened an account with Universal did so by completing account opening documents provided by Universal, and transmitting funds to Universal (DE # 72, ¶¶ 29, 30). All customer funds were made payable to Universal. Universal would not accept money from Sterling or any other introducing entity, and would not accept checks made out to any introducing entity (DE # 72, ¶ 31).

Sterling used customer account documents that were provided by Universal.[6] The first document in the package is a Notice to Traders, which identifies the transactions at issue as involving "ac-counts to speculate and/or purchase and/or sell cash or spot foreign currency." Customers were advised that "there may be certain cases in which trading liquidity decreases causing trading in a certain Currency to cease, thereby preventing the liquidation of an adverse position that may result in a substantial financial loss" (¶ 1). It further states that "trader acknowledges that the purchase or sale of currency always anticipates the accepting or making of delivery" (¶ 3), and that "UFX also reserves the right to refuse to accept any order" (¶ 4). In paragraph 7, which advises the Trader of off-exchange transactions, it states, "It may be difficult or impossible to liquidate an existing position...."

The next document, entitled, "Trader Agreement," provides that Universal agrees to provide services in connection with the purchase and sale of cash currencies (including financial instruments) and any similar instruments (collectively referred to as 'OTCFX'). Paragraph 1 contains an authorization to trade, under which "UFX is authorized to purchase and sell OTCFX for Trader's account(s) ... in accordance with Trader's oral or written or computer instructions. Unless instructed by Trader to the contrary in writing, UFX is authorized to execute all orders with such banking institutions, counter party, bank, or sophisticated institutional participants as UFX deems appropriate" (¶ 1). In paragraph 3, entitled "Margins and Deposit Requirements," the Agreement states, "UFX will attempt to execute

---

**5.** The first Declaration of Investigator Koh sets forth an analysis of the activity of eleven introducing brokers during selected periods of time (DE # 4, Ex. 2 at ¶¶ 9 and 10). During the two-week period from May 1, 2003 through May 14, 2003, Sterling was responsible for $575,101.91, which is approximately 51% of the customer funds deposited at Universal, with the remainder divided among eight additional introducing brokers (*Id.* at ¶ 9). During the month of January 2003, Sterling was responsible for $717,430.00, which is approximately 67% of the customer funds deposited at Universal (*Id.* at ¶ 10).

**6.** The three versions of the account opening documents are contained in DE # 4, Ex. 2, Koh Decl. at Atts. A, B, and C.

all orders, which it may, in its sole discretion, choose to accept in accordance with the oral or written, or computer instructions of Trader's. UFX reserves the right to refuse to accept any order." Paragraph 5 sets forth the mechanism under which a customer can request the settlement and rollovers "with respect to purchases or sales of Currencies." It states, "Except as provided herein, during the term of the Currency position, Trader shall give UFX instructions for rolling the Currency position no later than two hours prior to the settlement of trading in the Currency contract on the day Trader intends to rollover a Currency position. In addition, Trader, by noon of the business day before the settlement date of the contract of the Currency contract, shall instruct UFX whether to deliver, offset or rollover the Currency position. In the absence of timely instructions from Trader, UFX is authorized, at UFX's absolute discretion to deliver, rollover or offset all or any portion of the Currency positions ..."

The account opening documents do not set a specific time with respect to the length of time between the opening of the transaction and the settlement date, but Universal used the industry custom of 48 hours (DE # 111, Stern Test. at 93).

A disclosure statement sets forth the agreement between the introducing brokers, such as Sterling, and Defendant Universal, and provides the dollar amount of "commissions per round turn lot" which will be charged to the customer and payed to Sterling (DE # 4, Ex. 2, Koh Decl., Att. B at 101 00075). A later version of this disclosure statement also contained information concerning mark-ups that would be charged, and provided the amounts charged for both the purchase (open) and sale (close) of currencies. It also provided the following example to describe the effect of commissions and mark-ups on the profitability of speculating on foreign currencies:

> For example, if you trade the EUR/USD and your IB charges $150 in commissions with a 2 pip mark-up on the open, and a 2 pip mark-up on the close, you need a $190 move to overcome all commissions and fees before any profit is realized. In the EUR–USD market, that would equate to a 19 pip move in your favor.

(DE # 4, Ex. 2, Koh Decl., Att. C at 101 00031).

The account opening documents also included a Limited Power–of–Attorney which authorized Sterling to act as Trading Agent for the Customer "to purchase and sell currencies on the OTCFX market and/or options on OTCFX market contracts on margin...." (DE # 4, Ex. 2, Koh Decl., Att. B at 101 00077).

### C. Legal Analysis

The same framework for analysis set forth in the Report and Recommendation regarding the Motion for Preliminary Injunction applies to the present Motion to Dismiss. That analysis is set forth below.

The parties agree that the Commodity Exchange Act regulates only options contracts and futures contracts, but does not regulate spot transactions. Thus, if, as the defendants contend, the transactions at issue were spot transactions, the CFTC does not have jurisdiction to regulate those transactions. On the other hand, if the transactions are futures transactions, the CFTC possesses regulatory jurisdiction and may pursue the present enforcement action.

Under the Commodities Exchange Act, the CFTC may exercise jurisdiction over "transactions involving contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). The scope of the

term "future delivery" is clarified in 7 U.S.C. § 1a(19), which provides: "The term 'future delivery' does not include any sale of any cash commodity for deferred shipment or delivery." The Eleventh Circuit has not addressed the appropriate methodology for determining jurisdiction under this statute, and the Courts of Appeals are divided. The competing methodologies are illustrated by comparing the opinion in *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 577–81 (9th Cir.1982)[7], with the opinions in *CFTC v. Zelener*, 373 F.3d 861 (7th Cir.2004); and *CFTC v. Madison Forex Int'l, LLC.*, Case No. 05–61672–CIV–Altonaga (DE # 80, filed 7/19/06)[8].

In *Co Petro*, the Ninth Circuit examined contracts offered by Co Petro for the future purchase of petroleum products to determine whether the CFTC had regulatory jurisdiction over these sales. The Court described these contracts, which were titled "Agency Agreement for Purchase and Sale of Motor Vehicle Fuel" as follows:

> Under the Agency Agreement, the customer (1) appointed Co Petro as his agent to purchase a specified quantity and type of fuel at a fixed price for delivery at an agreed future date, and (2) paid a deposit based upon a fixed percentage of the purchase price. Co Petro, however, did not require its customer to take delivery of the fuel. Instead, at a later specified date the customer could appoint Co Petro to sell the fuel on his behalf. If the cash price had risen in the interim Co Petro was to (1) remit the difference between the original purchase price and the subsequent sale price, and (2) refund any remaining deposit. If the cash price had decreased, Co Petro was to (1) deduct from the deposit the difference between the purchase price and the subsequent sale price, and (2) remit the balance of the deposit to the customer. A liquidated damages clause provided that in no event would the customer lose more than 95% of his initial deposit.

680 F.2d at 576. The Court also examined the context in which the transactions occurred, noting that although the contracts were not as rigidly standardized as futures contracts traded on licensed markets, they were not individualized since there was uniformity in the units of volume offered for sale, the dates were uniform regarding notification of intent to resell a contract or take delivery, there was a right to offset the transaction, and the delivery date was set at ten months from the purchase date.

In determining that these transactions were futures contracts, the Court used a totality of the circumstances test:

> In determining whether a particular contract is a contract of sale of a commodity for future delivery over which the Commission has regulatory jurisdiction by virtue of 7 U.S.C. § 2 (1976), no bright-line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose. The contracts here represent speculative ventures in commodity futures which were marketed to those for whom delivery was not an expectation. Addressing these circumstances in the light of the legislative history of the Act,

---

**7.** *Accord CFTC v. Noble Wealth Data Info. Serv.*, 90 F.Supp.2d 676, 688–89 (D.Md.2000), which was adopted in *CFTC v. Baragosh*, 278 F.3d 319, 329 n. 3 (4th Cir.2002); *CFTC v. Nat'l Inv. Consultants, Inc.*, 2005 WL 2072105 (N.D.Cal. Aug. 26, 2005); *CFTC v. Calvary Currencies LLC*, 437 F.Supp.2d 453, 460–64 (D.Md.2006).

**8.** *Accord CFTC v. Erskine*, Case No. 04–CV–0016, 2006 WL 1050677 (N.D. Ohio April 19, 2006), *appeal docketed*, No. 06–3896 (6th Cir. Jun. 21, 2006).

we conclude that Co Petro's contracts are "contracts of sale of a commodity for future delivery."

680 F.2d at 581.

The Seventh Circuit took a different approach in *Zelener.* There, the Seventh Circuit examined transactions which were very similar to the transactions at issue in the case at bar, and concluded that they were spot transactions over which the CFTC lacked enforcement jurisdiction. The similarity to the transactions in the case at bar is not coincidental; the business which was the subject of the *Zelener* opinion was the model for the business operations in Phase I of the Complaint in the case at bar. The focus of the Court in *Zelener* was whether the transactions at issue involved trading in "contracts" for the sale of a commodity, in which case they were futures transactions, or whether the transactions were for the purchase and sale of the underlying commodity, in which case they were not subject to the CFTC's jurisdiction. The Court expressly held that the motive and intent of the purchaser, *i.e.* to ultimately take delivery or to engage in speculation and enter into an offsetting transaction, was not a relevant factor in the analysis. In addition, the Court emphasized that the jurisdictional determination did not relieve the defendants of liability for fraud—it merely changed the avenue for pursuing such claims away from the CFTC to other avenues for relief.[9]

The transactions in *Zelener* were described by the Court as follows:

AlaronFX deals in foreign currency. Two corporations doing business as "British Capital Group" or BCG solicited customers' orders for foreign currency.... Each customer opened an account with BCG and another with AlaronFX; the documents made it clear that AlaronFX would be the source of all currency bought or sold through BCG in this program, and that AlaronFX would act as a principal. A customer could purchase (go long) or sell (short) any currency; for simplicity we limit our illustrations to long positions. The customer specified the desired quantity, with a minimum order size of $5,000; the contract called for settlement within 48 hours. It is agreed, however, that few of BCG's customers paid in full within that time, and that none took delivery. AlaronFX could have reversed the transactions and charged (or credited) customers with the difference in price across those two days. Instead, however, AlaronFX rolled the transactions forward two days at a time—as the AlaronFX contract permits, and as BCG told the customers would occur. Successive extensions meant that a customer had an open position in foreign currency. If the dollar appreciated relative to that currency, the customer could close the position and reap the profit in one of two ways: take delivery of the currency (AlaronFX promised to make a wire transfer on demand), or sell an equal amount of currency back to Alaron FX. If, however, the dollar fell relative to the other currency, then the client suffered

---

9. The Court emphasized that the challenged conduct "could form the basis of a mail-fraud or wire-fraud prosecution, a civil or criminal action under RICO, or fraud litigation in state court. Consumers or state attorneys general could invoke consumer-protection laws as well. It is unnecessary to classify the transactions as futures contracts in order to provide remedies for deceit. Why stretch the Commodity Futures Act—with resulting uncertainty, litigation costs, and potentially unhappy consequences for other economic arrangements that may be swept into a regulatory system not designed for them—when other remedies are ready to hand?" 373 F.3d at 867.

a loss when the position was closed by selling currency back to AlaronFX.

373 F.3d at 863.

In *Zelener*, the CFTC focused on three principal factors to support its argument that the above transactions were futures contracts: "first, the positions were held open indefinitely, so that the customers' gains and losses depended on price movements in the future; second, the customers were amateurs who did not need foreign currency for business endeavors; third, none of the customers took delivery of any currency." 373 F.3d at 863. The Court rejected this "totality of the circumstances" approach, holding that the determination must be based on an analysis of the contract, rather than the intention of the parties or whether the contracts ultimately led to delivery:

> In organized futures markets, people buy and sell contracts, not commodities. Terms are standardized, and each party's obligation runs to an intermediary, the clearing corporation. Clearing houses eliminate counterparty credit risk. Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn makes it possible to close a position by buying an offsetting contract. All contracts that expire in a given month are identical; each calls for delivery of the same commodity in the same place at the same time. Forward and spot contracts, by contrast, call for sale of the commodity; no one deals "in the contract:" it is not possible to close a position by buying a traded offset, because promises are not fungible; delivery is idiosyncratic rather than centralized. *Co Petro*, the case that invented the multi-factor approach, dealt with a fungible contract, see 680 F.2d at 579–81, and trading did occur "in the contract." That should have been enough to resolve the case.

> It is essential to know beforehand whether a contract is a futures or a forward. The answer determines who, if anyone, may enter into such a contract, and where trading may occur. Contracts allocate price risk, and they fail in that office if it can't be known until years after the fact whether a given contract was lawful. Nothing is worse than an approach that asks what the parties "intended" or that scrutinizes the percentage of contracts that led to delivery *ex post* .... But reading "contract of sale of a commodity for future delivery" with an emphasis on "contract," and "sale of any cash commodity for deferred shipment or delivery" with an emphasis on "sale" nicely separates the domains of futures from other transactions.

373 F.3d at 866.

The Court expressly rejected the CFTC's contention that the rollovers turned these contracts into futures contracts, holding that the CFTC's position was not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), since Congress had not delegated this determination to the CFTC. 373 F.3d at 867. Thus, rather than turn to the totality of circumstances, the Court examined the contract to determine whether trading occurred in fungible contracts. Since customers of AlaronFX did not purchase identical contracts since each was unique in the amount of currency and in timing, and did not have defined expiration or delivery dates, the Court concluded that the contracts were not fungible *unless* there was a promise to create an offset. The Court recognized that "A promise to create offsets makes a given setup work *as if* fungible: although the customer can't go into a market to buy an equal and opposite position, the dealer's promise to match the idiosyncratic terms in order to close the position without deliv-

**1316**

ery means that the customer can disregard the absence of a formal exchange." 373 F.3d at 868.

Examining the account opening documents, the Court concluded that the following language, which is nearly identical to the language in the case at bar, did not give the customer an automatic right to offset, and that therefore the contracts were not fungible.[10] In sum, the Court concluded: "These transactions were, in form, spot sales for delivery within 48 hours. Rollover, and the magnification of gain or loss over a longer period, does not turn sales into futures contracts. . . ." 373 F.3d at 869.

In *CFTC v. Madison Forex Int'l, LLC.*, *supra*, this Court followed the *Zelener* approach, and determined that the transactions which occurred there, on the same online foreign exchange platform that was used in *Zelener* and this case, were not futures contracts, but were spot transactions not subject to the regulatory jurisdiction of the CFTC.

The undersigned concludes that the approach taken by the Seventh Circuit in *Zelener* should be followed in the case at bar. This approach leads to consistency in the application of the CFTC's regulatory jurisdiction, based upon the provisions of the contracts into which the parties enter, rather than the uncertainty created by a post-hoc determination, based upon the totality of the circumstances. As recognized by the Seventh Circuit, there is a need for certainty regarding the legal duties of persons offering commodities for sale that is undermined by the examination of facts outside the contractual obligations.

An examination of the account documents in the case at bar reflects that, as in *Zelener* and *Madison Forex*, the customers were clearly advised that these were spot transactions and there was no absolute right to offset. The undersigned recognizes that there are some differences upon which the CFTC has relied to distinguish this case. However, those differences are not material.[11] In fact, the

**10.** The Court stated: "Paragraph 8 provides that if a customer's account contains "two or more open and opposite Contracts providing . . . for the purchase and sale of the same Foreign Currency . . . on the same Value Date, such Contracts shall automatically be canceled and replaced by an obligation to settle only the net difference" . . . . Paragraph 9, on which the Commission places its principal reliance, does not contain any promise. What it says instead is that, if the client fails to give timely instructions about the disposition of the positions, then 'AlaronFX is authorized, in AlaronFX's sole discretion, to deliver, roll over or offset all or any portion of the Open Position in Customer's Account at Customer's risk.' This paragraph does not give the client a right to purchase an offsetting position and thus close a transaction; that option belongs to AlaronFX rather than to the customer. As for ¶ 5: subsection 5.3 says that 'AlaronFX will attempt to execute all Orders that it may, in its sole discretion, accept from Customer in accordance with Customer's instructions. . . .' That's not a promise to close any given position by offset. This

subsection continues: 'AlaronFX or its affiliates may, at a future date, establish a trade matching system. . . . In that event, AlaronFX . . . shall have the right (but not the obligation) . . . to act for its own account, and as a counter party or as a broker to AlaronFX customers, in the making of markets.' The Commission does not contend that such a 'trade matching system' was ever established. Customers thus had no assurance that they could close their positions by offset. The only *promise* was that, if AlaronFX did not buy back the currency (and thus create an offset under ¶ 8), it would deliver. This looks more like the business of a wholesaler in commodities such as metals or rare coins than like a system of trading in fungible contracts that characterizes futures exchanges." 373 F.3d at 868.

**11.** Perhaps the most significant difference is the disclosure of the commission rate in this case as "per round turn lot." However, there is scant evidence in the record regarding what this meant; and, the fact that the commission would be charged only on the first

problem with a post hoc determination of coverage is exemplified, in part, by the position of the CFTC in the case at bar. On the one hand, the CFTC contends that it has jurisdiction over these transactions; on the other hand, it asserts that Defendants misled its customers into believing that the transactions were covered by the CFTC by including the risk disclosure statement mandated by 17 C.F.R. § 1.55(c), Appendix A, and an arbitration agreement that states any disputes shall be resolved by arbitration in accordance with Part 180 of the CEA. The testimony of Andrew Stern that he included these provisions in an abundance of caution due to the lack of guidance from the CFTC regarding Forex transactions following the enactment of the CFMA, and the uncertainty of the CFTC's jurisdiction is credible.

The transactions at issue in Phase I were, in form, spot sales for delivery within 48 hours, as were the transactions in *Zelener.* The Customer Agreement expressly states that "trader acknowledges that the purchase or sale of a Currency always anticipates the accepting or making of delivery." The Agreement also provides that a customer could take actual delivery on the settlement date, and the evidence supports the fact that Universal had the ability to make delivery.

In addition, the account documents do not give the customer an absolute right to offset their transactions; although, at the discretion of Universal, offset was certainly contemplated:

UFX also reserves the right to refuse to accept any order. (Agreement at Bates No. 101 00035)

UFX retains the right to limit the amount and/or total number of open positions that Trader may acquire or maintain at UFX. UFX will attempt to execute all orders, which it may, *in its sole discretion,* choose to accept in accordance with the oral or written, or computer instructions of the Trader's. UFX reserves the right to refuse to accept any order. (Agreement at Bates No. 101 00037) (emphasis added).

In addition, as in *Zelener,* the contracts were unique in amount of currency and in timing; there were no defined expiration or delivery dates as is common with futures contracts.

The CFTC argues that the rollovers were, in fact, sham transactions that did not really occur. If this is the case, it does not mean that the contract was a "futures" contract within the jurisdiction of the CFTC, rather than a contract for the purchase and/or sale of a commodity. What it means is that Defendants engaged in fraudulent conduct, and are subject to the traditional civil and/or criminal remedies for fraud. The same remedies apply with respect to the radio advertisements used by Sterling to market these transactions. Some of these ads appear to be marketing futures transactions, particularly the ad that states customers who invested $2,000.00 would control $100,000.00 of the currency, but wouldn't "physically own that" (DE # 132, Att. D at 27). On the other hand, other ads referred to the purchase and sale of "pure" currency (DE # 132, Att. F at 19). The marketing pitch of introducing brokers such as Sterling, however, cannot logically control the jurisdiction of the CFTC to regulate the actual transactions conducted by Universal (or any other counterparty, for that matter). If this were the case, Universal would be subject to the jurisdiction of the CFTC, and its panoply of regulations, with respect to transactions with customers of some introducing brokers, but not subject to those regulations with respect to identical

transaction, and not for any subsequent disposition, is not sufficient to create a right on the part of the customer to offset the transaction.

transactions entered into with customers of other introducing brokers. This result is not tenable, and illustrates the wisdom of the Court's approach in *Zelener*, which focuses on the account opening documents.

It bears repeating, however, that this decision does not excuse or relieve sellers of these commodities from the consequences of fraud; on the contrary, they remain subject to the traditional remedies for fraudulent transactions.[12]

Since the undersigned has determined that the transactions in Phase I do not fall within the jurisdiction of the CFTC, it is hereby recommended that Counts I and III of the Complaint, as well as that part of Count IV which relates to Universal, be dismissed. This will result in dismissal of Defendants Sterling and Universal from this case. Defendants Arsenault and Stern remain subject to other counts alleged in the Complaint.

## V. REGULATORY JURISDICTION OVER THE PHASE II CLAIMS [13]

### A. *Introduction*

The Amended Complaint alleges Phase II-related violations in Counts Two, Four and Five. Phase II of the operations involved transactions in foreign currency options engaged in by Defendants Graystone Browne, STG Global, QIX, Arsenault and Stern. It is undisputed that the CFTC has some jurisdiction to regulate transactions in foreign currency options, unlike the spot transactions discussed in the preceding section. However, as discussed below, this jurisdiction is not unlimited, and Defendants contend that the jurisdiction of the CFTC does not extend to the Phase II transactions.

The challenges raised in the motion to dismiss those Counts were also raised in connection with the Motion for Preliminary Injunction, and rejected. The same analysis applies, and is set forth below.[14]

### B. *The Regulatory Background*

It is useful to set forth the background of the regulation of commodities in order to put in perspective the issues presented in the case at bar. An excellent and detailed history is set forth in the opinions of Judge Ryskamp In *CFTC v. Next Fin. Serv. Unltd.*, Case No. 04–80562: DE # 85 (S.D. Fla. June 7, 2005) (DE # 171), and

---

**12.** The undersigned notes that if Congress disagrees with the *Zelener's* interpretation of the CFTC's jurisdiction, or determines that the CFTC should have a more expansive jurisdiction over foreign currency transactions, it can enact the legislation proposed by the CFTC on May 20, 2005, which "revises the Commission's existing jurisdiction over retail foreign exchange transactions to address ... the recent *Zelener* decision" (DE # 168).

**13.** These contentions are also raised with respect to the Phase I claims; but it is unnecessary to address them in that context based upon the conclusion that the CFTC does not have jurisdiction over any of the spot transactions that occurred in Phase I. The same analysis would apply, however, and if the Phase I claims are not dismissed pursuant to the preceding analysis, those claims would survive the challenges addressed in this section.

**14.** These arguments can be characterized either as jurisdictional, in the sense that Defendants argue that the CFTC does not have jurisdiction to enforce certain regulations with respect to the transactions alleged in the Complaint; or, as failing to state a claim upon which relief can be granted, in the sense that Defendants argue that the regulations which the CFTC seeks to enforce do not apply to the entities and/or transactions alleged in the case at bar. Regardless of form, however, the legal analysis is the same since the dispute concerns the legal interpretation of the statutes and regulations which govern the CFTC's regulation of transactions in foreign currency options. *See CFTC v. First Int'l Group*, 06–20972–CIV–JORDAN, DE # 34 at 2 n.3 (S.D.Fla. Jan. 7, 2007) (DE # 263) (noting that a similar motion to dismiss for failure to state a claim was quasi-jurisdictional in nature).

Judge Dimitrouleas in *CFTC v. G7 Advisory Serv., LLC,* 406 F.Supp.2d 1289 (S.D.Fla.2005) (DE # 198); therefore, only an abbreviated summary is presented here.

Initially, the only commodities regulated by Congress were certain grain futures transactions pursuant to the Grain Futures Act. In 1936, Congress renamed the Act to be the Commodity Exchange Act ("CEA"), and expanded its coverage to include additional agricultural commodities.

Until 1974, foreign currency transactions were not included in the CEA. In 1974, the CEA was greatly expanded to include, *inter alia,* trading in foreign currency. In addition, Congress created the CFTC, and granted it the power, *inter alia,* to investigate complaints, hold administrative hearings, order reparations, and seek injunctive relief. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 357–58, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Next Fin. Serv.* at 11. Based upon a concern expressed by the Treasury Department, however, coverage of foreign currency transactions was limited by a provision now known as "the Treasury Amendment." This amendment exempted from CFTC jurisdiction "transactions in foreign currency ... unless such transactions involve the sale thereof for future delivery conducted on a board of trade." *Next Fin. Serv.* at 12–13.

The CFTC took the position that the exemption should be narrowly construed and that it was not applicable to options contracts. In *Dunn v. CFTC,* 519 U.S. 465, 469, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997), the United States Supreme Court squarely rejected this position, holding that the phrase "transactions in foreign currency" included transactions in options to buy or sell foreign currency. The Court, however, did not address the meaning of the phrase "conducted on a board of trade," and the lower courts were split on the issue of whether this meant that only interbank transactions were exempt, or whether all off-exchange transactions were exempt. *G7 Advisory Serv.,* 406 F.Supp.2d at 1294. The confusion was caused in part by the definition of "board of trade" as "any exchange or association, whether incorporated or unincorporated, of persons who are engaged in the business of buying or selling any commodity." *Id.*

In 2000, Congress enacted the Commodities Futures Modernization Act of 2000 ("CFMA") with the stated purpose of "clarifying the jurisdiction of the [CFTC] over certain retail foreign exchange transactions." As explained by the Court in *G7 Advisory Serv.,* "The CFMA, as codified in Title 7, United States Code, § 2(c)(2)(B) [15]

15. Title 7, United States Code, § 2(c)(2)(B) provides:

**(B) Agreements, contracts, and transactions in retail foreign currency**
This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that—
    (i) is a contract of sale of a commodity for future delivery (or an option on such a contract) or an option ...; and
    (ii) is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, of the person is—
    (I) a financial institution;

    (II) a broker or dealer registered under ... the Securities Exchange Act ... or a futures commission merchant registered under this chapter;
    (III) an associated person of a broker or dealer registered under ... the Securities Exchange Act ... or an affiliated person of a futures commission merchant registered under this chapter, concerning the financial or securities activities of which the registered person makes and keeps records under ... the Securities Exchange Act ... or section 6f(c)(2)(B) of this title;
    (IV) an insurance company described in section 1a(12)(A)(ii) of this title, or a reg-

grants the CFTC jurisdiction over all off-exchange foreign currency transactions involving non-eligible contract participants unless the counterparties to the transactions are an entity enumerated in 7 U.S.C. § 2(c)(2)(B)(ii)." "The CFMA's listing of specified unregulated entities eliminated the need for judicial interpretation of the term "Board of Trade," which the CFMA redefined as 'any organized exchange or other trading facility.' 7 U.S.C. § 1a(2)." 406 F.Supp.2d at 1295 (footnote added).

### C. The Applicability of the Statutes and Regulations to Phase II

The first issue in the case at bar is whether the transactions alleged are exempt from the CFTC's regulatory jurisdiction pursuant to section 2(c)(2)(B)(ii). The Amended Complaint alleges, and It is undisputed that most, if not all, of the persons who engaged in transactions with Defendants were not eligible contract participants (Amended Complaint ¶ 112).[16] Thus, to determine whether the transac-

tions at issue are exempt from regulation pursuant to this provision, and therefore outside the jurisdiction of the CFTC, it is only necessary to examine whether Universal and QIX, as counterparties, were one of the entities enumerated in subparagraph (B)(ii).[17] Subparagraph (B)(ii)(II)[18] provides exemption for a futures commission merchant registered under the Act, and subsection (B)(ii)(III)[19] provides for exemption for "an affiliated person of a futures commission merchant registered under this Act, concerning the financial or securities activities of which the registered person makes and keeps records under ... section 6f(c)(2)(B)[20] of this Act."

The Amended Complaint alleges that QIX was not a proper counterparty under this provision because it was neither an FCM nor an "affiliate" of an FCM within the meaning of subsection (B)(ii)(III). Defendants challenge this assertion, and claim that QIX is exempt from the jurisdiction of the CFTC as an "affiliated per-

---

ulated subsidiary or affiliate of such an insurance company;

**(V)** a financial holding company (as defined in section 1841) of Title 12; or

**(VI)** an investment bank holding company....

**(C)** Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions described in subparagraph (B) shall be subject to sections 6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b of this title prohibit manipulation of the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any market), 13a–1, 13a–2 and 12(a) of this title if .they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

**16.** An "eligible contract participant" is defined as an individual who has total assets in excess of $10,000,000.00; or, has assets in excess of $5,000,000.00, and enters into the contract in order to manage the risk associat-

ed with an asset owned or a liability incurred by that person. 7 U.S.C. § 1a(12)(A)(xi). Based upon CFTC Investigator Koh's examination of the records, as well as the testimony of the individual investors at the evidentiary hearing, none of the customers met this definition (DE # 4, Ex. 2: Koh Decl. ¶ 19).

**17.** 7 U.S.C. § 2(c)(2)(B)(ii). Hereafter, for ease of reference, in the body of this discussion, the provisions of subsection 2(c)(2) will be referred to only by the letter designation and numbers which are within this subsection, and the full citation will be footnoted to avoid potential confusion. I.e., 7 U.S.C. § 2(c)(2)(B) will be referred to as subparagraph (B); 7 U.S.C. § 2(c)(2)(B)(ii) will be referred to as subparagraph (B)(ii); 7 U.S.C. § 2(c)(2)(B)(ii)(III) will be referred to as subparagraph (B)(ii)(III); 7 U.S.C. § 2(c)(2)(C) will be referred to as subparagraph (C); etc.

**18.** 7 U.S.C. § 2(c)(2)(B)(ii)(II).

**19.** 7 U.S.C. § 2(c)(2)(B)(ii)(III).

**20.** 7 U.S.C. § 6f(c)(2)(B) (footnote added).

son" under this provision. An affiliated person is "any person directly or indirectly controlling, controlled by, or under common control with a futures commission merchant." 7 U.S.C. § 6f(c)(1)(I).

The critical issue in this respect is whether all affiliated persons are exempt as long as the registered FCM keeps records, or whether the exemption applies only where the registered FCM is required to keep records pursuant to § 6f(c)(2)(B). The CFTC contends that because the registered FCMs in the case at bar were not required to keep records, the exemption does not apply, and the fact that the registered FCMs, in fact, decided to keep records is irrelevant. Defendants, on the other hand, contend that since the registered FCMs elected to keep records, they qualify as exempt affiliates.

Section 6f(c)(2)(A)-(B) (emphasis added) provides, in pertinent part:

(A) Each registered futures commission merchant shall obtain such information and make and keep such records as the Commission, by rule or regulation, prescribes concerning the registered futures commission merchant's policies, procedures, or systems for monitoring and controlling financial and operational risks to it resulting from the activities of any of its affiliated persons, other than a natural person.

(B) The records *required* under subparagraph (A) shall describe, in the aggregate, each of the futures and other financial activities conducted by, and the customary sources of capital and funding of, those of its affiliated persons whose business activities are reasonably likely to have a material impact on the finan-

cial or operational condition of the futures commission merchant, including its adjusted net capital, its liquidity, or its ability to conduct or finance its operations.

Pursuant to this authority, the CFTC has promulgated 17 C.F.R. §§ 1.14(d) and 1.15(c)(1). Those regulations require FCMs to keep financial records regarding certain affiliated persons which are determined to be "Material Affiliated Persons." [21] However, those record keeping requirements do not apply to certain smaller FCMs, and specifically exempt "any futures commission merchant which holds funds or property of or for futures customers of less than $6,250,000 and has less than $5,000,000 in adjusted net capital as of the futures commission merchant's fiscal year-end." It is undisputed that, under these provisions, QIX Futures was not required to keep records.

The CFTC argues that Congress sought to limit the exemption for affiliates set forth in subparagraph (B)(ii)(III) [22] by including the proviso "concerning the financial ... activities of which the registered person makes and keeps records *under section 4f(c)(2)(B)* [23] *of the Act.*" (Emphasis added). When Congress referenced this subparagraph in the text of the CFMA, it chose the specific subpart of the CEA's statutory provision on Risk Assessment for Holding Company Systems that expressly referred to "records required" to be maintained pursuant to the CFTC's regulations. At the time the CFMA was enacted, there was a regulatory scheme in place that specified which FCMs were required to keep records for such affiliates; these affiliate were referred to as "material affili-

---

**21.** Section 1.14(a)(2) sets forth a five-factor test to be used to determine whether an affiliated person is a Material Affiliated Person, which "involves consideration of all aspects of the activities of, and the relationship between, both entities." 17 C.F.R. § 1.14(a)(2).

**22.** 7 U.S.C. § 2(c)(2)(B)(ii)(III).

**23.** Section 4f(c)(2)(B) of the CEA is codified at 7 U.S.C. § 6f(c)(2)(B).

ates" in that scheme. Based upon this specific reference, the CFTC argues that the CFMA exemption applies *only* to those affiliates who are subject to the record-keeping requirements of § 6f(c)(2)(B)— *i.e.*, affiliates that are classified as "Material Affiliated Persons" or "MAPs" of certain FCMs that meet the specified capital requirements. Since QIX does not fit into this category, the CFTC contends that the limited exemption specified in subparagraph (B)(ii)(III) does not apply.

Numerous cases in this District have considered this issue and adopted the position of the CFTC, and the undersigned Magistrate Judge concurs with this result. Those courts have rejected "the Defendant's interpretation, as it would allow registered FCMs to avoid CFTC regulation based on personal preference. Any regis-

tered FCM could skirt CFTC regulation merely by electing to keep records, thereby confounding the CFMA's purpose of making clear which off-exchange foreign currency transactions are subject to CFTC regulation." *CFTC v. G7 Advisory Serv., LLC*, 406 F.Supp.2d at 1296–97. *Accord CFTC v. Next Fin. Serv. Unltd.*, 04–80562–CIV–RYSKAMP (S.D.Fla. Jun. 7, 2005) (DE # 85)[24]; *CFTC v. E–Metals Merchants, Inc.*, 05–21571–CIV–LENARD (S.D.Fla. Jul. 26, 2005) (DE # 29 (R & R, adopted on other grounds in DE # 60),); *CFTC v. First Int'l Group*, 06–20972–CIV–JORDAN (S.D.Fla. Jan. 7, 2007) (DE # 34, relying on *G7 Advisory Serv.*).[25]

Therefore, the undersigned concludes that QIX was not a proper counterparty within the meaning of Section 2(c)(2)(B)(ii)(III), and therefore does not

---

24. The undersigned notes that in *Next Fin. Serv.*, the Court specifically found that QIX was not a proper counterparty to the foreign currency transactions at issue in that case. Although QIX was not a party to that action, which was brought only against certain introducing brokers who were similarly situated to Defendants STG and Graystone in the case at bar, the rationale supporting this determination is persuasive.

25. The CFTC contends, in the alternative, that even if Defendants were exempt affiliates, the statute contains an exclusion from this exemption which makes the transactions alleged in the case at bar subject to the jurisdiction of the CFTC with respect to the anti-fraud provisions of the CEA. Subparagraph (2)(C) provides:

> Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions ... shall be subject to sections 6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b prohibit manipulations of the market price of any commodity ...), 13a–1, 13a–2, and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

7 U.S.C. § 2(c)(2)(C). The CFTC contends that this provision reserves the CFTC's anti-fraud jurisdiction with regard to retail foreign currency transactions where one party is a retail customer and the counterparty is a registered FCM or an affiliate of an FCM. The position of Defendants is that they fall within the exclusion from the anti-fraud provisions of subparagraph (2)(C) since they are "an entity described in subparagraph (B)(ii)." Other courts in this District have adopted the argument of the CFTC in this regard, holding that the final provision of subparagraph (2)(C) operates to provide an exemption from the CFTC's anti-fraud jurisdiction for only those registered FCMs or qualified affiliates that are also another type of entity described in subparagraph (2)(B)(ii), such as financial institutions, insurances companies, financial holding companies, investment bank holding companies, or fully registered broker-dealers. *See CFTC v. Madison Forex Int'l*, 05–61672–ALTONAGA (S.D.Fla. July 19, 2006) (DE # 80 at 6–7); *CFTC v. Gibraltar Monetary Corp.*, 2006 WL 1789018 (S.D.Fla. May 30, 2006); *First Int'l Group* at 6–7. This reading of the exemption makes sense because those entities are regulated by other agencies. However, it is not necessary for the Court to reach that issue in the case at bar since the undersigned concludes that Defendants do not qualify as exempt affiliates.

qualify for the exemption from jurisdiction set forth in that provision. Therefore, as specified in Section 2(c)(2)(B)(i)-(ii), Defendants are subject to the provisions of the entire Commodities Exchange Act with respect to Phase II transactions.

Defendants also contend that the only regulations applicable to foreign currency transactions are those which were expressly incorporated by the CFMA. Thus, Defendants contend that the following regulations, which were promulgated prior to the CFMA and have not specifically been made applicable to foreign currency transactions, cannot be enforced by the CFTC in the case at bar: 7 U.S.C. § 6h (which makes it unlawful to falsely represent registration status); Section 32.11 of the Regulations (regarding the prohibition on off-exchange transactions); 7 U.S.C. § 6(a) (which makes it unlawful to trade off-exchange futures contracts); CFTC Regulation 1.2, 17 C.F.R. § 1.2 and 7 U.S.C. §§ 2(a)(1)(B) and 13c(b) (respectively, principal/agent and control person liability). Defendants contend that the CFTC did not have jurisdiction to regulate off-exchange foreign currency transactions until the enactment of the CFMA. Therefore, none of the pre-existing regulations were applicable to the transactions at issue in the case at bar. Defendants further argue that since 7 U.S.C. § 6c(b), specifically states that regulations "may be made only after notice and opportunity for hearing," and since there was no regulation promulgated which specifically adopts the above regulations to the transactions, there has not been the required hearing and the regulations do not apply.

To support their argument, Defendants rely on *Krause v. Forex Exch. Mkt., Inc.,* 356 F.Supp.2d 332 (S.D.N.Y.2005). In *Krause,* investors filed suit against a registered FCM (FXCM) and various other defendants. The liability of FXCM was based upon control person liability pursuant to section 13(b) and principal/agent liability pursuant to section 2(a)(1). The Court held that since registered FCMs are exempt from the CFMA's grant of jurisdiction, except with respect to certain sections specifically enumerated in § 2(c)(2)(C), and since neither section 13(b) nor section 2(a)(1) were among those enumerated provisions, the CEA claims against FXCM must be dismissed.

The CFTC agrees that the regulations at issue were in existence at the time the CFMA was enacted. However, the CFTC contends that when Congress enacted the CFMA to clarify its jurisdiction over certain retail foreign exchange transactions, Congress subjected the Defendants' conduct to the CEA in its entirety. The CFTC emphasizes that Congress is presumed to know the existing law when it enacts legislation, and that a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction (DE # 134 at 24).

At the outset, the undersigned notes that Defendants' reliance on *Krause* is unavailing since QIX, unlike FXCM in *Krause,* is not a proper counterparty, and therefore the construction of the exemption granted to registered FCMs (and certain of their affiliates) does not apply. At least three other cases in this District have adopted the arguments advanced by the CFTC. *See CFTC v. G7 Advisory Serv., LLC,* 406 F.Supp.2d 1289, 1297–98 (S.D.Fla.2005) (holding that 17 C.F.R. § 32.9 applies to off-exchange currency transactions, since Congress took no affirmative act to deprive § 32.9 of effect with respect to Forex transactions, and to hold otherwise would by contrary to the CFMA's purpose of clarifying, not revoking the CFTC's authority to regulate off-exchange foreign currency transactions); *CFTC v. Next Fin. Serv. Unltd.,* 04–80562–CIV–RYSKAMP (S.D. Fla. June 7,

2005), DE # 85 at 20–23 (DE # 171) (same); *CFTC v. First Int'l Group*, 06–20972–CIV–JORDAN (S.D. Fla. DE # 34 Jan. 7, 2007), DE # 34 at 2 n.3 (DE # 263) ("When Congress passed the CFMA it was simply *clarifying* the CFTC's jurisdiction. Given the presumption that Congress had knowledge of the law enacting the CFMA ... Regulation 32.9 applies to the transactions here."); *CFTC v. Valko*, 06–60001–CIV–DIMITROULEAS (S.D.Fla. Mar. 12, 2007), DE 129 at 7–12 (holding that both CFTC Regulations 32.9 and 32.11, which bar fraud in connection with commodity option transactions and suspend commodity option transactions not otherwise permitted under the regulations, are applicable to foreign currency transactions conducted by Defendants who are not proper counterparties, as are the sections of the CEA regarding control person liability, 7 U.S.C. §§ 13c(a) and 13c(b)).

The undersigned concurs with the opinions of the District Judges in the above cases. It is manifestly clear that by enacting the CFMA, Congress intended the CFTC to assert the entirety of its jurisdiction, and all of its existing regulations, over foreign currency transactions, with respect to all entities except for those specifically excluded under 7 U.S.C. § 2(c)(2)(B)(ii). Since, as previously discussed, QIX does not qualify for this exclusion, the full regulatory scheme applies in the case at bar.

Therefore, since QIX is not an entity exempted in any respect from the jurisdictional reach of the CFTC, and since all existing statutes and regulations apply to the activities of Defendants with respect to the transactions at issue in Phase II, the undersigned recommends that the Motion to Dismiss Counts Two, Four and Five be denied as to those grounds.

## VI. *THE AUTHORITY TO SEEK RESTITUTION*

Defendants request this Court to dismiss or strike the CFTC's claim for restitution on the grounds that Congress has not authorized the CFTC to seek such relief in federal court. Defendants contend that 7 U.S.C. § 13a–1, which governs the scope of relief available to the CFTC in an action brought in federal court, specifically limits the relief to injunctive relief, compliance orders and civil penalties. Since restitution is not specified, Defendants contend that this relief is not available. To support their position, Defendants contrast this statute with the statute governing available remedies in administrative proceedings convened by the CFTC. Pursuant to 7 U.S.C. §§ 9 and 15, the CFTC is expressly authorized to convene adjudicatory administrative hearings and, *inter alia*, to "required restitution to customers of damages proximately caused by violations." 7 U.S.C. § 9.

The CFTC counters, *quoting Porter v. Warner Holding Co.*, 328 U.S. 395, 397–98, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), that under well-established legal principles, "all inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction," and that this includes restitution. The CFTC emphasizes that 7 U.S.C. § 13a–1 includes language which compels the conclusion that this Court has full equitable authority to implement ancillary relief, including restitution. Specifically, it provides that a court may issues a restraining order "which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property," and also provides that the court may issue "writs of mandamus or orders affording like relief ... including the requirement that such person take

such action as is necessary to remove the danger of violation of this Act."

The CFTC explains that the failure of Congress to expressly authorize restitution as an available remedy in its authorization with respect to litigation in federal courts, whereas restitution *is* expressly authorized in connection with administrative proceedings is explained by the fact that the inclusion of restitution as an administrative remedy was part of the Futures Trading Practice Act of 1992, P.L. 102–546 (102nd cong. 1st Sess. 1992), in which Congress sought to fill certain gaps in the relief provided in administrative proceedings. Restitution was added as available relief in administrative proceedings based upon the representation by the CFTC to Congress that it already *had* this authority in injunctive proceedings in federal court, and sought to add it to administrative proceedings (DE # 165 at 12).

This Court, as well as other Courts in this District, has previously rejected the position of Defendants, and held that restitution is an available remedy. The rationale is persuasive, and should be followed in the case at bar:

> [D]istrict courts are authorized to order restitution on the basis of the language, legislative history, and purpose of the Act as well as pursuant to the equitable powers of federal courts. . . . First, the language of the Act does not expressly limit the equitable powers of district courts. *See, e.g.* 7 U.S.C. § 13a–1. The U.S. Supreme Court has taught that "[u]nless otherwise provided by statute, all the inherent equitable powers of the District court are available for the proper and complete exercise of that jurisdiction. And [when] the public interest is involved in a proceeding of [an equitable] nature, those equitable powers assume an even broader and more flexible character." *Porter v. Warner Holding Co.,* 328 U.S. 395, 398 [66 S.Ct. 1086, 90

L.Ed. 1332] (1946); *see also Federal Trade Commission v. Gem Merchandising Corp.,* 87 F.3d 466, 469 (11th Cir. 1996) (discussing a district court's equitable powers in the context of the Federal Trade commission Act); *Federal Trade Commission v. United States Oil & Gas Corp.,* 748 F.2d 1431, 1433–34 (11th Cir.1984). Next, the Act expressly authorizes the issuance of restraining orders that prohibit the dissipation or disposal of assets, funds, or other property. *See* 7 U.S.C. § 13a–1. The legislative history of the Act explains that it was the intent of Congress that restraining orders would enable the CFTC to seek restitution for customers. *See* H.R. Rep. 97–565, pt. 1, at 93, *reprinted in* 1982 U.S.C.C.A.N. 3871, 3942. Specifically, the House Report explains that Section 13a–1 empowers courts to issue *ex parte* restraining orders and "such power is provided . . . to prohibit movement or disposal of funds, assets, and other property *which may be subject to lawful claims of customers." Id.* (emphasis added). Last, the Court finds that Plaintiff is seeking restitution in equity, that is, it commenced this action in order to restore to [defendant's] customers particular funds or property in the possession of the Defendants. *See Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213–18 [122 S.Ct. 708, 151 L.Ed.2d 635] (2002). Thus, its equitable powers having been invoked, the Court finds that it may exercise the full range of those powers. . . . Consequently, the Court concludes that the CEA authorizes the CFTC to seek and this Court to order both disgorgement and restitution.

*CFTC v. E–Metal Merchants, Inc.,* No. 05–21571–CIV–LENARD, DE # 60 at 17–18 (S.D.Fla. Jan. 6, 2006)(footnotes omitted); *accord CFTC v. Next Fin. Serv. Unltd.,* No. 04–80562–CIV–RYSKAMP,

DE # 155 (Order Denying Motion to Exclude or Strike Restitution Claim) (S.D.Fla. Mar. 13, 2006); *CFTC v. Madison Forex Int'l, LLC.,* No. 05–61672–CIV–ALTONAGA, DE # 80 at 20 n.15 (S.D.Fla. July 19, 2006) (DE # 250) (*citing* other cases in this District).

Therefore, the undersigned recommends that the motion to dismiss or strike the claim for restitution in the case at bar be denied.

## VII. *THE SUFFICIENCY OF THE COMPLAINT*

Defendants also contend that the principal/agent and control person claims should be dismissed as improperly pled and for failure to state a claim, or in the alternative, that a more definite statement should be required. To support this contention, Defendants rely on Rule 10(b), which provides that "[e]ach claim founded upon a separate transaction or occurrence ... [shall] be stated in a separate count ... whenever a separation facilitates the clear presentation of the matters set forth." The substance of Defendants' argument, which is set forth in two paragraphs, is contained in one conclusory sentence: "The CFTC's commingling of various counts is not only confusing and improper, but has allowed the CFTC to omit critical elements of the alleged claims that the CFTC cannot prove, such as factual allegations establishing any meaningful agency relationship between the parties." (DE # 160 at 16–17).

The CFTC responds that the pleadings are neither vague nor ambiguous, contain extensive detail, and that Defendants have failed to specify what additional information is missing (DE # 165 at 12–13).

Based upon a review of the detailed allegations contained in the Amended Complaint, and the failure of Defendants to point to any omitted critical elements, the undersigned finds that the Amended Complaint is not confusing, and clearly alleges control person and principal/agent liability with respect to each of the Defendants to which it is applicable. *See, e.g.* Amended Complaint ¶¶ 99–101, 125 (Arsenault is a controlling person with respect to Graystone and STG); ¶ 126 (Graystone and STG are principals with respect to actions committed by their employees); ¶¶ 102–08, 127 (QIX is a principal with respect to the acts of Graystone and STG); ¶¶ 98, 136 (Stern is a controlling person with respect to QIX).

Under Fed.R.Civ.P. 12(e), if a Complaint is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading," the Court may order Plaintiff to provide a more definite statement of the claim for relief. However, motions for a more definite statement are generally disfavored and are not a substitute for discovery. "Courts should grant such motions only if the complaint is so unintelligible that the defendant cannot draft a responsive pleading." *Moore v. Fidelity Financial Services, Inc.,* 869 F.Supp. 557, 559–60 (N.D.Ill.1994).

The Amended Complaint contains a coherent, detailed statement of the factual allegations and a concise statement of the claims. The Amended Complaint identifies each Defendant and provides specific allegations against each Defendant. The Complaint also provides specific statutory references for each of the claims. No purpose would be served by requiring a more definite statement.

Therefore, the undersigned recommends that the motion to dismiss or for a more definite statement with respect to the control person and principal/agent claims be denied.

## VII. *CONCLUSION*

Based upon the foregoing analysis the undersigned concludes that:

1. The CFTC does not have jurisdiction over the transactions alleged between Defendants Universal and Sterling, and therefore Counts One, Three, and those parts of Count Four that apply to Universal should be dismissed.

2. With respect to transactions in foreign currency options, QIX is subject to the full panoply of statutes governing transactions in commodity options, as well as the regulations promulgated by the CFTC, including 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1,3) and 32.9(a, c) as alleged in Count Two; 7 U.S.C. § 6h, as alleged in Count Four; and 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a), as alleged in Count Five.

3. The statutory and regulatory provisions regarding control person liability (pursuant to 7 U.S.C. § 13c(b)) and principal/agent liability (pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2) apply to transactions in foreign currency options.

4. The CFTC is entitled to seek restitution for the alleged violations.

5. The Complaint clearly alleges the basis for liability with respect to each Count and each Defendant, and is not vague, ambiguous, or confusing.

Therefore, it is hereby

**RECOMMENDED** that Defendants' Motion to Dismiss be Granted as to Counts One, Three, and those parts of Count Four that apply to Universal; and otherwise be **DENIED.**

**DONE AND SUBMITTED** in Miami, Florida, this 24th day of July, 2007.

The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned. Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *LoConte v. Dugger,* 847 F.2d 745 (11 th Cir.), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *RTC v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993).

## REPORT AND RECOMMENDATION

Presently pending before the Court is Plaintiff's Motion for Summary Judgment (DE # 202). This motion is referred to the undersigned Magistrate Judge to take all necessary and proper action as required by law (DE # 257). The motion is fully briefed (DE ## 207 (replacing DE # 203), 204, 218, 220, 236,[1] 238).[2] The motion seeks summary judgment on liability and injunctive relief as to all counts, and seeks a hearing thereafter to determine amounts to be assessed for restitution and/or disgorgement, civil monetary penalties, and interest (DE # 202 at 1). Since the undersigned has recommended dismissal of Counts One, Three, and that part of Count Four which relates to the operations of Defendants Sterling and Universal, this Report and Recommendation addresses only the remaining counts—Count Two, Count Four (remaining parts), and Count Five. For the reasons stated below, the undersigned recommends that summary judgment be granted as to liability on Count Five, and otherwise denied.

---

1. Pursuant to the Order of the Court (DE # 226), Defendants' Joint Statement of Material Facts in Dispute and Disputed Facts Not Included in Plaintiff's Statement (DE # 236) replaces the prior separate statements filed by the two groups of defendants (DE ## 216 and 217).

2. In addition, voluminous evidentiary support has been filed. All of these materials have been reviewed, and are referenced by docket entry number where appropriate.

## I. BACKGROUND

The Commodity Futures Trading Commission ("CFTC") has filed an Amended Complaint alleging violations of the Commodities Exchange Act ("the Act"), as amended by the Commodities Futures Modernization Act of 2000 ("the Modernization Act" or "CFMA"), against Defendants STG Global Trading, Inc. ("STG"), Graystone Browne Financial, Inc. ("Graystone"), QIX, Inc. ("QIX"), Joseph Arsenault and Andrew Stern (DE # 151).

As stated above, the undersigned has recommended dismissal of Counts One, Three and Four (as it relates to Defendant Universal), and therefore those counts are not discussed herein. In addition, the undersigned recommended denial of the Motion to Dismiss to the extent that it was based on arguments concerning the applicability of various statutes and regulations to the transactions involving QIX. The legal reasoning stated in that report and recommendation is incorporated herein by reference.

In Count Two, the Amended Complaint alleges that Defendants Graystone, STG, Arsenault and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options, in violation of 7 U.S.C. § 6c(b)[3] and 17 C.F.R. §§ 1.1(b)(1) and (b)(3) and 32.9(a) and (c) (Amended Complaint ¶¶ 122–27). The Amended Complaint alleges control person liability, pursuant to 7 U.S.C. § 13c(b),[4] with respect to Defendant Arsenault for the activities of Defendants Graystone and STG (Amended Complaint ¶¶ 99–101, 125). The Amended Complaint further alleges that Defendants Graystone and STG are liable as principals, pursuant to 7 U.S.C. § 2(a)(1)(B)[5] and 17 C.F.R. § 1.2, since the acts or omissions complained of were committed by Graystone and STG representatives within the scope of their respective employments (Amended Complaint ¶ 126). Finally, the Amended Complaint alleges that QIX is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, for the acts of Graystone and STG as its agent (Amended Complaint ¶¶ 102–08, 127). Defendant Stern is not charged with liability in Count Two.

In Count Four, the Amended Complaint alleges that Defendants QIX and Stern violated 7 U.S.C. § 6h by falsely representing that QIX was a member of a registered entity and/or that QIX was a registrant under the Act (Amended Complaint ¶¶ 134–36). The Amended Complaint alleges that Stern is liable as a controlling person with respect to QIX, pursuant to 7 U.S.C. § 13c(b) (Amended Complaint ¶¶ 98, 136). Defendants Graystone and STG are not charged with liability in Count Four.

---

**3.** Section 6 of Title 7 codifies Section 4 of the Commodity Exchange Act. Although the Amended Complaint and the memoranda of the parties cite to both, this Report and Recommendation uses only the citation to the appropriate section of Title 7.

**4.** Section 13c(b) provides: "Any person who, directly or indirectly, controls any person who has violated any provision of this Act or any of the rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commis-

sion has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation."

**5.** Section 2(a)(1)(B) provides: "The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation or trust, as well as of such official, agent, or other person." Regulation 1.2 contains identical language.

In Count Five, the Amended Complaint alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade (Amended Complaint ¶¶ 137–41). The Amended Complaint alleges that Defendant Arsenault is liable for these violations as a control person with respect to Graystone and STG; and that Defendant Stern is liable as a control person of QIX.

As relief, the Amended Complaint seeks the following (DE # 151 at 40–41):

a. a permanent injunction prohibiting the defendants and any other person or entity associated with them, or any successor thereof, from engaging in conduct violative of the provisions of the Act as alleged in this Complaint, and from engaging in any activity relating to commodity interest trading, including but not limited to, soliciting, accepting or receiving funds, revenue or other property from any person, giving advice for compensation, or soliciting prospective customers, related to the purchase and sale of any commodity futures or options on commodity futures contracts;

b. an order directing the defendants and any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constituted violations of the Act, as described herein, and interest thereon from the date of such violations;

c. an order directing the defendants to make full restitution to every customer whose funds were received by them as a result of acts and practices which constituted violations of the Act, as described herein, and interest thereon from the date of such violations;

d. an order directing the defendants to pay a civil monetary penalty in the amount of not more than the higher of $120,000 or triple the monetary gain to each defendant for each violation of the Act or Regulations; and

e. such other and further remedial ancillary relief as the Court may deem appropriate.

The Amended Complaint concerns transactions that occurred during two different phases of operations involving overlapping defendants, and contains detailed allegations regarding the nature of the operations and the allegedly fraudulent activities which occurred. Based upon the recommendation of dismissal with respect to the Counts relating to Phase I of the operations, which occurred between July 2002 and August 2003, this Report is directed to the Counts which are based on Phase II only.

The Amended Complaint alleges that during Phase II of the operations, which occurred between August 2003 and June 7, 2004, Graystone and STG, under the control of Arsenault, solicited retail customers to enter into foreign currency options transactions with QIX, which was controlled by Stern. The Amended Complaint alleges that Graystone and STG used false and misleading sales solicitation materials, high-pressure and deceptive sales tactics, and failed to provide access to account information regarding these transactions. The Amended Complaint contains a detailed recitation of the specifically alleged fraudulent activities. The Amended Complaint also alleges that these transactions were illegal, regardless of fraud, since QIX was not a proper counter-

party to the transactions (Amended Complaint ¶¶ 77–108).

## II. *THE POSITIONS OF THE PARTIES*

The CFTC contends that the undisputed material facts establish that Defendants are subject to the full panoply of statutes and regulations applicable to transactions involving options on commodities; *i.e.* that QIX is not a proper counterparty to foreign currency options transactions since it is not an "affiliate" of a registered FCM within the meaning of 7 U.S.C. § 2(c)(2)(B)(ii), and that QIX entered into these transactions with retail customers who were not "eligible contract participants" as defined by 7 U.S.C. § 1a(12)(A)(xi) (DE # 207 at 11–15).

With respect to Count Five, the CFTC contends that the undisputed material facts establish that the transactions were not "conducted on or subject to the rules of a contract market or a foreign board of trade," and therefore these transactions are illegal since CFTC Regulation 32.11[6] prohibits the sale of commodity options unless the transactions occur thereon (DE # 207 at 15–17).

With respect to Count Four, the CFTC contends that the undisputed material facts establish that the account opening documents utilized by QIX demonstrate, as a matter of law, that QIX falsely represented itself as a registrant of the CFTC, and that Defendant Stern directly approved these false representations (DE # 207 at 22–23).

With respect to Count Two, the CFTC contends that the undisputed material facts establish that Graystone, STG, Arsenault and QIX committed fraud in connection with the solicitation of members of the public to engage in foreign exchange option transactions with QIX (DE # 207 at 21–22). Specifically, the CFTC relies upon documents obtained from the offices of Graystone, STG, and QIX in June 2004, which included sales scripts, broker solicitation tapes, handwritten notes, customer account statements and internal financial reports. The CFTC states that the sales scripts contained canned responses to potential customer concerns, that handwritten notes and broker solicitation tapes used high pressure sales tactics while touting large profit potentials and downplaying the risks, and that one "Graystone broker acknowledged that brokers at the firm had to read verbatim sales scripts provided by the company, and that he and other brokers could and did use profit illustrations in excess of 300%–600% while reading such scripts to prospective customers, without ever disclosing that most Graystone customers were in fact losing money" (DE # 207 at 22). The CFTC also contends that the undisputed facts establish that Defendant Arsenault was aware of the brokers' use of extravagant and misleading profit projections since he regularly discussed all aspects of the use of sales scripts during sales meetings, and is liable as a controlling person. Finally, the CFTC states that brokers at STG also used similarly misleading sales scripts (*Id.*).

The CFTC contends that, based upon the undisputed facts concerning the relationship between QIX, Graystone and STG, QIX is liable as a principal of both Graystone and STG pursuant to 7 U.S.C. § 2(a)(1)(B) (DE # 207 at 23–24). The CFTC relies, *inter alia,* upon the fact that Graystone and STG: sent account opening

---

**6.** 17 C.F.R. § 32.11. All relevant regulations promulgated by the CFTC are contained in Title 17 of the Code of Federal Regulations. In this Report and Recommendation those regulations will be cited only by the applicable number, *e.g.,* references to 17 C.F.R. § 32.11 will be made to "Section 32.11" or "Regulation 32.11".

documents provided by QIX to customers; instructed customers to send funds to QIX; and had contractual agreements which provided for an exclusive relationship with QIX (DE # 207 at 24).

The CFTC also contends that Arsenault is a controlling person of Graystone and STG, and that Stern is a controlling person of QIX (DE # 207 at 24–25), incorporating by reference its Memorandum in Support of its Motion for Preliminary Injunction (DE # 4, at 19–20).

In their Joint Response, Defendants initially contend that summary judgment is premature since the CFTC has indicated that it intends to engage in further discovery (DE # 218 at 2).[7] On the merits, Defendants contend that: summary judgment for a plaintiff in a fraud case is almost never appropriate; there are a myriad of disputed facts; and the CFTC cannot demonstrate reliance, scienter and materiality of the alleged misrepresentations (DE # 218 at 2–5). In addition, Defendants contend that the CFTC lacks jurisdiction to enforce the statutory and regulatory provisions on which its claims are based, and rely upon the arguments previously presented in their papers opposing the CFTC's Motion for Preliminary Injunction (DE ## 144, 145, 146) and in support of Defendants' Joint Motion to Dismiss (DE ## 159, 160, 172). Other than by reference to these prior memoranda, the Joint Response does not directly address the arguments regarding summary judgment as to Counts Four and Five. Various arguments are presented by Defendants, however, in the body of their Joint Statement of Material Facts in Dispute and Disputed Facts Not Included in Plaintiff's Statement (DE # 236). Those arguments are addressed below.

## III. STATEMENT OF FACTS

In determining whether summary judgment for Plaintiff is appropriate, the evidence and all inferences must be viewed in the light most favorable to Defendants. Using this guiding principle, the following facts are taken from Plaintiff's Statement of Undisputed Material Facts, as amended by Defendants' Joint Statement of Material Facts in Dispute and Disputed Facts Not Included in Plaintiff's Statement (DE # 236).[8] Where Defendants have purported to dispute any fact contained herein, the undersigned explains why the uncontradicted evidence nevertheless establishes that fact.[9]

### A. The Defendants

1. Andrew Stern ("Stern") is president of QIX, Inc., Universal FX, and Universal Financial Holding Corporation, Inc. He is a registered Associated Person with the NFA, and an approved NFA associated member and principal. He was a respon-

---

7. The undersigned notes that no further discovery materials were filed in support of the CFTC's motion, and thus this argument appears moot.

8. Facts which pertain only to Counts One, Three and that portion of Count Four which relates to Defendant Universal, as to which the undersigned has recommended dismissal, have not been included. To facilitate review by the parties and the District Judge, the facts are stated in numbered paragraphs, in the same order in which they appear in the parties' statements of facts.

9. The Court ordered Defendants to file a Joint Response to Plaintiff's Statement of Material Facts which specifically identified each fact that is disputed, and cited evidence in the record to support the dispute, together with a statement of why the dispute is material (DE # 226). This Order also stated that all facts which were not specifically controverted, with supporting evidence in the record, will be deemed admitted (DE # 226). Therefore, where Defendants have not controverted a statement of fact, it has been deemed admitted for purposes of this Report and Recommendation.

dent in three NFA regulatory and four NFA arbitration actions.

2. Sterling Trading Group, Inc. was organized as a Florida corporation on May 9, 2002. During the operation of Sterling, Joseph Arsenault was listed as its managing director and vice president. From approximately August 2002 through July 2003, Sterling solicited retail customers to engage in foreign currency transactions with Universal FX, Inc. Sterling ceased doing business in July 2003.

3. Universal FX, Inc. ("Universal" or "UFX") was organized as a Florida corporation on February 22, 2002. Andrew Stern is listed as its president. From about February 2002 through December 2003, Universal entered into foreign currency transactions with retail customers. Universal is not registered in any capacity with the Commission. Since May 13, 2003, however, Universal has been listed in NFA records as a principal of UTS World, Incorporated, a registered FCM.

4. STG Global Trading, Inc. ("STG") was organized as a California corporation on July 14, 2003. STG is not registered with the CFTC in any capacity. STG solicited retail customers to engage in foreign currency options transactions with QIX, Inc. STG has no present place of business since it ceased business when this action was filed.

5. Global Forex Trading, Inc. ("Global Forex" or "GFT") was organized as a Florida corporation on July 24, 2003. Its president was Andre Stepsky. In November 2003, Global Forex changed its name to Graystone Browne Financial, Inc. after receiving a threatening letter from counsel representing a similarly named company. Graystone sent letter to customers advising them of this name change.

6. Graystone Browne Financial, Inc. ("Graystone") was organized as a Florida corporation on November 5, 2003. Graystone ceased doing business when this case

was filed, and has no present place of business. From August 2003 to the filing of this action, Graystone (f/k/a as GFT) solicited retail customers to engage in foreign currency options transactions with QIX, Inc. Graystone is not registered with the Commission in any capacity.

7. QIX, Inc. ("QIX") was organized as a Florida corporation on October 17, 2002. Andrew Stern is its president and sole shareholder. QIX is currently not in business. From at least August 2003 to the filing of this lawsuit, QIX entered into foreign currency option transactions with retail customers. QIX is not registered in any capacity with the CFTC. Since November 20, 2003, however, QIX has been listed in NFA records as a principal of QIX Futures, Inc., a registered Futures Commission Merchant ("FCM").

8. Joseph S. Arsenault ("Arsenault") resides at various times in California and Florida. He organized Sterling, Graystone, and STG. Arsenault was responsible for their overall management and the hiring and firing of employees.

B. *Other Relevant Entities*

9. Universal Financial Holding Corporation, Inc. ("UFHC") is a Florida corporation organized, owned and controlled by Stern, who is listed as its president. UFHC is a registered FCM.

10. QIX Futures, Inc. ("QIX Futures") is an Illinois corporation organized by Stern. QIX Futures has been a registered FCM since November 20, 2003. QIX, Inc. is the sole owner of QIX Futures.

11. UTS World, Inc. is a Florida corporation organized on March 1, 2003. UTS World has been a registered FCM since May 13, 2003.

### C. Phase II Operations

#### Facts Relied Upon to Support the Claim of Fraud

##### a. Graystone

12. Various documents were seized from the offices of Graystone pursuant to this Court's statutory restraining order, including:

a. sales scripts which include profit projections on individual trades of $65,000 (on ten options)(Koh Dec. 3, Att. A, bates number GB 130 00218, Att. D, bates number 130 00558); $45,000 (on ten options) (*Id.*, bates number GB 130 00222); $130,000 (on 20 options), (*Id.*, Att. C, bates number 130 00417); $78,000 (on ten options), *Id.*, Att. C, bates number GB 130 00555.

b. sales "bullet points" that indicated Graystone brokers represented QIX, the clearing firm, as being "registered-NFA" or "regulated by NFA." (*Id.*, Att. B, bates number GB 130 00237; GB 130 00250.)

c. a sales script that states, "I represent the FOREX or Interbank market. We trade foreign currency, the most liquid and lucrative market in the world." (*Id.*, Att. B, bates number GB 130 00248.)

d. a sales script that states "we only make two or three verbal recommendations a year and we only do so when the information in front of us is so overwhelming that we can recommend it with such a high degree of confidence that the Euro will reach our target price within the specified time frame." (*Id.*, Att. C, bates number GB 130 00407.)

e. audiocassette tapes seized from Graystone containing actual tape recorded sales solicitations. On one tape, a Graystone broker states:

(i) "keep in mind the Euro has made six separate five penny movements and each penny is a 50% profit, and it's happened six separate times ... any one of those would have generated profits of 200%, 300% or even 400% if you had invested, but keep in mind that past performance is not a guarantee of future returns...." (DE # 97 (transcript of tape) at 1).

(ii) "I will show you a return in this market, not because I'm the best trader, but simply because the Euro is moving, it's been rising for four years straight, the volatility will slow down, and when it does so will your potential for profit." (DE # 97 at 10).

(iii) "If you've heard of options, you know that the average strike price is 3 and a half, 4, even 5 cents out of the money, but I can get you 2 and a half cents out of the money, and the simple reason is, we buy in bulk, we only make recommendations four or five times a year, when we make those recommendations, we buy in bulk, because we know—not we think—that the market is going to make a movement where we want it to go." (DE # 97 at 16).

(iv) "Our institutional clients, almost all of them, have earned as much as 250%— excuse me, 232%, since January; individual accounts for myself right now, are up about 110% in the past month and a half." (DE # 97 at 19).

Defendants do not dispute that the above materials were seized from the offices of Graystone, but contend that they cannot be used as evidence in support of Plaintiff's summary judgment motion since they are not admissible evidence. Specifically, Defendants assert that some, if not all, of the materials are broker's notes or personal property of Graystone brokers. Those materials therefore are not books and records of Graystone kept in the normal course of business and therefore are not admissible as business records. Defendants also contend that the materials identified in the Koh Declaration are an undifferentiated mass; that some are

clearly personal notes or training materials designated as such; and that the CFTC has not introduced any evidence to establish the foundation as to how, if at all, Graystone used these materials or whether Graystone authorized or tolerated these materials. Defendants contend that the CFTC has failed to connect any of these materials with Graystone other than to state they were found on the premises. In addition, Defendants assert that the CFTC has failed to demonstrate that the mathematical leverage examples of market information were inaccurate or incorrect, or that the material was otherwise false or misleading (DE # 236 at 48). Finally, Defendants assert that even if the documents are technically admissible, they are not probative.

The CFTC responds, and the undersigned agrees, that the existence of these records on the premises of Graystone in such a prevalent manner is at least circumstantial evidence of fraud.

13. According to internal financial reports obtained from QIX on June 9, 2004, for the period from December 2003 through June 2004, 77 Graystone customers lost money, while no customer made a profit. One hundred percent of Graystone Browne customers whose records were complete, lost a total of $1,287,599.30.[10] On cross-examination by defense counsel at the preliminary hearing, CFTC Investigator Koh testified that 90% of commodity investors lose money, and the fact that losses occurred didn't mean that there was wrongdoing.

14. Graystone account executives made trade recommendations to customers.

15. Defendants dispute the fact that sales scripts were used by Graystone account executives to solicit customers, and rely upon the Declaration and testimony of Rose Mary Judy, who was responsible for accounts payable and receivable, payroll, customer service, and certain compliance functions at Graystone. Ms. Judy avers that she did not observe phone sales scripts used for anything except for training, and that use of scripts in actual calls to customers would not have been tolerated (DE # 49, Judy Decl. ¶ 14). She testified that there was a training script that was given to new brokers, but she had never reviewed it, and wasn't familiar with its contents and did not observe brokers with that script (DE # 214 at 63). The typewritten scripts attached to CFTC Investigator Koh's Third Declaration all contain the words, "FOR TRAINING PURPOSES ONLY," at the bottom (DE # 59). Other typewritten documents, as well as handwritten notes, which contain various paragraphs regarding sales, are not so labeled. At least some support Defendants' claim that they were not generated or approved by Graystone since refer to the sale of shares of stock rather than commodities.[11] Other documents, which are in

---

**10.** The record does not reflect the number of Graystone customers who were excluded from this computation due to incomplete records.

**11.** For example, GB 130 00233 is entitled, "CLOSES," and includes the following and other similar paragraphs:

_____, believe me I understand your concerns. In fact, if someone were to ask me to invest $____, whom I didn't know very well, I would be skeptical too. So I absolutely understand. I know that I'm asking you to stretch but I also know that nothing great was done without it. Give me your trust and confidence this one time and I will never, never have to ask you for either again. Let's go with the ___ shares. It's the right thing to do.

and

I have a philosophy of investing in the market, and that is to take a fundamentally sound company, whose value is not yet reflected in the price of the stock, and then tie in a near-term event, a catalyst if you will. (*name of company*) satisfies such criterion, and let me say this—whenever I've isolated a situation as unique as this I've made money for my clients hand over fist. Do this pick up ___ shares, hold the stock 30 to

various typefaces, and handwritten notes, refer to the foreign currency market. Andre Stepsky, who worked as a sales person at all three companies, had never seen and/or never used certain of the typewritten, as well as handwritten, documents which were taken from Graystone's office in June 2004 (DE # 211, Stepsky Depo. at 88, 103–110,120).[12]

Andre Stepsky testified that he read from a script when talking to customers at Sterling, Global Forex and Graystone, and that he was instructed to read from the script and interject his own personality into it, and scripts were present on all brokers' desks (DE # 211, Stepsky Depo. at 109, 130–32). Elements of the scripts were discussed at training meetings, which occurred two or three times a week at Graystone (DE # 211 at 63–64, 78–79, 87). Stepsky also testified that they were told to stay within realistic estimates when explaining leveraging, and that he gave estimates based upon the price movement in currency that he observed (DE # 211, Stepsky Depo. at 134–35).[13] Stepsky testified:

> [W]e were trained to say the right thing, and we were never allowed to sell dirty, is what it was called. You weren't allowed to ever use the word guarantee. We were trained properly to say that if you invest $100,000, you could make as

much as—if the market moves for you in the right direction. We were always told to sell the risk as much as the rewards.

(DE # 211, Stepsky Depo. at 56).

The undersigned finds that the undisputed material facts establish that brokers used scripts at Global Forex and Graystone. Andre Stepsky's testimony on this point is unequivocal, and not contradicted by the testimony of Rose Mary Judy. Although Ms. Judy stated in her Declaration that scripts were only used for training purposes, and that the use of scripts in actual calls would not be tolerated, her deposition reflects that she had no personal knowledge of this. Specifically, she testified that she could hear brokers talking, but she kept her door closed because she could not work with all that noise. She never heard the details of any individual conversation. She knew that there was a training script that was given to new brokers, but she didn't know who provided the script to brokers. She never observed brokers with that training script; she never reviewed the contents of the script; and, she was not familiar with the contents (DE # 211, Judy Depo. at 61–63).[14] Moreover, the Declaration of Financial Crimes Investigator Michael Lipsitt, who participated in the seizure of documents from Graystone's premises establishes that,

60 days, and I think the only problem you'll have is that you didn't buy more.

**12.** In addition, the undersigned notes that victim Brad Campbell testified that he had been convinced by salesperson Lyle Wexler to lie about the source of the money he was investing and to lie to the compliance officer when confirming the trade, and thus avoid the customer protections that had been instituted by Graystone and QIX (DE # 101, Campbell Test. at 164–68,179, 205–06). Campbell testified that he did so because "It was his rule. If [Wexler] wanted to break his rule, that was fine with me." (DE # 101, Campbell Test. at 205–06).

**13.** In his Declaration filed in opposition to the Motion for Preliminary Injunction, Stepsky addressed only his involvement in the operations at Sterling, and Stepsky denied making the misleading statements attributed to him by Sterling customers Firebaugh and McNelley (DE # 49).

**14.** The undersigned notes that Defendant Arsenault, who ran the day-to-day operations and was integrally involved in training sessions and in monitoring brokers, did not provide a declaration, affidavit, or testimony on this matter.

"There were numerous sales scripts .... on the sales desks and in desk drawers" (DE # 61, Att. C ¶ 7). There was at least one sales script on Mr. Arsenault's desk (*Id.* at ¶ 8). However, it is also clear that the script does not reflect the totality of what was said to customers.

16. The CFTC alleges that sales scripts contain various misleading statements touting the high profit potential of investing in currency options, while downplaying the risks. Defendants dispute this characterization, and rely upon an audit report prepared at the direction of QIX which found that the training scripts were compliant. The CFTC objects to the use of an unsigned and unsworn audit report as evidence. The undersigned finds that the sales script speaks for itself, and the receipt of the audit report can be used for the purpose of establishing compliance efforts and good faith on the part of Defendants, although not for the truth of the findings contained therein. Since the CFTC places heavy reliance on the sales script in seeking summary judgment as to the fraud count, the four-page script identified by Stepsky, and taken from the office of Graystone, is set forth below:

1. HELLO _____. MY NAME IS _____, AND I'M AN ACCOUNT EXECUTIVE WITH _____. HOW ARE YOU TODAY? I'M CALLING BECAUSE A WHILE BACK I RECEIVED A REQUEST FOR SOME INFORMATION ABOUT HIGH PROFIT INVESTMENT OPPORTUNITIES; AND I'M GIVING YOU THE COURTESY OF A PHONE CALL TODAY TO LET YOU KNOW I'LL BE MAILING THAT INFORMATION, PLUS OUR LATEST CHARTS AND MARKET REPORT.

(VERIFYING MAILING ADDRESS)

2. _____, HAVE YOU EVER INVESTED IN THE CURRENCY MARKET BEFORE? (*BUT/THEN*)

I'M SURE YOU REALIZE THAT TIMING IS THE KEY TO MAKING MONEY IN ANY INVESTMENT, DON'T YOU? GOOD, AND IT IS ESPECIALLY TRUE IN THE CURRENCY MARKETS. IN FACT, OUR TRADERS ARE VERY EXCITED ABOUT WHAT THEY BELIEVE TO BE A TREMENDOUS OPPORTUNITY IN THE ___ CURRENCY RIGHT NOW!!

THE REASONS BEING    1. _____

(*Bullets*)    2. _____

3. _____

3. _____, GRAB A PEN AND PAPER AND LET ME SHOW YOU IN BLACK AND WHITE WHAT THIS SITUATION COULD MEAN TO YOU FINANCIALLY. I'LL HOLD ON!

4. GIVE: YOUR NAME AND COMPANY NAME & TOLL FREE NUMBER

GET: HIS FIRST NAME—OTHER PHONE #'S FROM HIM (*CELL/WORK/ETC.*)

THE MARKET IS CALLED INTERBANK OR FOREX (*FOREIGN EXCHANGE*)

1. HIGH LIQUIDITY—1.5–4 TRILLION $ DAILY WHICH TAKES THE ENTIRE STOCK MARKET 100 DAYS TO DO THAT VOLUME.

WE ALSO TRADE 24 HOURS A DAY WORLD WIDE HOWEVER, THE OPTION MARKET IS OPEN FROM 8:30AM–6PM MONDAY–THURSDAY AND 8:30–4:00 PM FRIDAY.

2. YOU CAN MAKE $ IN EITHER DIRECTION IF WE ARE RIGHT (*CALLS & PUTS*).

5. NOW _____, THERE ARE TWO MAJOR WAYS TO INVEST IN THE FOREX MARKET. THE FIRST WAY IS CALLED SPOT

TRADING. WRITE DOWN SPOT TRADING.

NOW WITH SPOT TRADING YOU HAVE **UNLIMITED PROFIT PO-TENTIAL** ... BUT YOU ALSO HAVE UNLIMITED RISK. THIS MEANS IF YOU INVEST $12,000 IN THE CASH MARKET, YOU CAN TURN IT INTO $50,000 OR MORE ... BUT IT ALSO MEANS THAT YOU CAN LOSE THE $12,000 YOU STARTED WITH. IN FACT, WITH SPOT TRADING, YOU CAN LOSE AN UNLIMITED AMOUNT MORE THAN YOU START-ED WITH (*MARGIN CALLS*). FOR THIS SPECIFIC REASON, WE **DO NOT** RECOMMEND SPOT TRADING TO MOST OF OUR CLIENTS.

NOW THE SECOND WAY TO IN-VEST IN THE FOREX MARKET IS CALLED OPTIONS. WRITE DOWN THE WORD **O P T I O N S**. IT IS EXTREMELY IMPORTANT FOR YOU TO KNOW THAT WHEN *BUY-ING OPTIONS* YOU STILL HAVE UNLIMITED PROFIT POTENTIAL, JUST AS YOU DO WITH SPOT TRADING.... BUT, **AS THE BUYER** OF OPTIONS, YOU STRICTLY LIM-IT YOUR RISK **TO THE AMOUNT YOU INVEST**. THIS MEANS,

_____ (*NAME*), IF YOU BUY $12,000 WORTH OF OPTIONS YOU CAN TURN IT INTO $50,000 OR MORE YOU CAN NEVER LOSE A PENNY MORE THAN WHAT YOU STARTED WITH; AND EVEN THAT'S UNDER A WORST CASE SCENARIO!

IN OTHER WORDS, _____, YOU'LL BE ABLE TO TAKE AD-VANTAGE OF THIS TREMENDOUS OPPORTUNITY AND STILL BE ABLE TO SLEEP AT NIGHT!! DO YOU FOLLOW ME? ?

6. _____, LET ME GIVE YOU A HYPOTHETICAL EXAMPLE.

**1 CONTRACT =** _____     **EXPECTED PRICE $** _____

**1 PENNY =** _____     **STRIKE PRICE/MNTH  $** _____

**SUB-TOTAL** _____ ¢

**X     $1,500**

**INVESTMENT RETURN    $**_____

**PURCHASE OPTION (Appro. $1,000) -1,000**     **$**_____
**PROFIT**

**# OF CONTRACTS**     **x 12 ETC.     $**_____
**PROFIT**

NOW TELL ME _____, IS THAT THE TYPE OF RETURN YOU'D LIKE ON YOUR INVESTMENT DOLLARS? (*PAUSE*) AND IF WE ARE ONLY HALF RIGHT, I DON'T THINK YOU WILL BE UNHAPPY; DO YOU AGREE?

7. NOW _____, YOU *MUST* UN-DERSTAND THAT IN ANY INVEST-MENT THERE IS RISK. IF WE'RE WRONG OFTEN ENOUGH, YOU COULD END UP LOSING SOME MONEY, WHICH I'M SURE YOU AL-READY REALIZE. BUT REST AS-

SURED OUR TRADERS WILL WORK VERY HARD AND USE ALL THE "TRADING TOOLS" AVAILABLE, TO GET YOU THE BEST RESULTS. BECAUSE REMEMBER _____, THE ONLY WAY YOU'LL REMAIN A CLIENT OF MINE; IS IF I MAKE YOU MONEY! NOW _____ DOESN'T THAT MAKE SENSE TO YOU? PAUSE (*WAIT FOR ANSWER*)

8. GREAT NOW _____, LET ME ASK ... CAN YOU HANDLE AN OUTLAY OF *$12,000* RIGHT NOW? (*IF YES*) WONDERFUL, SO WHAT YOU'RE TELLING ME IS THAT YOU COULD WRITE A CHECK OR WIRE ME *$12,000* WITHIN THE NEXT COUPLE OF DAYS IF YOU WANTED TO, IS THAT CORRECT (*WAIT FOR ANSWER*) GREAT!!

(*IF NO*) THAT'S A SHAME, BECAUSE I REALLY BELIEVE THAT A LOT OF MONEY COULD BE MADE IN THE _____ OVER THE NEXT COUPLE WEEKS.

*PERSONAL CONTACT*

9. WHAT DO YOU DO WITH YOURSELF, SUCH AS INTERESTS (*FISHING–BOATING–GOLF–KNITTING–HOBBIES*), (*INCOME $*) CURRENT INVESTMENTS? STOCK MARKET? MONEY MARKET—HOW MUCH? CD'S/ ETC.? AMOUNTS (*WHERE IS YOUR MONEY WORKING FOR YOU FOR THIS INVESTMENT?*), (*IF NOT OBVIOUS*)

10. NOW _____, SO YOU KNOW, WE CHARGE A *"ROUND TURN"* COMMISSION OF $200, PLUS A $30.00 TRANSACTION FEE; A TOTAL OF *$230* PER EACH CONTRACT TRADED. "ROUND TURN" MEANS YOU DO NOT PAY ANOTHER COMMISSION WHEN WE SELL. THE TOTAL OF COMMISSION FEES PLUS PREMIUM WILL AL-LOW YOU TO LEVERAGE $150,000 PER EACH OPTION PURCHASED, WHICH IN MOST CASES GIVES YOU A LEVERAGE OF ABOUT 150 TO 1, THAT MEANS EACH DOLLAR WILL WORK LIKE $150!!! ISN'T THAT EXCITING?

11. VERIFY ADDRESS AND HOME AND WORK PHONE NUMBERS.

* * *REMEMBER ANY ANSWER OTHER THAN A STRONG "YES" IS A "NO" * * *

12. _____, ONCE YOU RECEIVE THE INFORMATION HOW LONG WILL YOU NEED TO GO OVER IT AND MAKE A DECISION? (IF MORE THAN ONE WEEK RE-SELL) THAT'S FINE.

13. NOW _____, AFTER GOING OVER THE MATERIAL, IF YOU AGREE THAT EVERYTHING I'VE TOLD YOU IS "RIGHT ON TARGET" DO I HAVE A CLIENT? (WAIT FOR ANSWER)

(IF YES) GREAT

(IF NO) WHY NOT?

REMEMBER ANY ANSWER OTHER THAN A "YES" IS A "NO"!

14. VERIFY ADDRESS & HOME & WORK PHONE # 'S.

15. _____, WHAT YOU MUST DO IS, AS SOON AS YOU RECEIVE MY PACKAGE, MAKE SURE YOU TAKE THE TIME; BETTER YET MAKE THE TIME TO GO OVER IT! *IT'S THAT IMPORTANT!* WRITE DOWN ANY QUESTION THAT YOU MAY STILL HAVE. THEN CALL ME ON MY TOLL FREE #, AGAIN THAT # IS _____.

WE'LL GO OVER IT TOGETHER. I'LL ANSWER ALL OF YOUR QUESTIONS AND CONCERNS, AND IF YOU LIKE WHAT YOU SEE, I'LL GET YOU INTO THE MARKET SO

THAT YOU'LL HAVE THE OPPORTUNITY TO MAKE SOME REAL MONEY! BECAUSE LET'S FACE IT _____, WHEN ALL IS SAID AND DONE THAT'S REALLY WHAT IT'S ALL ABOUT, ISN'T IT?
YOU HAVE A GREAT WEEK/WEEKEND, AND I'LL EXPECT TO HEAR FROM YOU BY ___ DAY OR NOT LATER THAN _____ DAY MORNING! OKAY. BYE FOR NOW.

(DE # 211, Stepsky Depo. Ex. 14). At the bottom of each page of the 4–page script are the words, *"FOR TRAINING PURPOSES ONLY."*

17. Sales scripts were generally left on broker's desks for anyone to see, including Arsenault.[15]

18. Graystone account executives were instructed to read from the script when the spoke to customers.[16] Arsenault discussed at training meetings what brokers could say in response to customer questions or concerns about their investment.

19. Arsenault, along with other Graystone employees, conducted training sessions, where Arsenault would instruct Graystone account executives on how to deal with customers on the phone.

20. The CFTC contends that the statements in the sales scripts were misleading since a majority of the customers of Graystone lost money. Defendants dispute this on the basis that the scripts were used only for training, and since they speak only of potentialities and contain no assurances or guarantees of profitability, nor do they have any statements of historical profits by Graystone customers (DE # 236 at 52). The undersigned finds that the scripts speak for themselves; and whether the scripts and other circumstances establish fraud as a matter of law is a legal conclusion for the Court.

21. Graystone account executives used sales scripts which gave examples of profit projections to customers.

22. Andre Stepsky did not know how to access account information for his customers. The CFTC did not cite to evidence in the record to establish that other account executives did not know how their customers were actually doing.

### b. *STG*

23. STG account executives used sales scripts to solicit customers.[17]

24. The CFTC alleges that sales scripts contain various misleading statements touting the high profit potential of investing in currency options, while downplaying the risks. As before, Defendants dispute this characterization, and rely upon an audit report prepared at the direction of QIX which found that the training scripts were compliant. The CFTC objects to the use of an unsigned and unsworn audit report as evidence. The undersigned finds that the sale script speaks for itself, and the receipt of the audit report can be used for the purpose of establishing compliance efforts and good

---

15. This is disputed based on Ms. Judy's deposition; however, as discussed above, her deposition does not contradict the testimony of Stepsky in this regard.

16. This is disputed based on Ms. Judy's deposition; however, as discussed above, her deposition does not contradict the testimony of Stepsky in this regard.

17. Defendants attempt to dispute this by relying on the aforementioned testimony of Rose Judy (DE # 236 at 54). However, Ms. Judy worked at Graystone in Florida, and did not work in STG's office in California. Heather Babber f/k/a Heather Moe worked in the California office, and testified unequivocally that she saw the sales scripts on broker's desks, saw them reading from them when they talked to customers, and overheard the brokers saying the same thing over and over again (DE # 211, Babber/Moe Depo. at 43–45).

faith on the part of Defendants, although not for the truth of the findings contained therein. The sales scripts speak for themselves regarding what is contained therein, and script quoted above with respect to Graystone was also used at STG. Ms. Babber also identified an option worksheet which was used at STG and posted on a broker's desk, and which showed calculations based on a seven cent move in the price of currency for 25 contracts, yielding a profit of $119,000 on a $25,000 investment, or a 378½% profit (DE # 211, Babber Depo. at 55 and Ex. 14).

25. According to internal financial reports obtained from QIX on June 9, 2004, for the period of December 2003 through June 2004, 35 STG customers lost money while 1 customer made a profit. Approximately 97% of STG customers whose records were complete lost a total of $546,929.50.[18]

26. STG account executives provided trade recommendations to customers.

27. STG account executives were provided with weekly trading information which showed how their customers were doing.

### c. *Representations Regarding Registration Status*

28. Arsenault's new firms appear to have the same type of relationship with QIX as Sterling did with Universal: QIX provided STG Global and Graystone with its account opening documents, customer agreements, and risk disclosures to be provided to their customers.

29. QIX's account opening documents are nearly identical to those for Universal. In particular, QIX's account documents, like Universal's:

  (a) contain a Regulation 1.55 Risk Disclosure designed for FCM's and IB's;

  (b) refer to arbitration and CFTC reparations proceedings in a manner identical to Universal's

  (c) the original account opening documents used by QIX stated, "QIX, Inc. is an affiliate of a Futures Commission Merchant with the Commodity Futures Trading Commission ("CFTC"), and is a member of the NFA pursuant to the provisions of the Commodity Exchange Act" (DE # 62, Att. B. Pendleton Decl. ¶ 8).

On February 9, 2004, the NFA wrote a letter to QIX Futures, Inc. advising that the language in the account opening documents was "potentially misleading" and requesting that the language be clarified "to prevent any confusion." The NFA suggested that the language be modified to state, "QIX, Inc. is an affiliate of a Futures Commission Merchant *which* is registered with the Commodity Futures Trading Commission and is a member of the NFA." (emphasis added to highlight the changed language) (*Id.* at Att. 2).

On March 11, 2004, Andrew Stern sent an e-mail to the NFA advising that the suggested modification had been made on the website and to the hard copies of the account documents (DE # 62, Att. B: Pendleton Decl. ¶ 8 and Att. 3). The modified language states:

QIX, INC. IS AN AFFILIATE OF A FUTURES COMMISSION MERCHANT WHICH IS REGISTERED WITH THE COMMODITY FUTURES TRADING COMMISSION ("CFTC") AND IS A MEMBER OF THE NATIONAL FUTURES ASSOCIATION ("NFA") PURSUANT TO THE PROVISIONS OF THE COMMODITY EXCHANGE ACT (THE "ACT").

(DE # 49, Ex. C: QIX Account Doc. at 17).

---

**18.** As with Graystone, the record does not reflect the number of STG customers who were excluded from this computation due to incomplete records.

30. The CFTC contends that, as a matter of law these statements were false and misleading, because while Graystone customer accounts were traded, neither Graystone nor QIX was registered with the CFTC is any capacity nor a member of the NFA. Defendants dispute that the above statements were misleading. Stern testified that he included the risk disclosure because it is the generic risk disclosure form that all FCMs are required to give and he recognized the importance of such disclosure and he did not want to explain the omission (Stern Test. at 155–56). CFTC Investigator Koh testified that the risk disclosure statement is not misleading as to the substance contained therein, and that it accurately discloses the risks involved, but was misleading because it gave the false impression that the trades were being conducted by an FCM (DE # 109, Koh Test. at 80–82). There is no regulation which prevents an unregistered entity from giving the disclosure, and the CFTC has passed no regulation setting forth an appropriate risk disclosure for off-exchange Forex transactions (DE # 109, Koh Test. at 83; DE # 101, Pendleton Test. at 21–22). With respect to the inclusion of the arbitration language, Stern testified he believed that arbitration and reparations proceedings would be available (De # 111, Stern Test. at 155–58), and CFTC Investigator Koh testified that he did not know whether those remedies were available (DE # 109, Koh Test. at 176–78).

*QIX Offered Option to Retail Customers*

31. From at least August 2003 through June 7, 2004, QIX entered into foreign currency option transactions with retail customers.

*The Jurisdiction of the Commission Over the Option Contracts*

32. QIX is a principal of QIX Futures, Inc., a registered futures commission merchant.

33. QIX Futures has never held any customer segregated funds over $6.25 million, or adjusted net capital of over $5 million at the end of a fiscal year.

34. QIX, STG and Graystone customers did not have the requisite total assets and did not enter into the transaction to manage risk associated with an asset they owned or a liability incurred; their purpose was purely speculation.

Defendants dispute this allegation on the grounds that the citation to CFTC Investigator's Koh's Declaration in the record (DE # 4, Ex. 2: Koh Decl. ¶ 49) refers only to a paragraph in which he states that none of Defendants has ever been designated a contract market for the sale of foreign currency futures or commodity options, and does not address the status of customers (DE # 236 at 57). Defendants are correct regarding this citation to the record; and, in fact CFTC Investigator Koh never addresses the status of customers of QIX, Graystone and STG. Defendants do not cite any contrary evidence in the record; they rely solely upon the CFTC's incorrect citation.

Inexplicably, the CFTC does not respond to this contention. However, uncontradicted evidence in the record regarding the financial status of various customers and their purpose for investing, as well as all inferences which can be drawn by the sales and marketing techniques which permeate the record, supports this factual statement.

At the outset, the undersigned notes that the CFTC is only seeking relief with respect to customers who were not "eligible contract participants." Thus, the CFTC does not purport to exercise jurisdiction over any possible transactions that might have occurred with eligible contract participants. The term "eligible contract participant" is defined as "an individual who has total assets in excess of

$10,000,000.00; or, has assets in excess of $5,000,000.00, and enters into the contract in order to manage the risk associated with an asset owned or a liability incurred by that person." 7 U.S.C. § 1a(12)(A)(xi). All of the evidence in the record regarding the financial status of customers and their purpose for investing supports the statement of the CFTC, and none of the evidence or any inferences which can be drawn from the sales and marketing techniques refutes it. There is evidence in the record regarding Graystone/QIX customer Gary Hicks, STG/QIX customer Vivian Barnhard; STG/QIX customer Ralph Chilton; and Graystone/QIX customer Brad Campbell. The Declaration of Defendant Arsenault, with the attached customer information of Brad Campbell (Ex. K), Vivian Barnhard (Ex. L), and Ralph Chilton (Exhs. N and O), and the Declaration of sales representative Michael Mesa with respect to Gary Hicks (DE # 49); establishes that their assets were below the above threshold. In addition, the testimony and Declarations of Hicks (DE # 4, Ex. 12; DE # 101, Hicks Test. at 49–78); Campbell (DE # 4, Ex. 11; DE # 101 at 154–213); Barnhard (DE # 49, Ex. 10; DE # 101 at 111–24); and Chilton (DE # 4, Ex. 9) confirms the financial status of these customers and that their purpose for investing was to speculate in foreign currency markets. Exhibits to the deposition of Heather Babber/Moe include a similar Customer Information form which show that the customer did not have the requisite assets (DE # 211, Babber/Moe Depo. Ex. 15, GB 140–0000089) (Franklin Barrick)

Thus, the undersigned finds that there is undisputed evidence in the record that at least some QIX, STG and Graystone customers did not have the requisite total assets and did not enter into the transaction to manage risk associated with an asset they owned or a liability incurred; their purpose was purely speculation.

*The Alleged Agency Relationship Between QIX and STG/Graystone*

35. QIX entered into identical introducing agreements with STG and Graystone which contained several provisions outlining an exclusive business arrangement between QIX and STG and Graystone, in which STG and Graystone agreed to introduce customers exclusively to QIX. Defendants don't dispute that this provision is in the written agreement; but dispute that there was an exclusivity arrangement on the grounds that Stern avers that QIX did not enforce that clause or interfere if an introducing broker introduced customers to another FCM (DE # 49, Ex. A: Stern Decl. at ¶ 42). However, the cited paragraph refers only to Universal, and there is no corresponding paragraph regarding the exclusivity arrangement with QIX.

36. STG and Graystone introduced customers exclusively to QIX.

37. In addition, QIX provided all account opening documents to STG and Graystone. The QIX account opening documents provided instructions for STG and Graystone customers to send their funds directly to QIX.

38. QIX was the counterparty to all of the trades entered into by STG and Graystone customers.

39. Relying on the deposition of Heather Babber/Moe, the CFTC alleges that QIX retained portions of the commissions charged to STG customers. Also relying on the same deposition, Defendants assert that STG received all the commissions in the approximate amount of $215 per round turn trade, and the QIX received a fee of $15 on each transaction. The testimony of Babber/Moe states that out of the $231 that was charged in the first few months, QIX paid one dollar to Joe Prager, kept $15, and paid the rest to STG; thereafter

the $1.00 payment to Prager was discontinued (DE # 211, Babber/Moe Depo. at 51–54). The typed sales script advises customers that they will be charged a round turn commission of $200.00 plus a transaction fee of $30.00 (*See, e.g.* DE # 211, Babber/Moe Depo., Ex. 13 at 140-0005234).

*Defendant Arsenault's Control Over Defendants STG and Graystone*

In their response to the facts set forth by the CFTC in this section,[19] Defendants assert that these facts are disputed on the grounds that the CFTC "has not proven Mr. Arsenault is liable as a controlling person for any antifraud violations by Sterling [sic].[20] Section 13(b) imposes on the CFTC the burden of proving the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting violations for such vicarious liability to attach." (DE # 236 at 58–63). Thus, Defendants have presented only legal arguments regarding why the facts in this case do not support liability and have not challenged the underlying facts in paragraphs 40 through 45 st forth below.

40. Arsenault set up STG Global in California using his brother Christopher as its corporate agent. Arsenault asked Heather Moe (n/k/a Babber) to run the operations of STG. Arsenault used a former Sterling employee, Andre Stepsky, to incorporate Global Forex Trading in Florida. Arsenault was the principal of STG and Graystone.

41. Arsenault controlled and was responsible for Graystone's overall operations. Arsenault ran and maintained the daily functions of Graystone. Arsenault had the authority to hire and fire employees of Graystone and STG, and he did hire employees.

42. STG employees, including Heather Babber (Moe) and the account executives, reported to Arsenault.

43. Arsenault provided training on options to account executives at STG and Graystone.

44. Arsenault took responsibility for compliance at STG and Graystone.

45. Arsenault kept track of how STG and Graystone customers were doing.

46. Arsenault made trade recommendations to account executives at Graystone and STG. Account executives made their own recommendations to customers.[21]

*Defendant Stern's Control Over Defendant QIX*

47. Stern was the president, director, and sole shareholder of QIX during the period of its operation.

48. The CFTC contends that Stern was responsible for QIX's overall operations

---

**19.** Those facts are numbered 117 through 122 in the CFTC Statement of Undisputed Material Facts (DE # 204); and are numbered 40 through 45 in this Report and Recommendation.

**20.** The undersigned assumes the Defendants meant to allege STG and Graystone Browne, and neglected to replace the name when cutting and pasting this argument from their statement of disputed facts as to the Phase I transactions involving Sterling and Universal. The facts asserted in the dispute with respect to these paragraphs to establish Arsenault's good faith, however, relate only to the operations of Sterling, and therefore are not included here.

**21.** Defendants dispute the contention of the CFTC that the account executives were supposed to provide Arsenault's recommendations to customers; and rely upon Arsenault's testimony that the executives were free to, and did, disregard Arsenault's recommendations (DE # 236 at 63; DE # 128, Arsenault Test. at 20–21). The undersigned agrees that this portion of the CFTC's statement is therefore disputed, and states this fact in the light most favorable to Defendants.

**1344**

(¶ 125); Stern ran and maintained the daily functions of QIX, and hired and fired employees (¶ 126); that Stern had control over and approved the account opening documents and contracts that STG and Graystone sent out to retail customers (¶ 127); and that Stern controlled the bank accounts of QIX and signed checks for the company (¶ 128).

Defendants dispute these facts, correctly asserting that the Declaration of Defendant Stern establishes the following: "Andrew Stern delegated responsibility to running QIX to Daniel Breen. Mr. Breen hired and fired employees, wrote the vast majority of checks, and ran every aspect of QIX's foreign currency options business. Mr. Stern briefly took control of QIX for a short period after Daniel Breen died, but only until a suitable replacement was found." (DE # 236 at 63–65, citing DE # 48, Ex. A, Stern Decl. at ¶ 45). The Declaration of Stern also establishes that he had access to bank accounts, but signed few checks, and rarely wired funds or transferred balances (Stern Decl. at ¶ 45). He hired people to run the operations of Universal and QIX (Stern Decl. at ¶ 46). He also averred that he "had nothing to do with account opening documents, except to adopt the documents of a competitor" (Stern Decl. at ¶ 48).

Defendants assert that "there is no evidence that Andrew Stern, or by implication QIX, exerted any 'purported control' over" the account opening documents (DE # 236 at 64, ¶ 127). Defendants contend that the CFTC's sole citation to the record is to paragraph 54 in Investigator Koh's Declaration, which does not mention either Graystone or STG (DE # 236 at 64, ¶ 127).[22] There is ample uncontradicted evidence in the record, provided in the Declaration and in the testimony of Defendant Stern, which demonstrates that Stern had control over the creation and use of the QIX account opening documents. In his testimony at the preliminary injunction hearing, Stern elaborated upon his involvement with the account opening documents of QIX. He testified that Daniel Perini put them together, but that he, Stern, ultimately approved them (DE # 111 at 118). The QIX documents are substantially identical to the ones used by Universal, and Stern provided extensive testimony on his involvement with the preparation of those documents, including how they had been adopted from documents used by FXCM and Alaron, and why he decided to include the risk disclosure and arbitration forms (DE # 111 at 64–67; 136; 155–58, 168–69).[23]

In addition, with respect to his involvement in the operations of QIX, Stern testi-

---

**22.** Paragraph 54 of Investigator Koh's Declaration states in conclusory terms, without further citation to evidence in the record:

Based upon my review of corporate records, bank records, and the testimony of Stern, he is the president of both Universal and QIX. In addition, he was responsible for the day-to-day operations of Universal and is currently responsible for the day-to-day operations of QIX. Stern also approves the account opening documents and customer agreements sent to customers. Stern was responsible for the hiring and firing of employees at Universal. According to Stern's own testimony, he personally negotiated with the software companies that

provided the trading platform for both Universal and QIX. Stern was also the signatory on the Universal bank accounts and personally signed all of the firm's checks. Stern currently performs the same role at QIX.

(DE # 4, Ex. 2 (Koh Decl.) at ¶ 54).

**23.** Defendants have not disputed the fact, contained in paragraph 86 of the CFTC's Statement of Facts, that "Stern had control over and approved the account opening documents and contracts that Sterling sent out to retail customers," although much of the remainder of paragraph 86 is disputed (DE # 236 at 44–46).

fied that *he* had compliance audits performed of introducing brokers at QIX since, "*I* thought it was most prudent, you know. It was the only way I could think of that we could possibly get any insight into what the operations of the introducers were about." (DE # 111 at 170–71) (emphasis added). When asked, with respect to the audit reports, "Are these documents that you read at the time and relied upon [in] your business decisions at QIX?" Stern responded, "Absolutely." (DE # 111, Stern Test. at 175–76).

*Defendants' Joint Statement of Additional Disputed Facts*

Defendants have provided a statement of additional facts which they contend are material and were omitted from Plaintiff's Statement (DE # 236 at 65–76). Many of these facts relate to the operations of Sterling and Universal, and are therefore are not relevant to the issues addressed in this Report and Recommendation. Other statements are legal arguments rather than statements of fact. The following facts, however, are based on evidence in the record, viewed in the light most favorable to Defendants, the non-moving parties. The undersigned notes that in citing to various provisions in the account opening documents, Defendants cite only to Universal's documents; however, QIX used documents which are identical with respect to the cited provisions.

### A. *Fair Treatment of Customers*

#### (1) *Risk Disclosure in Account Opening Documents*

49. According to the Declaration of Defendant Stern, the account opening documents were not designed to confuse or mislead, and carefully explained the nature, risks and mechanics of foreign currency transactions.

50. The account opening documents state no less than six times that the trans-actions at issue were off-exchange, unregulated foreign currency transactions.

51. With respect to risk disclosure statements, there are approximately 62 different disclosures relating to risks contained in the account opening documents.

52. Every CFTC customer witness admitted reviewing, and signing, extensive account opening documentation including a variety of risk disclosure statements, prior to being permitted to open a trading account.

#### (2) *Compliance Procedures*

53. Defendant Arsenault, according to his Declaration, considered compliance to be an important part of any investment-related operation, and did not want any person to become a client who did not understand the nature, mechanics and risks involved in foreign currency transactions. Nor did he want persons investing who, if money was lost, would experience a diminution of their lifestyles. From time to time, Arsenault prohibited persons from trading or refused to allow them to become customers based upon conversations with them, review of their application materials or other information. Stepsky testified that he would not send out an initial account information package unless the customer demonstrated in response to Mr. Stepsky's questions that he was "qualified" to receive the materials. If a customer had never invested before, it "would send up a red flag" which Mr. Stepsky used from time to time to turn down prospective customers.

54. There was compliance taping at STG and Graystone. This is a process by which a salaried employee with no interest in the transaction asks the customer a series of questions prior to the customer entering the market to make certain that the customer understands the nature, mechanics and risks of the transaction in-

volved, has not been guaranteed profits, and that no representations have been made by the broker contrary to those contained in the customer agreement and disclosure statement. These conversations were taped with the customer's consent. In addition, customer buy and sell orders were often taped.

55. The compliance taping calls were made by using a script which the compliance officers read to the customers.[24] Arsenault and others monitored sales presentations by representatives, using including a phone system that allowed Arsenault to listen in without the salesperson being aware.

56. As part of overall compliance procedures, STG and Graystone tried to settle any claims from disgruntled customers of which they became aware. The number of customer complaints was small, and was never a significant or a material percentage of all customer accounts.

57. Certain evidence presented by the CFTC, including charts received by customers, showed that the Euro was generally moving up against the dollar during the time period in question.[25]

(3) *Compliance Audits*

58. Investment Reference, Inc. ("IRI"), whose principal was Dennis Stahr, a highly experienced veteran of the commodities business, was engaged by QIX to perform two compliance audits of Graystone.

59. IRI performed its first audit of Graystone on December 12, 2003, and provided a Forex Audit Report ("First Report") dated December 30, 2003.

60. The cover of the First Report states:

### OPENING COMMENT

Although not currently required by any regulatory agency, QIX has taken it upon themselves to order this review of your current Forex operation. With great foresight, the principals of QIX realize the need to operate within certain guidelines to protect the interest of customers of QIX while bringing a measure of consistency to the firms that clear the trades for these customers. It is not only in the interest of the customers and of QIX, but also your own, that these reviews be completed. Based on these audits, recommendations can be made to enhance the opportunities this industry offers while at the same time forming a compliance guideline in a yet unregulated climate.

61. Page two of the report notes that Arsenault and sales manager Stuart Brandon monitor the sales presentations by live observation and "silent" phone. On the next page, the audit notes a single small deficiency with respect to customer files audited, and none as to order entry.

62. Under the caption "COMPLAINT FILE," the report notes that Graystone had a complaint file, and had resolved the one complaint received. The Report found no deficiencies with respect to the advertising file or promotional materials. The

---

**24.** Transcripts and tapes of compliance calls were filed by Defendants (DE # 147); and the script is also contained in the record (DE # 49, Judy Decl. at Ex. A). The transcripts of the compliance tapes for customers Hicks and Campbell reflect that the script was followed. The undersigned notes that when Mr. Hicks was asked to explain in his own words, what he perceived the risks to be with respect to option trading, he stated, "Well, I see a big gamble, but the profits, if they do show up, can be substantial" (DE # 147, Trans. at 3). Customer Campbell responded, "Well, if the option expires before it is moved in the direction that we're wanting it to go, the option could become worthless and I make no money and lose the money I've invested" (DE # 147, Trans. at 9).

**25.** Defendants argue that this gave any opinions expressed about the possible profitability of that market a rational basis.

report noted that Graystone had a website that appeared compliant, and had a strong disclaimer.

63. The Report also noted that there was a phone script "for training only" and that the script appeared compliant.

64. With respect to telephone solicitations, the report notes: "Heard in conversation with customer and/or prospects were: Andre Stepsky, Mike Wexler and Roberta Couri. All conversations appeared compliant and the demeanor of the reps was professional and courteous. There was no sense of urgency conveyed and no pressure applied to open an account or to trade. There was risk discussion included in the conversations."

65. IRI performed a second audit on June 2, 2004, and produced a Forex Audit Report dated June 22, 2004. This report contained the same description of activities as the first report, and found no deficiencies, including with respect to radio advertisements placed through March 2004.[26] The Declaration of Arsenault confirms the accuracy of the conclusions and findings contained in the reports.

### (4) No Obligation to Disclose Track Record

66. Defendants concede that they did not disclose any track record or performance history to customers, and contend that they were not required to do so. In addition, Defendants rely on the testimony of CFTC Investigator Koh that the fact that losses occurred does not mean anything was done wrong and that 90% of commodity investors lose money.

### (5) Essential Good Faith

67. According to the Declaration of Arsenault, Defendants made every effort to ensure that they treated all customers fairly and that the customers understood the nature, mechanics and risks of transactions in foreign currencies; the relatively few complaints received supported Arsenault's belief that customers were being treated fairly; and they had a reasonable basis for all statements made, including those related to the use of leverage and potential profitability in the foreign currencies market.

68. Defendant Arsenault also averred in his Declaration that although STG and Graystone were not members of the NFA, and therefore not bound by NFA rules concerning balanced presentations, they made certain to emphasize the risks and customer understanding of the possibility of loss. The Arsenault Defendants affirmed that customers fully understood the risks in the written disclosures and the compliance taping procedure. Arsenault averred that he had no interest in having any person participate in the foreign currency markets who did not have the necessary understanding of them or the ability and right mental attitude to withstand the loss.

69. Defendants contend that there is evidence to support a finding that customers knew what the risks were; that Arsenault focused on the customer understanding that the customer could lose his money; and that Stepsky testified that sales representatives "were always told to sell the risk as much as the rewards."

### B. Likelihood of Repetition

### (1) Cessation of Activities

70. With the exception of this case, Arsenault has never been a defendant or respondent in any other action brought by a regulatory agency.

71. Sterling voluntarily ceased business in or about July 2003 when Arsenault be-

---

**26.** The record does not contain tapes or transcripts of these advertisements, unlike the advertisements of Sterling, which are included in the record.

came convinced that nobody could make money in foreign currency spot trading.

72. STG and Graystone ceased doing business with the filing of this action.

(2) *Complexity of the Regulatory Scheme for Foreign Currency Transactions*

73. There are no specific regulations regarding retail foreign currency transactions. Sharon Pendleton testified that she had been waiting almost four years for the CFTC to prepare a promised statement on the requirements for an "affiliate" of an FCM to be exempt from the regulations, and to date none had been issued.

### IV. THE STANDARD FOR GRANT-ING SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure authorizes entry of summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir.2001). Summary judgment is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the federal rules as a whole, which are designed to secure a just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Ty-*

*son Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997). In assessing whether the movant has met its burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion and all reasonable doubts about the facts should be resolved in favor of the non-movant. *See Denney v. City of Albany,* 247 F.3d at 1181. Even where the basic facts are undisputed, if reasonable minds could differ on the material inferences that should be drawn from these facts, summary judgment is not appropriate. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir.1999). Conclusory allegations will not suffice to create a genuine issue of material facts. *See Leigh v. Warner Bros.,* 212 F.3d 1210, 1217 (11th Cir.2000). There must be more than a scintilla of evidence; there must be "substantial conflict in evidence to support a jury question." *Tidwell v. Carter Prods.,* 135 F.3d 1422, 1425 (11th Cir.1998) *quoting Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989). Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods,* 121 F.3d at 646.

### V. LEGAL ANALYSIS

#### A. The Regulatory Framework as Applied to the Undisputed Facts

The same framework for analysis set forth in the Report and Recommendation regarding the Motion for Preliminary Injunction (DE # 270) and the Report and Recommendation regarding the Motion to Dismiss (DE # 271) applies to the present motion for summary judgment. The CFMA, as codified in Title 7, United States Code, § 2(c)(2)(B)[27] grants the

---

**27.** Title 7, United States Code, § 2(c)(2)(B) provides:

**(B)** Agreements, contracts, and transactions in retail foreign currency

CFTC jurisdiction over all off-exchange foreign currency transactions involving non-eligible contract participants unless the counterparties to the transactions are an entity enumerated in 7 U.S.C. § 2(c)(2)(B)(ii).

Thus, to establish jurisdiction over the transactions at issue here, the undisputed material facts must establish that (1) the customers were not eligible contract participants, and (2) QIX is not a proper counterparty, *i.e.*, is not one of the entities enumerated as exempt from the CFTC's jurisdiction.

Defendants did not challenge the assertion that customers were not eligible contract participants in either their opposition to the Motion for Preliminary Injunction or in their Motion to Dismiss, and also do not mention this issue in their Joint Response in Opposition to Plaintiff's Motion for Summary Judgment. However, in their Statement of Material Facts in Dispute, Defendants assert that the evidence cited by the CFTC fails to establish that customers were not eligible contract participants. The undersigned disagrees. As the record evidence described above reflects, all of the customers whose records are in evidence provided financial information which demonstrates that they did not have the assets required to make them eligible contract participants.[28]

The second determination is whether the undisputed facts establish that QIX was not a proper counterparty. Section 2(c)(2)(B)(ii) provides exemption for a futures commission merchant registered under the Act, and subsection 2(c)(2)(B)(ii)(III) provides for exemption

---

This chapter applies to, and the Commission shall have jurisdiction over, an agreement, contract, or transaction in foreign currency that—

(i) is a contract of sale of a commodity for future delivery (or an option on such a contract) or an·option ...; and

(ii) is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, of the person is—

(I) a financial institution;

(II) a broker or dealer registered under ... the Securities Exchange Act ... or a futures commission merchant registered under this chapter;

(III) an associated person of a broker or dealer registered under ... the Securities Exchange Act ... or an affiliated person of a futures commission merchant registered under this chapter, concerning the financial or securities activities of which the registered person makes and keeps records under ... the Securities Exchange Act ... or section 6f(c)(2)(B) of this title;

(IV) an insurance company described in section 1a(12)(A)(ii) of this title, or a regulated subsidiary or affiliate of such an insurance company;

(V) a financial holding company (as defined in section 1841) of Title 12; or

(VI) an investment bank holding company....

(C) Notwithstanding subclauses (II) and (III) of subparagraph (B)(ii), agreements, contracts, or transactions described in subparagraph (B) shall be subject to sections 6b, 6c(b), 15 and 13b (to the extent that sections 9, 15 and 13b of this title prohibit manipulation of the market price of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any market), 13a–1, 13a–2 and 12(a) of this title if they are entered into by a futures commission merchant or an affiliate of a futures commission merchant that is not also an entity described in subparagraph (B)(ii) of this paragraph.

28. An "eligible contract participant" is defined as an individual who has total assets in excess of $10,000,000.00; or, has assets in excess of $5,000,000.00, and enters into the contract in order to manage the risk associated with an asset owned or a liability incurred by that person. 7 U.S.C. § 1a(12)(A)(xi). Based upon CFTC Investigator Koh's examination of the records, as well as the testimony of the individual investors at the evidentiary hearing, none of the customers met this definition (DE # 4, Ex. 2: Koh Decl. ¶ 19).

for "an affiliated person of a futures commission merchant registered under this Act, concerning the financial or securities activities of which the registered person makes and keeps records under ... section 6f(c)(2)(B) [29] of this Act."

The CFTC contends that QIX was not a proper counterparty under this provision because it was neither an FCM nor an "affiliate" of an FCM within the meaning of subsection (B)(ii)(III). Defendants challenge this assertion, and claim that QIX is exempt from the jurisdiction of the CFTC as an "affiliated person" under this provision. An affiliated person is "any person directly or indirectly controlling, controlled by, or under common control with a futures commission merchant." 7 U.S.C. § 6f(c)(1)(I).

The critical issue in this respect is whether all affiliated persons are exempt as long as the registered FCM keeps records, or whether the exemption applies only where the registered FCM is required to keep records pursuant to § 6f(c)(2)(B). The CFTC contends that because the registered FCMs in the case at bar were not required to keep records, the exemption does not apply, and the fact that the registered FCMs, in fact, decided to keep records is irrelevant. Defendants, on the other hand, contend that since the registered FCMs elected to keep records, they qualify as exempt affiliates.

In the Reports and Recommendations issued with respect to the Motion for Preliminary Injunction and Motion to Dismiss, the undersigned adopted the position of the CFTC. For the reasons stated therein, which are incorporated by reference, the undersigned adheres to this position. Since the undisputed facts establish that QIX was not required to keep records under section 6f(c)(2)(B), the undersigned concludes as a matter of law that it was

not a proper counterparty within the meaning of Section 2(c)(2)(B)(ii)(III). Thus, QIX does not qualify for the exemption from jurisdiction set forth in that provision, and, as specified in Section 2(c)(2)(B)(i)-(ii), Defendants are subject to the provisions of the entire Commodities Exchange Act with respect to Phase II transactions.

Defendants also contend that the only regulations applicable to foreign currency transactions are those which were expressly incorporated by the CFMA. Thus, Defendants contend that the following regulations, which were promulgated prior to the CFMA and have not specifically been made applicable to foreign currency transactions, cannot be enforced by the CFTC in the case at bar: 7 U.S.C. § 6h (which makes it unlawful to falsely represent registration status); Section 32.9 of the Regulations (which prohibits fraudulent conduct in connection with transactions involving off-exchange options); Section 32.11 of the Regulations (regarding the prohibition on off-exchange transactions); 7 U.S.C. § 6(a) (which makes it unlawful to trade off-exchange futures contracts); CFTC Regulation 1.2, 17 C.F.R. § 1.2 and 7 U.S.C. §§ 2(a)(1)(B) and 13c(b) (respectively, principal/agent and control person liability). Defendants contend that the CFTC did not have jurisdiction to regulate off-exchange foreign currency transactions until the enactment of the CFMA. Therefore, none of the pre-existing regulations were applicable to the transactions at issue in the case at bar. Defendants further argue that since 7 U.S.C. § 6c(b), specifically states that regulations "may be made only after notice and opportunity for hearing," and since there was no regulation promulgated which specifically adopts the above regulations to the transactions,

---

**29.** 7 U.S.C. § 6f(c)(2)(B) (footnote added).

there has not been the required hearing and the regulations do not apply.

The CFTC agrees that the regulations at issue were in existence at the time the CFMA was enacted. However, the CFTC contends that when Congress enacted the CFMA to clarify its jurisdiction over certain retail foreign exchange transactions, Congress subjected the Defendants' conduct to the CEA in its entirety. The CFTC emphasizes that Congress is presumed to know the existing law when it enacts legislation, and that a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction (DE # 134 at 24).

Again, for the reasons stated in the Reports and Recommendations issued in connection with the Motion for Preliminary Injunction and Motion to Dismiss, the undersigned concludes that all existing regulations are applicable to the transactions in the case at bar.

Having determined that Defendants are subject to the statutes and regulations which form the basis for the present Complaint, it is now necessary to determine whether they violated those provisions.

### B. *Summary Judgment Should Be Denied as to Count Two*

In Count Two, the Amended Complaint alleges that Defendants Graystone, STG, Arsenault and QIX committed fraud and deceit in the offer and sale of off-exchange foreign currency options, in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. §§ 1.1(b)(1) and (3) and 32.9(a) and (c) (Amended Complaint ¶¶ 122–27).[30]

CFTC Regulations 32.9(a) and (c) make it "unlawful for any person directly or indirectly: (a) [t]o cheat or defraud or attempt to cheat or defraud any other person ... [or] (c) [t]o deceive or attempt to deceive any other person by any means whatsoever; in, or in connection with an offer to enter into, the entry into, or in the confirmation of the execution of, any commodity option transaction." 17 C.F.R. §§ 32.9(a) and (c). It is well-settled that "to establish a claim for fraud, the CFTC has the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir.2002). Unlike a common law fraud claim, however, reliance is not a requisite element in an enforcement action. *Id.* at 1328 n. 6.

In *CFTC v. R.J. Fitzgerald & Co.*, the Eleventh Circuit established the parameters governing the determination of whether fraud has been established as a matter law.[31] There, in a two-to-one decision, the Eleventh Circuit reversed the finding of the District Court, following a bench trial,

---

**30.** The Amended Complaint alleges control person liability, pursuant to 7 U.S.C. § 13c(b), with respect to Defendant Arsenault for the activities of Defendants Graystone and STG (Amended Complaint ¶¶ 99–101, 125). The Amended Complaint further alleges that Defendants Graystone and STG are liable as principals, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, since the acts or omissions complained of were committed by Graystone and STG representatives within the scope of their respective employments (Amended Complaint ¶ 126).

Finally, the Amended Complaint alleges that QIX is liable as a principal, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, for the acts of Graystone and STG as its agent (Amended Complaint ¶¶ 102–08, 127). Defendant Stern is not charged with liability in Count Two. QIX denies the existence of a principal/agent relationship with STG and Graystone. Based upon the finding of material disputed facts with respect to the issue of fraudulent misrepresentations by STG and Graystone, it is not necessary to reach that issue.

**31.** Although *R.J. Fitzgerald & Co.* involved a violation of Regulation 33.10 rather than 33.9, the two regulations contain identical wording, and the same analysis applies.

that the defendants were not involved in fraudulent solicitations and did not attempt to cheat, defraud, or deceive clients. At the outset, the Court discussed each of the required elements of a claim:

Whether a misrepresentation has been made depends on the "overall message" and "common understanding of the information conveyed." For purposes of fraud or deceit in an enforcement action, scienter is established if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct represents an extreme departure from the standards of ordinary care. In the similar context of federal securities law, we have previously stated that scienter is met when Defendant's conduct involves "highly unreasonable omissions or misrepresentations ... that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it." A representation or omission is "material" if a reasonable investor would consider it important in deciding whether to make an investment.

310 F.3d at 1328–29 (internal citations omitted).

There were two primary solicitation devices at issue in *R.J. Fitzgerald*—a commercial advertisement that ran on CNBC and a seminar. The words used in the commercial and in the script used to conduct the seminar were not in dispute. The Court set forth the following recitation of the contents of the commercial:

"[T]he El Nino [weather phenomenon] has struck where expected, and if patterns continue, the effects could be devastating. Droughts, floods, and other adverse conditions could drastically alter the supply and demand dynamics of the corn market.... With the giant developing nations, such as China and Russia badly in need of grains and world grain

supplies put to the test, conditions may exist for profits as high as 200 to 300 percent." This was accompanied by a graphic statement on the television screen that the percentages were a mathematical example of leverage. The Commercial further asserted that "the potential of the corn market may never be greater. Tight U.S. reserves coupled with domestic and worldwide demands could be the formula for a trade you won't want to miss. Find out how as little as $5,000 could translate into profits as high as 200 to 300 percent. Call R.J. Fitzgerald today...."

310 F.3d at 1325.

The Court described the seminar script as follows:

The Seminar informed customers that weather patterns, political events, and historical trends can affect the prices of certain commodities. The Seminar also told customers that technical analysis could assist them in the commodity options market, since "history often repeats itself" and "past price action can provide you with clues to future action." Customers were told they could "take advantage" of "fundamental" market moves such as weather events and political events and "technical theory" such as past market movements through either futures or options investing. The Seminar also drew a distinction between investment instruments based on the quantum of risk involved: Which one you choose depends on how aggressive or what degree of risk you wish to take on. If you are highly aggressive and looking for unlimited profit potential as well as unlimited risk than it would be the futures. But most would like something less aggressive, something offering unlimited profit potential but limited risk-option trade.

On the topic of risk, the Seminar additionally told potential customers: "options on futures allow investors and risk managers to define risk and limit it to the loss of a premium paid for the right to buy or sell a futures contract while still providing ... unlimited profit potential.

The ... employees who conducted the Seminar offered what the Seminar script deemed a "very exciting" illustration of how profits could be made on options. Specifically, the Seminar focused on the commodity heating oil, explaining that for the last eighteen years, there was an average increase in that commodity "of 22 cents from the low to the high in the price range" and that a $5,000 investment on a heating oil futures contract would result in $46,200 if there was a 22 cent move in the price. Customers were told that if they wanted "limited risk," they could invest in an option contract, where they would receive "approximately 50% of that profit –46,200 divided by 2 equals $23,100."

310 F.3d at 1326–27.

The Court concluded that read for its overall message, and how that message would be interpreted by an objectively reasonable television viewer, it overemphasized profit potential to such an extent that it was deceptive and misleading as a matter of law. The fact that boilerplate risk disclosure language was also included was unavailing. The Court noted that numerous cases had held that a general risk disclosure statement does not preclude liability where the overall message is clearly and objectively misleading or deceptive.

In addition, the Court found as a matter of law that the element of scienter was established because Defendants acted recklessly with respect to the statements made in the commercial. This conclusion was based upon the fact that the Court and the CFTC had previously condemned

attempts to attract customers by "(1) linking profits expectations on commodities options to known and expected weather events, seasonal trends and historical highs; (2) suggesting that the commodities market can be correctly timed to generate large profits; and (3) substantially inflating option profit expectations while downplaying risk of loss." 310 F.3d at 1330.

Finally, the Court concluded that the misrepresentations were material because, "It is too obvious for debate that a reasonable listener's choice-making process would be substantially affected by the emphatic statements on profit potential (200–300%) and the suggestion that known and expected weather events are the vehicle for achieving those enormous profits." 310 F.3d at 1330.

The seminar was found to be similarly fraudulent and deceptive as a matter of law:

> Like the Commercial, the Seminar, when viewed in its entirety, suggests to a reasonable listener that [Defendant] has a reliable strategy in place for increasing profits and limiting losses. Like the Commercial, it presents a distinctly unbalanced picture between the potential for profit and the potential for loss in options, inflating one while downplaying the other.

310 F.3d at 1331.

However, although the CFTC presents a convincing argument for finding fraud as a matter of law; viewing the evidence and all inferences in the light most favorable to Defendants, the undersigned cannot conclude that the CFTC has met its burden. Unlike the commercial set forth in *R.J. Fitzgerald,* and the radio advertisements of Sterling, the present record does not have a tape or transcript of the radio advertisements used by STG or Graystone. The record is not clear with respect to what was said; and, the CFTC

does not rely on those ads with respect to the liability of STG and Graystone. Rather, the CFTC relies on the script, the training materials, the handwritten documents of brokers that were seized when this case was brought, and one tape recorded broker solicitation. The undersigned cannot conclude that the script before the Court here, which is recited in its entirety in the Statement of Facts, and which contains blank spaces for the discussion of potential profits, is materially misleading as a matter of law. The script does not reflect the entirety of the conversation between the customer and the sales person. As salesperson Andre Stepsky testified, they were told to adapt the script to their personality, were never allowed to "sell dirty" and "were always told to sell the risk as much as the reward" (DE # 211 at 56).

In addition, the undersigned is not free to weigh the credibility of Arsenault and Stern with respect to efforts to ensure that fraudulent and misleading statements did not occur. Defendant Arsenault, according to his Declaration, considered compliance to be an important part of any investment-related operation, and did not want any person to become a client who did not understand the nature, mechanics and risks involved in foreign currency transactions. Nor did he want persons investing who, if money was lost, would experience a diminution of their lifestyles. From time to time, Arsenault prohibited persons from trading or refused to allow them to become customers based upon conversations with them, review of their application materials or other information. In addition, there were taped compliance calls to make certain that the customer understood the nature, mechanics and risks of the transaction involved, had not been guaranteed profits, and that no representations had been made by the broker contrary to those contained in the customer agreement and disclosure statement. Stern testified that,

on behalf of QIX he ordered audits to ensure the propriety of operations by Graystone.

To be sure, the materials seized demonstrate fraudulent practices, assuming they were used in connection with the solicitation of customers with either the knowledge or reckless disregard on the part of Defendants. However, the record is not sufficiently complete or undisputed to determine the liability of Defendants as a matter of law.

Therefore, the undersigned recommends that summary judgment be denied as to Count Two.

### C. Summary Judgment Should Be Granted as to Count Five

In Count Five, the Amended Complaint alleges that Defendants STG, Graystone, QIX, Arsenault, and Stern violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.11(a) through the offer and sale of commodity options not conducted or executed on, or subject to the rules of a contract market or a foreign board of trade (Amended Complaint ¶¶ 137–41). The Amended Complaint alleges that Defendant Arsenault is liable for these violations as a control person with respect to Graystone and STG; and that Defendant Stern is liable as a control person of QIX.

Title 7, United States Code, Section 6c(b) provides that "no person shall offer to enter into or confirm the execution of, any transaction involving any commodity regulated under this Act which is of the character of, or is commonly known to the trade as, an "option," contrary to any rule, regulation or order of the Commission prohibition any such transaction." CFTC Regulation 32.11(a), 17 C.F.R. § 32.11(a), states that it is unlawful for any person to solicit or accept orders for the purchase or sale of any commodity option, except for commodity option transactions conducted

or executed on or subject to the rules of a contract market.

■ In the case at bar, it is undisputed that STG, Graystone and QIX were soliciting, accepting funds for and offering to enter into foreign currency option transactions that were not traded on either a contract market or foreign board of trade. The essence of Defendants' contrary argument is that they were not subject to Rule 32.11(a) since they were eligible counterparties exempt from this regulation, and that the regulation is inapplicable because it was not adopted after Forex became subject to regulation. As stated above, both of these legal arguments are rejected.[32]

Therefore, the undersigned concludes that STG, Graystone and QIX violated the provisions of the CEA and Regulation 32.11(a) in connection with the transactions at issue in the case at bar, which involved parties who were not eligible contract participants.

■ In addition, it is clear that Defendants Arsenault and Stern were controlling persons with respect to this violation. Title 7, United States Code, Section 13c(b) provides:

> Any person who, directly or indirectly, controls any person who has violated any provision of this Act or any of the rules, regulations, or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

The scope of this provision was explained by the Court in *CFTC v. Gibraltar Monetary Corp.*, No. 04–80132–CIV–DIM-ITROULEAS, 2006 WL 1789018 (May 30, 2006):

> A fundamental purpose of this Section, "is to allow the [CFTC] to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the [CEA] directly on such individuals as well as on the corporation itself." *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995)....
>
> The CFTC bears the burden of demonstrating "controlling person" liability. *CFTC v. Midland Rare Coin Exch., Inc.* 71 F.Supp.2d 1257, 1265–66 (S.D.Fla. 1999). To prove "controlling person" liability the CFTC must demonstrate that the (1) corporation violated the CEA; (2) defendants "directly or indirectly" controlled the corporation; and (3) defendants failed to act with good faith, or knowingly induced the acts that constitute the violations. *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir.2002). This "controlling person" standard is satisfied when an individual has actual or constructive knowledge of the activities that constitute the violation and allows them to continue. *Commonwealth Fin. Group, Inc.*, 874 F.Supp. at 1357. For "controlling person" liability the focus is upon the power to control not whether that power is actually exercised.

*Id.* at *18. *Accord CFTC v. Next Fin. Serv. Unltd., Inc.*, No. 04–80562–CIV–RYSKAMP, 2006 WL 889421 (Mar. 30, 2006).

In the case at bar, it is clear that both Arsenault and Stern had the power and

---

**32.** In view of the determination that QIX is not an eligible counterparty, it is unnecessary to determine whether Regulation 32.11 is among those regulations as to which Congress reserved the enforcement jurisdiction of the CFTC pursuant to 7 U.S.C. § 2(c)(2)(C).

the ability to control the activities of their respective companies with respect to the decision to engage in off-exchange trading of foreign currency options. Neither Arsenault nor Stern appear to challenge their control in this respect. Arsenault has not disputed his extensive involvement and control over the operations of STG and Graystone, challenging only the fact that he was aware of any fraud or misrepresentations, and contending that he took extensive steps to eliminate such abuses. Stern disputes his control over the day-to-day operations, but does not appear to dispute his ultimate decision-making authority to control the type of business in which QIX engaged, or that he is the person who established QIX for the purpose of engaging in off-exchange foreign currency transactions.

The CFTC notes that Defendants argue that the regulatory scheme is "incomprehensible" and imply that they should not be held liable because they acted without scienter. However, Defendants have not claimed that scienter is an element of a violation of Regulation 32.11(a), and the CFTC correctly notes that it is not. This Regulation is an absolute prohibition against off-exchange trading of commodity options, regardless of intent, and Defendants have not argued otherwise.[33] *See generally CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 773 (9th Cir.1995) (holding that 7 U.S.C. § 6(a) does not have a scienter element); *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir.1985) (finding willfulness established under the CEA) "(if a person 1) intentionally does an act which is prohibited, irrespective of evil motive or reliance on erroneous advice, or 2) acts with careless disregard of statutory requirements").

However, the issue of intent is relevant to the issue of whether injunctive relief is required. The undersigned notes that, in its Motion for Summary Judgment, the CFTC has requested a hearing to determine amounts to be assessed for restitution and/or disgorgement, civil monetary penalties, and interest (DE # 202 at 1). In view of the contested facts concerning whether there was a good faith attempts by Arsenault and Stern to determine whether they were required to comply with this regulation, the undersigned has determined that the hearing should also encompass the need for the requested injunctive relief, and the scope of that relief.

### D. *Summary Judgment Should Be Denied as to Count Four*

In Count Four, the Amended Complaint alleges that Defendants QIX and Stern violated 7 U.S.C. § 6h by falsely representing that QIX was a member of a registered entity and/or that QIX was a registrant under the Act (Amended Complaint ¶¶ 134–36). The Amended Complaint alleges that Stern is liable as a controlling person with respect to QIX, pursuant to 7 U.S.C. § 13c(b) (Amended Complaint ¶¶ 98, 136). Defendants Graystone and STG are not charged with liability in Count Four.

Although the underlying facts concerning these written representations are undisputed, there is considerable dispute about the inferences to be drawn from those facts. In general, summary judgment is not appropriate even where the underlying facts are undisputed if the inferences which may be drawn from those facts remain in dispute.

Defendants contend that the representations were not misleading, and that to the

---

**33.** With the caveat that Defendants have argued that this provision does not apply to their transactions at all. That is to say, Defendants have not disputed that Regulation 32.11(a) was violated *if* it applies to them and to foreign currency transactions.

extent that the initial statement in the account opening documents was viewed by the NFA as "potentially misleading," it was corrected. The CFTC asserts that inclusion of the risk disclosure statement is misleading because, even though it accurately discloses the risks applicable to the transactions at issue, the statement is required only for registered FCMs, which QIX is not (DE # 220, Att. A at 9). The CFTC contends that by including a risk disclosure document that was promulgated for registered entities, the customers were misled into believing that QIX was registered. In addition, the CFTC claims that by including in the account documents an arbitration clause pursuant to the Commission Regulations, despite Defendants' claim that they are not subject to the jurisdiction of the Commission, QIX further misled the customers into believing that QIX was a Commission registrant. CFTC Investigator Koh testified, however, that he was not sure of the availability of arbitration by agreement with respect to off-exchange foreign currency transactions; and Defendant Stern testified that he believed that such proceedings occurred and that QIX intended to be bound by those provisions. Moreover, it is now established that the transactions at issue are subject to the jurisdiction of the CFTC. In any event, it appears that the relief sought here is moot based upon the determination that the transactions were illegal *vel non.* Therefore, the undersigned recommends that summary judgment be denied as to Count Four. The evidence concerning these alleged misleading statements, of course, remains admissible in connection with the claim of fraud asserted in Count Two.

VI. *CONCLUSION*

Based upon the foregoing analysis, it is hereby

**RECOMMENDED** that the CFTC's Motion for Summary Judgment be **GRANTED** as to liability on Count Five, and otherwise **DENIED**.

**DONE AND SUBMITTED** in chambers, in Miami, Florida, on July 30, 2007.

The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the United States District Judge to whom this case is assigned. Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein. *LoConte v. Dugger,* 847 F.2d 745 (11th Cir.), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *RTC v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993).